# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT
## CASE NO. 22-10480

---

### IRISH JENKINS, Appellant,

### v.

### KOCH FOODS, INC., et al., Appellees.

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION
### Case No. 2:17-cv-364-RAH

---

### APPELLANT IRISH JENKINS' OPENING BRIEF

---

Charles E. Guerrier
Alicia K. Haynes
Co-Counsel for Appellant

Of Counsel:
HAYNES & HAYNES, P.C.
1600 Woodmere Drive
Birmingham, AL 35226
(205) 879-0377
ceguerrier@haynes-haynes.com
akhaynes@haynes-haynes.com

Cynthia Wilkinson
WILKINSON LAW FIRM PC
1717 3rd Avenue North, Suite A
Birmingham, AL 35203

Heather Leonard
HEATHER LEONARD, PC
2105 Devereuz Circle, Suite 111
Birmingham, AL 35242
(205) 977-5421

Date: June 15, 2022

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT
### No. 22-10480 Irish Jenkins v. Koch Foods Inc., et al.

Pursuant to Rule 26.1, Fed. R. App. Proc., 11th Circuit Rule 26.1-1, the undersigned counsel of record for the Appellant Irish Jenkins hereby certifies the following as a complete list of the trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal (including subsidiaries, conglomerates, affiliates, parent corporations, and any publically held corporation that owns 10% or more of a party's stock), and other identifiable legal entities related to a party that have an interest in this case.

**Magistrate Judge Jerusha T. Adams**;

**Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.** – Counsel for Defendants-Appellees Koch Foods, Inc., and Koch Foods of Alabama, LLC;

**Andrew J. Baer** – Counsel for Defendants-Appellees Birchfield and McDickinson;

**Magistrate Court Judge David A. Baker**;

**Barlotta, Rachel V.** – Counsel for Defendants-Appellees Koch Foods, Inc., and Koch Foods of Alabama, LLC;

**Birchfield, David** – Defendant-Appellee;

**District Court Judge Andrew L. Brasher**;

**Magistrate Judge Wallace Capel, Jr.**;

C1 of 4

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT
### No. 22-10480 Irish Jenkins v. Koch Foods Inc., et al.

**Magistrate Judge Stephen Michael Doyle**;

**Edwards, Sonya** – Former Counsel for Plaintiff;

**Elrod, Bobby** – Employee of Defendants-Appellees Koch Foods, Inc., and/or Koch Foods of Alabama, LLC;

**Fancher, Sharonda Childs** – Counsel for Defendants-Appellees Koch Foods, Inc., and Koch Foods of Alabama, LLC;

**Fisher Phillips LLP** – Counsel for Defendants-Appellees Melissa McDickinson and David Birchfield;

**Goerdt, Corey Joseph Myers** – Counsel for Defendants-Appellees Melissa McDickinson and David Birchfield;

**Guerrier, Charles, E.** – Counsel for Plaintiff-Appellant;

**Haynes, Alicia K.** – Counsel for Plaintiff-Appellant;

**Haynes & Haynes, PC** – Counsel for Plaintiff-Appellant;

**Heather Leonard, PC** – Counsel for Plaintiff-Appellant;

**District Court Judge R. Austin Huffaker, Jr.**;

**Koch Foods of Alabama, LLC** (an Alabama corporation, wholly owned by Koch Foods, Inc.) – Defendant-Appellee;

**Harmon, Bart Gregory** – Counsel for Alabama Department of Corrections Legal Division, Movant in the District Court;

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT
### No. 22-10480 Irish Jenkins v. Koch Foods Inc., et al.

**Jackson, Steven** – Witness;

**Karlson, Daisy Christina** – Counsel for Defendants-Appellees Koch Foods,Inc. and Koch Foods of Alabama, LLC;

**Koch Foods, Inc.** (a privately-held corporation) – Defendant-Appellee;

**Leonard, Heather Newsom** – Counsel for Plaintiff-Appellant;

**District Court Judge Emily C. Marks**;

*Reese, Annalese Herndon* – Counsel for Defendants-Appellees Melissa McDickinson and David Birchfield;

**Smith, Ashley Nicole**, Miller Smith, LLC – Counsel for Steven Jackson;

**Stewart, Joseph Gordon, Jr.** – Counsel for Alabama Department of Corrections Legal Division, Movant in the District Court;

**District Court Judge Myron H. Thompson**;

**Walker, Marion F.** – Counsel for Defendants-Appellees Melissa McDickinson and David Birchfield;

**Wilkinson, Cynthia Forman** – Counsel for Plaintiff-Appellant;

**Wilkinson Law Firm PC** – Counsel for Plaintiff-Appellant

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT
### No. 22-10480 Irish Jenkins v. Koch Foods Inc., et al.

Pursuant to Fed. R. App. P. 26.1, counsel also makes the following disclosures:

1.    For non-governmental corporate parties, please list all parent corporations: **Koch Foods of Alabama, LLC** and **Koch Foods, LLC** are wholly-owned by **Koch Foods, Inc.**

2.    For non-governmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock: **NONE.**

Respectfully submitted,

*/s/ Charles E. Guerrier*
Charles E. Guerrier
Attorney for Appellant Irish Jenkins

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. This case presents the Circuit with important questions concerning sexual and racial harassment in the workplace.

Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminate[s] on the basis of sex." *Meritor Savings Bank v. Vinson*, 477 U.S. 47, 64 (1986) (internal quotation marks omitted). Whether the subordinate's submission to the advances were believed by the perpetrator to be "voluntary" or "consensual" is not determinative; the correct question is whether the subordinate found the advances to be unwelcome. *Id.* at 68.

This case presents the following special questions:

1.     Assuming the existence of a sexual relationship between a subordinate and his supervisor outside the workplace, is it unlawful for the supervisor to use her position to compel the subordinate to engage in sexual conduct in the workplace?

2.     Must a plaintiff who is subjected to unwelcome sexual advances in the workplace identify a "similarly situated" comparator in order to survive a motion for summary judgment?

 */s/ Charles E. Guerrier*
Charles E. Guerrier
Attorney for Appellant Irish Jenkins

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS
    AND CORPORATE DISCLOSURE STATEMENT. . . . . . . . . . . . . C1 of 4

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

    Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

    Statutes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

    Rules. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  vi

STATEMENT REGARDING ADOPTION OF
    BRIEFS OF OTHER PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

CITATIONS TO THE RECORD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  viii

STATEMENT OF SUBJECT MATTER
    AND APPELLATE JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Subject Matter Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Appellate Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . 2

STANDARDS OF REVIEW FOR EACH CONTENTION. . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Statement of Disputed and Undisputed Facts. . . . . . . . . . . . . . . . . . . . 3

Course of Proceedings Below................................... 26

SUMMARY OF ARGUMENT....................................... 31

ARGUMENT................................................... 32

I.    Jenkins Was Subjected To Sexually-Hostile Work Environment......... 32

      A.    Evidence Of McDickinson's And Birchfield's Involvement....... 32

      B.    Evidence Of The Causal Link............................... 34

      C.    Evidence Of Pretext...................................... 36

II.   Jenkins Was Subjected To Race Discrimination And Harassment......... 39

      A.    Jenkins Belongs To A Protected Group...................... 42

      B.    Jenkins Was Subjected To Sexual Advances Because
            Of His Race And Sex..................................... 43

      C.    The Harassment Was Severe Or Pervasive.................... 45

      D.    The Harassment Was Unwelcome............................ 49

III.  Jenkins' State Law Torts................................... 55

CONCLUSION................................................ 56

CERTIFICATE OF COMPLIANCE................................... 58

iii

## TABLE OF CITATIONS

**Cases:**

*Burlington Industries v. Ellerth*, 524 U.S. 742 (1998). . . . . . . . . . . . . . . . . . . . . . 45

*Cooke v. Stefani Management Services, Inc.*, 250 F.3d 564 (7th Cir. 2001). . . . . . 50

*EEOC v. Prospect Airport Services, Inc.*, 621 F.3d 991 (9th Cir. 2010). . . . . . 42, 52

*EEOC v. Reeves & Assocs.*, 68 Fed. App'x 830 (9th Cir. 2003). . . . . . . . . . . . . . 48

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). . . . . . . . . . . . . . . . . . 45, 46

*Hare v. H&R Indus., Inc.*, 67 Fed. Appx 114 (3rd Cir. 2003) . . . . . . . . . . . . . . . 48

*Harvey Fuller and Ka'Toria Gray v. Koch Foods of Alabama, LLC, et al.*, 2:17-cv-00595 (M.D. Ala.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

*Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982). . . . . . . . . . . . . . . . . . 43

*Hulsey v. Pride Rests*, 367 F.3d 1238 (11th Cir. 2004). . . . . . . . . . . . . . . . . . 45, 46

*Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re United States Pipe & Foundry Co.*, 32 F.4th 1324 (11th Cir. 2022). . . . . . . . 2

*Jennings v. Univ. of N. Carol.*, 482 F.3d 686 (4th Cir. 2007). . . . . . . . . . . . . . . . 48

*Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501 (11th Cir. 2000). 40, 46

*Martin v. Nannie & The Newborns, Inc.*, 3 F.3d 1410 (10th Cir. 1993) . . . . . . . . . 41

*Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999). . . . . . . . . . . . . . . . . . 47

*Meritor Savings Bank v. Vinson*, 477 U.S. 47 (1986) . . . . . . . . . . . i, 40, 49, 50, 53

*Moye v. Fleming Co., Inc.*, 924 F.Supp.1119 (M.D. Ala. 1996). . . . . . . . . . . . . 48

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) . . . . . . . . . . . 42

*Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933 (6th Cir. 2000), *rev'd on other grounds*, 532 U.S. 843 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798 (11th Cir. 2010). . . . . . 45

*Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486 (M.D. Fla. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Tina Boyd, et al. v. Koch Foods of Alabama, LLC, et al.*, 2:11-cv-00748 (M.D. Ala.).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

*Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307 (11th Cir. 2002). . . . . . . . . . . . . . . 2

**Statutes:**

28 U.S.C. §41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1367. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1391. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. §1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 26

42 U.S.C. §2000e *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

42 U.S.C. §2000e-2(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 40

42 U.S.C. §2000e-5(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Rules:**

11th Circuit Rule 26.1-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C1 of 4

Rule  4(a)(1)(A), Fed. R. App. Proc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Rule 26.1, Fed. R. App. Proc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C1 of 4

Rule 32(a)(5), Fed. R. App. Proc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Rule 32(a)(6), Fed. R. App. Proc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Rule 32(a)(7)(B)(1), Fed. R. App. Proc.. . . . . . . . . . . . . . . . . . . . . . . . . . 58

Rule 32(f), Fed. R. App. Proc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

The Appellant does not adopt any portion of the brief of any other party to this

appeal.

                                    */s/ Charles E. Guerrier*
                                    Charles E. Guerrier
                                    Attorney for Appellant Irish Jenkins

## CITATIONS TO THE RECORD

Citations to all documents other than depositions will be in the form "Docket number:page number" as assigned by CM/ECF.  Pin citations to depositions will be to the Docket number, assigned by CM/ECF, followed by the actual page and lines of the deposition.  Additional information may be provided if necessary to identify the item being referenced.  Paragraph or section symbols (¶§) will be used as appropriate.

The environment at Koch Foods of Alabama, LLC, spawned a number of lawsuits: *Tina Boyd, et al. v. Koch Foods of Alabama, LLC, et al.*, 2:11-cv-00748 (M.D. Ala.); *Jenkins v. Koch Foods of Alabama, LLC, et al.*, 2:17-cv-00364 (M.D. Ala.); *Harvey Fuller and Ka'Toria Gray v. Koch Foods of Alabama, LLC, et al.*, 2:17-cv-00595 (M.D. Ala.)   *Fuller* and *Gray* were subsequently severed and proceeded separately. Evidence from all four cases was relied upon at summary judgment.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

**Subject Matter Jurisdiction**

Appellant Irish Jenkins ("Jenkins") asserted three federal and four state law claims against the various Defendants (Koch Foods of Alabama, LLC; Koch Foods, Inc.; Melissa McDickinson; David Birchfield): Title VII sexual harassment, 42 U.S.C. §2000e-2(a)(1); Title VII sex discrimination and harassment; Title VII and 42 U.S.C. §1981 race discrimination and harassment; Title VII and §1981 retaliation; Invasion of privacy; assault and battery; negligent and wanton retention and training; and intentional infliction of emotional distress. Subject matter jurisdiction was premised on 28 U.S.C. §1331 and 42 U.S.C. §2000e-5(f)(3) as to the federal causes of action. Supplemental jurisdiction over the state law claims existed pursuant to 28 U.S.C. §1367. Personal jurisdiction and venue exists pursuant to 28 U.S.C. §1391.

**Appellate Jurisdiction**

Appellate jurisdiction is founded on 28 U.S.C. §41 and 28 U.S.C. §1291. The District Court granted summary judgment on January 14, 2022, and final judgment was entered that day. (Doc. 222; Doc. 224.) Jenkins filed his timely notice of appeal (Doc. 226) on February 11, 2022, within 30 days after entry of the final judgment. Rule 4(a)(1)(A), Fed. R. App. Proc.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Did the District Court err in granting summary judgment on Appellant's discrimination claims?

2.      Did the District Court err in granting summary judgment on Appellant's state law claims?

3.      Must an employee, who alleges he was subjected to unwelcome race-based sexual advances in the workplace, identify a "similarly situated" comparator in order to survive a motion for summary judgment?

4.      Assuming the existence of a sexual relationship between a supervisor and her subordinate outside the workplace, is it lawful for the supervisor to use her position to compel the subordinate to engage in sexual conduct in the workplace?

## STANDARDS OF REVIEW FOR EACH CONTENTION

The grant of summary judgment, including the interpretation and application of the law, is reviewed *de novo*, applying the same legal standards that governed the district court. *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002); *In re United States Pipe & Foundry Co.*, 32 F.4th 1324, 1329 (11th Cir. 2022).

## STATEMENT OF THE CASE

**Statement of Disputed and Undisputed Facts**

Koch Foods of Alabama, LLC ("Koch-Ala") is a chicken processing facility in Montgomery, Alabama. It is a wholly-owned subsidiary of Koch Foods, Inc. ("Koch-Inc.") (Doc. 272-11:31:12-32:23.) Koch-Ala has three facilities at its Montgomery complex: the kill plant, the debone plant, and a hatchery. *Id.* The kill and debone facilities have separate human resources departments, each with its own manager. Melissa McDickinson ("McDickinson"), a white female, was the HR manager for the debone plant. (Doc. 189-7:20:11-14;77:16;236:3-15.) Shawnetta Collins was the HR manager at the kill plant. (Doc. 189-8:250:9:11-10:16.) They both reported to the Complex HR Manager, David Birchfield "Birchfield"). (McDickinson 20:11-17.) Birchfield was responsible for ensuring the workplace was free of sexual harassment. (Doc. 189-6:103:19-104:2.) As part of this responsibility, Birchfield would conduct annual harassment training. (Doc. 192-3:19:18-20:8;21:7-16.) According to Birchfield, employees and managers of the HR department are held to a higher standard than others because they are the gatekeepers of the employment policies. (Doc. 192-3:18:6-13; Doc. 189-6:18:6-13;225:16-18;374:19-375:16.)

Birchfield hired McDickinson in late 2014. (Doc. 192-1:237:21-238:2;240:11-

15.)  She was trained on the sexual harassment policy.  (Doc. 189-7:106:2-7; Doc. 176-27.)

Koch-Ala also has an anti-fraternization policy that prohibits employees from fraternizing with employees they supervise, or dating or engaging in intimate relationships with anyone under their direct supervision.  Intimate means an "in depth personal relationship. ... Don't be involved at a very deep level with people you work with or supervise or indirectly supervise."  (Doc. 192-3:52:17-55:1.)

Early in McDickinson's employment, employees concluded, from their observations and what they heard, that Birchfield and McDickinson were romantically involved.  (Doc. 189-9:77:22-81:7.)  Birchfield let Randy Sharpley, Chief Union Steward, know he was intimate with McDickinson, talking "hoochie coochie" talk with her while on speaker phone in Sharpley's presence and talking about the color of her panties and tattoos.  (Doc. 189-15:61:7-62:8; 64:3-19;165:19-22;166:16-167:6;169:3-170:17;171:7-172:2.)  McDickinson also discussed her sexual escapades outside of her marriage with HR staff and allowed Laura Cortes[1] to listen while she discussed sexual positions with a Koch employee at another facility. (Doc. 189-9:87:3-88:9;251:9-254:18.)

---

[1]At a party McDickinson hosted, Cortes became uncomfortable with McDickinson's inappropriate and sexually suggestive conduct.  (Doc. 189-9:188:6-190:15.) Cortes stopped being friends with McDickinson.  (Doc. 189-9:87:3-21;250:3-255:1;287:13-288:23.)

4

Irish Jenkins ("Jenkins" or "Appellant"), an African-American male, was hired by Koch-Ala to work at its debone facility in 2013. (Doc. 182-2:274:20-275:3.)  An ex-felon, he was living in a half-way house when he was hired by Koch-Ala. (Doc. 182-2:35:19-37:3.)  He was a good worker and, in April 2014, Koch-Ala promoted Jenkins to the position of inventory clerk in the purchasing department.  (Doc. 192-15.) By the summer of 2015,  Jenkins was reporting to Anthony Lasner.  (Doc. 182-2:59:14-60:16.)

Jenkins' job took him all over the plant.  (Doc. 182-2:64:1-9.)  Further, if he finished his duties as inventory clerk he would help out in other departments, shrink-wrapping pallets, writing-up the trucks. "Whatever was needed." (Doc. 182-2:64:12-65:5; Doc 189-15:34:32:12-20.)  That is not to say Jenkins did not have problems integrating into the workplace. He did.  (Doc. 182-2:49:21-51:6; 78:9-15; Doc. 176-26:137:4-138:12; 153:15-155:2.)  But despite these issues, Jenkins was considered to be a reliable, hard-working employee.   (Doc. 189-15:16:9-17:2; Doc. 189-6:166:275.)  And Jenkins felt he was blessed to have a job. (Doc. 182-2:86:13-14.)

Jenkins also frequently worked overtime on weekends in the Waste Water Department under the supervision of Randy Sharpley.  (Doc. 182-2:67:13-17; Doc. 189-15:34 3.)  Sharpley considered Jenkins a good worker and heard no complaints about his work.  (Doc. 189-15:36-37.)  Because this weekend work was scheduled to

5

begin later than Jenkins' weekly schedule, he, along with others who worked on the weekend, would have problems clocking in.  He would often be listed as "absent" or "tardy." This would cause him unjustly to accrue a disciplinary "point."  (Doc. 182-2:68:3-69:6.)

Jenkins considered himself a vulnerable employee and McDickinson knew this. As HR manager over the plant where Jenkins was employed, she was familiar with Jenkins' background and his criminal record.  (Doc. 182-2:131:2-19.) Not long after being hired, McDickinson approached Jenkins in his department and told him he should start taking smoke breaks with her in the back smoking area.  (Doc. 182:2:115:8-18.) Jenkins was concerned about McDickinson's directive because the smoking area was not near his department and he felt that he would be in trouble with his department for taking these breaks with McDickinson in another area of the plant. (Doc. 182-2:115:8-18.)  Jenkins opined: "I guess she was like showing me she did what she wanted to."  (Doc. 182-2:115:8-12.)

Taking smoke breaks while working were commonplace at Koch-Ala. Sharpley smoked while employed by Koch-Ala and he never had to clock-out to take a smoke break.  (Doc189-15:25:11-26:7.)  He never saw employees filing grievances with the Union for being fired for taking a smoke break.  *Id.*  Sharpley took smoke breaks with Birchfield, where they would smoke in front of the building, an area not

designated for smoking. (Doc. 189-15:28:7-29:19.) Birchfield smoked with Jenkins more times than he could count. (Doc. 189-6:370:10-14.) Sharpley smoked cigarettes with McDickinson standing outside the door to Human Resources. (Doc. 189-15:29:20-30:12.) When Jenkins would finish his regular sift and volunteer to help Sharpley, Sharpley allowed Jenkins and other employees to smoke outside the wastewater area because he did not want them to stop working to go smoke in a designated smoking area. (Doc. 189-15:31:13-32:20.)

Johngerita Foxhall would leave the production line to smoke with McDickinson and Jenkins after her own break, when she was not supposed to be there. (Doc. 189-11:44:15-45:10; 135:21-136:13.) McDickinson never disciplined Foxhall about smoking on the clock. (Doc. 189-11:45:11-14;136:14-19;137:9-23;152:5-22.)

During these breaks, McDickinson would touch Jenkins and stroke his hair, despite his protestations that she not do it. (Doc. 182-2:128:10-129:4;275:8-13.) Every time McDickinson encountered Jenkins she made it a sexual encounter. *Id.* She urged Jenkins to leave his fiancé, who also worked at the facility. (Doc. 182-2:131:20-132:14.) She would describe her sexual preferences to Jenkins, including telling him that black guys were different, better, and bigger; she would put her hands

7

in his hair and tell him she did not wear panties. (Doc. 182-2:129:1-4;274:20-275:17.)

McDickinson enlisted other employees in her seduction of Jenkins. She instructed another employee, Steven Jackson, to give Jenkins her phone number and tell Jenkins that she liked him and wanted to talk. (Doc. 182-2:100:1-4;18-23;101:8-15.) While Jackson gave Jenkins the number, Jenkins did not then call McDickinson. (Doc. 182-2:101:4-7.)

Not content with Jenkins' responses, McDickinson "started having sexual contact with [Jenkins]. She forced herself on [him]." (Doc. 182-2:189:15-16.) On one occasion, Jackson invited Jenkins to join him, McDickinson, and Rebecca Milam (another Koch-Ala employee and McDickinson's sister-in-law) to have a drink at a local bar. McDickinson used this opportunity to flirt with Jenkins, to tell him she was attracted to him sexually and was interested in pursuing a sexual relationship with him. (Doc. 189-3:84.) McDickinson did this despite knowing that, as a supervisor, having a sexual relationship with a subordinate would violate Koch-Ala's policies and could result in her termination. (Doc. 189-7:92:22-93:7;93:13-94:5.) Eventually, Jenkins acceded to a McDickinson's pressure to engage in sexual activity.[2] (Doc. 189-3:84.)

---

[2]In his deposition, Jenkins testified that he did not know the meaning of the word "consensual." (Doc. 182-2:334:10-336:3.)

8

Jenkins' first sexual encounter with McDickinson occurred at work.[3] McDickinson called the receiving department and told Jenkins to meet her inside the "cage," an enclosed area in his department. (Doc. 182-2:113:13-114:7; 46:21-148:7;375:11-382:11;389:5-15.) Once inside the cage, McDickinson kneeled down by a filing cabinet and began going through files, as if looking for something. As Jenkins stood there, waiting to assist with the files, McDickinson reached up and began fondling Jenkins' genitals. McDickinson then unzipped Jenkins' pants, exposed his penis, and began performing fellatio on him. (Doc. 182-2:113:13-114:7; 117:13-119:9;146:21-148:7;375:13-382:11;389:5-15.) Jenkins tried to step away but McDickinson continued performing oral sex on him. (Doc. 182-2:376:20-378:10.) Jenkins was shocked by McDickinson's assault, but remained in the cage while she was assaulting him. (Doc. 182-2:119:13-17;120:10-16.) When asked during his deposition why he did not turn around and walk away from McDickinson, Jenkins responded: "I didn't have anything. I needed my job, so I went through with it, man, to keep my job." (Doc. 182-2:119:13-17;120:10-16.) When Appellee's counsel suggested that he could have put his hands on McDickinson and push her away, Jenkins responded: "Put my hand on her? No. Push her and go back to prison? No.

---

[3]McDickinson denies ever engaging in any sexual conduct with Jenkins. (Doc. 177-1:4 fn. 2.)

I just – I don't know, man. I just had got a blessing to get a job and I wanted to keep it. God blessed me with that job. So I just – I went along what she asked me, what she did. She said she had me, man. She got me." (Doc. 182-2:120:17-121:2.) Jenkins understood McDickinson had authority over him and she made certain he knew she was in charge and could cause him to lose his job. (Doc. 182-2:122:5-124:20.) Birchfield described Jenkins as someone who is easily influenced by a stronger personality, a "go-along" type. (Doc. 189-6:293:18-294:12.)

After this first encounter, McDickinson continued to seek out Jenkins at work for sex. One morning, when Jenkins arrived at his office at 4:30 a.m., he found McDickinson waiting for him in his office space, and she proceeded to have sexual intercourse with him in the receiving department. (Doc. 182-2:173:20-174:21.)

On another occasion, McDickinson summoned Jenkins to her office and performed fellatio on him. (Doc. 182-2:128:8-20;148:10-151:12; 152:12-153:13.) Afterwards, gesturing to her computer monitor, she told Jenkins she could see everything in the plant and knew every time he was on break because it was all on camera. *Id.* McDickinson even showed Jenkins camera surveillance footage of him while he was on break. (Doc. 182-2:151:7-12;338:23-339:16.) While he could not remember exact numbers, Jenkins believes McDickinson performed fellatio on him more than three times in her work office. (Doc. 182-2:390:17-391:19.)

McDickinson's sexual advances also occurred outside the workplace. One day, McDickinson offered to drive Jenkins home from a bar. On the way, McDickinson pulled over into a parking lot and engaged in sexual activity with Jenkins. (Doc. 182-2:166:9-169:21.) On two or three occasions Jackson asked Jenkins to ride with him to a nearby convenience store. Unbeknownst to Jenkins, McDickinson had arranged to arrive at the store at the same time. When Jackson would go inside the store, McDickinson would tell Jenkins to sit in her car where she would fondle his penis. (Doc. 182-2:108:9-110:23.) McDickinson would stalk Jenkins while at home with his fiancé, calling him on his phone and riding around his apartment complex. (Doc. 182-2:124:2-10;125:3-12.)

McDickinson understood that her conduct was affecting Jenkins. On July 16, 2015, at 9:08 p.m., McDickinson texted Steven Jackson: "Be honest, do you think I have I's[4] head fucked up. I'm asking you because that's what he tells me." (Doc. 189-4:59-86.)

Jenkins never approached or asked McDickinson to engage in any sexual conduct; it was always McDickinson who initiated any sexual act. (Doc. 182-2:129:2-4;401:23;403:4-5.) Jenkins told McDickinson once or twice that he did not want to deal with her advances. (Doc. 182-2:179:2-180:2;189:10-18.) McDickinson

---

[4]McDickinson referred to Irish Jenkins as "I".

11

would respond by making certain Jenkins knew she was in charge and could cause him to lose his job. (Doc. 182-2:122:5-14;123:10-14.) She would tell Jenkins he was "protected" and that he did not have anything to worry about. (Doc. 182-2:180:8-16.) She told him he was "untouchable" as long as she "dealt" with him. (Doc. 182-2:96:3-7.) After McDickinson began sexually engaging with Jenkins, she excused attendance points Jenkins should have received, even though Jenkins informed her that he objected. (Doc. 182-2:93:15-17;96:8-97:3;95:21-96:2;98:2-6.) In December 2015, Jenkins was suspended for three days for an alleged "points" violation. (Doc. 189-3:84-87.) Upon returning to work, Birchfield and McDickinson retroactively reduced his points balance, paid him for the time off, and told Jenkins that he was "in" with them. (*Id.*; Doc. 189-6:165.)

Jenkins was not the only subordinate McDickinson was pursuing. Harvey Fuller ("Fuller") was an African-American HR Clerk who worked at the Montgomery complex. McDickinson supervised Fuller. (Doc. 189-11:63:9-13.) McDickinson would stand behind Fuller, leaning over him and pressing her breasts into his shoulder while massaging his other shoulder and touching his chest. (Doc. 189-11:151:6-152:20;239:13-240:3.) As with Jenkins, McDickinson approached Fuller with requests for sex and sexual favors. (Doc. 189-11:526:15-18.) On one occasion away from the office, McDickinson told Fuller that she wanted him to be her big

12

black dick at work. (Doc. 189-11:14:1-15:1.) She suggested that Fuller needed to leave his family to "get with someone who is going places" and implied that by complying with her requests, Fuller would improve his employment situation. *Id.*

McDickinson would interweave sexual innuendoes into work conversations and tell Fuller she had a plan for him if he understood her ways. (Doc. 189-111:13:12-15;84:23-85:6.) Fuller understood McDickinson to be demanding he engage in a sexual relationship with her to ensure the security of his job. (Doc. 189-11:154:3-13;195:15-23.) McDickinson's conduct toward Fuller made him uncomfortable and he refused her advances. (Doc. 189-11:140:14-16;141:18-23; 154:3-13.)

Fuller was afraid to complain to Birchfield about McDickinson's sexually aggressive conduct toward him because he had heard they were in a sexual relationship. (Doc. 189-11:118:2-6.)

Near the end of his employment at Koch-Ala, Fuller called the temporary service, Onin, who first hired him to work with Koch-Ala. He complained that he was being sexually harassed by his manager. The Onin representative suggested Fuller talk to his HR representative, who would be McDickinson. (Doc. 192-9:9:7-22;11:7-22; 14:1-12. Fuller was fired soon thereafter. *Id.*

13

Eventually, McDickinson's conduct attracted the attention of other employees. In early August, 2015, Randy Davenport, Debone Plant Manager, began noticing McDickinson in Jenkins' department. In addition, two HR clerks, Laura Cortez and Kathy Denton, told him there were many issues within the HR Department that made them feel "very uncomfortable and threatened." (Do. 189-2:62-66: Doc. 189-13:56:4-16.) Denton complained that McDickinson sexually harassed HR clerk Fuller, and that she had an "ongoing sexual relationship" with "both Irish Jenkins and Steven Jackson." (Doc. 189-2:62-66; Doc. 189-13:56:4-16.) She had also pointed out to Birchfield that it appeared McDickinson was overlooking or forgiving attendance points for Jenkins and others. (Doc. 189-9:139:103:15-104:5;108:11-17.)

Under Koch-Ala's attendance policy, employees would receive either 1 point or ½ point for unexcused absences, tardiness, or leaving work early. (Doc. 189-1:66-69.) An employee who reached 7 points would be terminated. *Id.* Points would remain on an employee's record for 1 year unless removed pursuant to certain exceptions under the policy, *e.g.* perfect attendance for 2 calendar months. An employee can also bank points for future use. *Id.*

Davenport submitted a letter to his boss, Regional Vice-President Wally Lewis, in which he raised these issue. (Doc. 189-2:61-66; Doc. 189-13:56:4-21; 57:3-18;69:6-10.) He also spoke to Birchfield about them. (Doc. 189-1:96-97.)

14

Bobby Elrod, Vice President of HR for all Koch entities, and Birchfield's boss, contacted him about the letter from Davenport. Birchfield told Elrod that he was aware of the rumors and that he was already conducting an investigation, allegedly to determine if there was a relationship between McDickinson, Jenkins and Jackson. (Doc. 189-6:226:23-227:8l189-9:196:85:11-86:23.) Because Birchfield said he was investigating the matter, Elrod took no action of his own to investigate and never saw the results of Birchfield's investigation. (Doc. 189-9:201:106:16-116:23.)

When questioned by Birchfield, Jenkins denied the allegations, but was evasive. (Doc. 189-6:300:9-301:4.) Birchfield was concerned that Jenkins may have been afraid to tell him he was involved with McDickinson. *Id.* McDickinson submitted a written statement to Birchfield denying the allegations made against her. (Doc. 189-4:39-40.) Because McDickinson frequently called Jackson, after hearing of Davenport's complaint, she told Jenkins he "might need to erase the calls after Randy Davenport wrote a letter on us." (Doc. 182-2:126:5-17.)

As part of his investigation, Birchfield interviewed Johngernita Foxhall, Jenkins' fiancé about Jenkins and McDickinson. During this interview, Birchfield asked Foxhall what McDickinson saw in Jenkins, "why was she so into him like that?" and told Foxhall, "you know that's my woman." (Doc. 189-11:38:20-39:23;43:19-44:5.) Birchfield also directed Sabrina Bell to search for any emails

McDickinson may have sent indicating she was excusing Jenkins' absences, tardies, or leaving early. (Doc. 189-4:27;33.)  Bell reported that she was unaware of McDickinson excusing any attendance points for anyone. (Doc. 182-9:2.)

After completing his investigation in August 2015, Birchfield decided to discipline and suspend Denton for taking her concerns to the Plant Manager and "spreading rumors." (Doc. 189-1:118-119; Doc. 189-1:121.)  Under Koch-Ala's procedure for reporting sexual harassment, an employee may report the conduct to the shift manager, plant manager or complex manager.  (Doc. 189-1:53-56.) McDickinson admitted that Denton was allowed to bring her concerns to Davenport. (Doc. 192-2:289:18-290:20.)

During this same period of time another event occurred that resulted in Jenkins being suspended.  Jenkins was accused of using an exit that was clearly marked "Emergency Exit Only." (Doc. 182-6:142-145.) Birchfield suspended Jenkins for three days.  Jenkins challenged his suspension, contending that the USDA committed the same violation. Birchfield investigated Jenkins' claim and determined that other employees and the USDA inspectors were using the same exit with impunity. (Doc. 182-3:189:19-193:6.) Birchfield also used this investigation to make inquiries about Jenkins attendance points. (Doc. 192-28:2.)

16

Jenkins tells a slightly different version of this suspension. He claims Birchfield told him he was being suspended because of his sexual relationship with McDickinson. (Doc. 182-2:84:23-85:22.) McDickinson told Jenkins that Birchfield was going crazy because she was having sex with Jenkins. (Doc. 182-2:87:2-14.) At the same time, Birchfield questioned Jackson about McDickinson sleeping with Jenkins and then suspended Jackson. (Doc. 189-13:109:18-110:7.)

After the August 2015 investigations, Birchfield reduced Jenkins' work hours. While Jenkins had normally worked until 5:00 or 6:00 p.m. each day, Birchfield instructed Jenkins' supervisor to make him clock-out at 1:30 p.m. (Doc. 182-2:159:16-161:23.) When Jenkins asked his supervisor, Jeffrey Shaw, why his hours had been reduced, Shaw told him he had a "bullseye" on his back. (Doc. 182-2:161:17-162:12;214:2-14;217:1-3.) After Jenkins' hours were cut, McDickinson met Jenkins at a gas station near the plant and told him that, while Birchfield wanted to fire both Jenkins and Jackson, she was not going to fire him. (Doc. 182-2:164:9-165:20.) McDickinson appeared remorseful that Jenkins' hours had been cut because of her and gave Jenkins cash. (Doc. 182-2:158:18-160:3;164:3-165:3.)

Despite the rumors which were circulating about himself and McDickinson, on September 25-29, 2015, McDickinson and Birchfield went on vacation to Panama

17

City Beach, Florida, and stayed in the same condo with Steven Jackson. (Doc. 192-10:9 (interrogatory 21); Doc. 192-1:444:3-5.)

On several occasions, beginning in November, 2015, McDickinson told Jenkins that Birchfield wanted to watch him have sex with her. Jenkins refused each time. (Doc. 189-3:85.) On another occasion, Jenkins was present when Birchfield and McDickinson discussed wanting to have group sex with another Koch-Ala employee, Ka'Toria Gray. (Doc. 189-3:85.) They asked Jenkins to approach Gray about having sex with them, but he refused, believing it would be sexual harassment. They laughed and asked Steven Jackson to approach Gray on their behalf. *Id.*

Bobby Cotton replaced Davenport as the debone plant manager in late 2015. (Doc. 182-2:194:11-20.) On December 7, 2015, Cotton reported to Birchfield and others that Jenkins was seen smoking inside the office building near waste water. (Doc. 182-10:24.) As a result, Jenkins was given a verbal warning, which he refused to sign. (Doc. 182-10:27.) Cotton later asked Birchfield what the outcome was with regard to Jenkins because "he is up front near the offices and walking around. Just making sure he was still permitted to be here." (Doc. 182-10:25.) Shaw testified that he spoke to Jenkins about this even and never heard another complaint about Jenkins smoking in an unauthorized area. (Doc. 189-15:122:45:8-48:2.)

18

On December 12, 2015, Birchfield summoned Jenkins to his office and questioned him about having sex with McDickinson. (Doc. 189-6:328:10-329:5.) Jenkins recorded the conversation. (Doc. 182-2:373:5-374:18.) During that meeting Birchfield accused Jenkins of going around the plant stating he was having sex with McDickinson; he showed Jenkins attendance calendars reflecting what Birchfield believed were favors McDickinson was doing for Jenkins. (Doc. 182-2:89:20-90:21;92:6-17.)

On December 14, 2015, Birchfield sent a text message to Steven Jackson stating: "I'm about fed up with all these line motherfuckers looking me in the eye and lying to me send me Irish phone number I'll call his sorry self." (Doc. 189-2:113.) That same day he sent an email to Rebecca Milam checking on Jenkins' point status for attendance. (Doc. 189-2:185.) Milam reported that he was at 6 points. *Id.* Birchfield responded that he wanted to know the "actual count," including any that had not been put on the calendar yet. *Id.* After Milam responded that her count was accurate, Birchfield asked her to "let me know the minute he points out please." *Id.*

An employee "points out" if they are not adhering to the attendance policy and have enough points to be terminated. (Doc. 189-15:74:12-17.) It was not typical for Birchfield, the Complex HR Manager, to get involve at the plant level on employee

19

points.  (Doc. 189-14:99:1-100:6.)  Milam could not recall Birchfield asking about the point status for any other employee.  *Id.*

On Sunday, January 3, 2016, Jenkins was accused of being late to work and was to receive an attendance point.    (Doc.  189-14:(108:1-110:8;119:23-112:13;117:20-118:4.)  Jenkins protested this point and demonstrated that Koch's time clock records showed that he clocked in on Sunday at 6:00 a.m.  *Id.* He was neither late nor left early that day.  *Id.*  Jenkins had been off work on January 2 due to a family death and was off work the following Monday and Tuesday for funeral leave.  (Doc. 189-14:113:13-23;115:2-13.)  Jenkins had somehow been scheduled to work a four-hour shift on January 2 despite being approved for bereavement leave. *Id.* Milam could offer no explanation for this discrepancy.  *Id.*

Also in January, 2016, McDickinson called Jenkins to her office in the HR Department.  When he arrive, Birchfield entered the room and closed the door.  On that occasion, McDickinson asked Jenkins if he had reconsidered allowing Birchfield to be present during sex with her.  Jenkins refused this request.  (Doc. 189-3:86.)

On February 24, 2016, Birchfield received an email to "Flag for follow up" Jenkins' statement of December 17, 2015, denying any involvement with McDickinson.  (Doc. 189-3:180-81.)

20

On March 20 or 21, 2016, Birchfield called Shaw and told him he had received a complaint about Jenkins being out of his work area while on the clock. (Doc. 189-15:122:48:6-50:1.) Birchfield did not tell Shaw who had complained, where Jenkins had been seen, and when he had been seen. (Doc. 189-15:123:49:19-50:19.) Birchfield simply told Shaw it was his my responsibility to make sure his employees are in their work areas. (Doc. 189-15:123:50:14-16.) Shaw told Birchfield he had not seen Jenkins out of his work area. (189-15:137:105:13-106:5.)

On Monday, March 21, 2016, Shaw observed Jenkins in the smoke area. (Doc. 189-15:137:106:6-107:12.) Shaw asked Jenkins if he was on break and he responded he was "on the clock." *Id.* Shaw then took Jenkins to HR and told Laura Cortex about Birchfield's call. *Id.* He then explained that he had found Jenkins outside smoking while on the clock. *Id.* Cortes then called McDickinson, explained the situation, and "the decision was made to suspend Irish Jenkins pending an investigation into the matter." Shaw was not involved in the decision to suspend Jenkins. *Id.* Cortes explained that the decision to suspend Jenkins came from Birchfield. (Doc. 189-9:52:202:12-206:7.)[5] Cortes also testified that it was not unusual, because of his duties, for Jenkins to be out of his work area, particularly in the smoking area: "I

---

[5]Cortes' testimony conflicts with that of Shaw. According to Cortes, Steven Jackson told her he had reported Jenkins for being out of the work area because Birchfield had told him to do so. (Doc. 189-9:53:205:1-14.)

would see him out there smoking. I mean, I – one of these things that – there's certain people who are always out of their work are, and Irish Jenkins was just one of those people who was allowed to be out of his work area." (Doc. 189-9:54:212:8-13.) She explained that employees in "Packout," because of the nature of their job, don't have to be stationary. (Doc. 189-9:55:213:11-17.)

McDickinson conducted the investigation following Jenkins' suspension and resulting in his termination. (Doc. 189-15:135:98:11-99:6.) The day after the suspension, McDickinson showed Shaw camera footage of Jenkins clocking in on a Saturday and taking a smoke break. *Id.* He could not remember which Saturday she was showing him. *Id.* McDickinson then told Shaw that Jenkins would no longer be employed. (Doc. 189-15:135:99:7-18.)

After being suspended, but before being terminated, Jenkins called Bobby Elrod, the Vice President of HR for all of the Koch facilities, and complained about McDickinson sexually harassing him and Birchfield unfairly disciplining him. (Doc. 182-2:198:23-199:9.) As with the Davenport complaint, Elrod took no action to investigate this complaint.

Jenkins was terminated on March 25, 2016. (Doc. 189-14:15:56:3-61:4.) While Cortes completed the paper work for the termination, she does not know who made the decision to terminate Jenkins. *Id.* Shaw testified that Human Resources

22

made the decision to terminate Jenkins, and McDickinson is the person who told Shaw that Jenkins would no longer be employed.  (Doc. 189-15:135:98:5-99:18.) Cortes testified that Jenkins was officially terminated for stealing time.  (Doc. 189-9:54:209:5-14.)  While she could not remember who gave the order, "usually the plant manager is not the one who tells HR who to terminate.  I would usually get that information from either Melissa [McDickinson] or Mr. Birchfield."  (Doc. 189-9:54:209:16-21.)  Birchfield, himself, testified that the Plant Manager did not have the authority to terminate an employee; while he could influence the decision, Birchfield was responsible for making the final decision. (Doc. 182-3:189:22-190:23.) According to Koch-Ala training, "[e]mployees are not to be terminated without direct approval of a Human Resource Manager," which means a Facility HR Manager (in this instance, McDickinson) or a Complex HR Manager (Birchfield). (Doc. 189-1:42.)   Supervisors are advised that, in the event of a suspension, "[a]ll information regarding the incident must be forwarded to the HR Manager to enable him/her to make an informed decision.  Be prepared to brief the HR Manager on the situation and assist them if needed."  (Doc. 189-1:43.)  Birchfield testified that McDickinson would have been the person to be involved in the decision to terminate Jenkins.  (Doc. 189-6:140:171:3-172:7.)

23

On or about March 31, 2016, Elrod finally got around to communicating with Birchfield about Jenkins' termination. (Doc. 189-2:68-69.) In a cryptic email chain, McDickinson sends an email to Birchfield at 11:27 AM stating "Theft of Company Time" in the Subject line. *Id.* At 12:12, PM, Birchfield forwarded this email to Elrod. *Id.* Elrod responds by asking "What does this mean?" and "How long was he away from work and on the clock"? *Id.*

Birchfield then responds by claiming that "[o]n that particular day for over an hour until his supervisor, Jeff Shaw, caught him. After Jeff told him to go back to work he went back to the smoke area and sat down." *Id.* Birchfield then proceeds to recount complaints that had been lodged against Jenkins dating back many months, including the unsubstantiated belief that Jenkins had set fire to the facility, that he was smoking in the building, and that he and McDickinson were "involved." *Id.*

This explanation for terminating Jenkins is not borne out by Koch-Ala's records. The time records for March 21 prove that Jenkins clocked in at 4:28 a.m. and out at 9:30 a.m. for his break. He then clocked in at 10:00 a.m. Shaw claims he witnessed Jenkins outside smoking at 10:07 a.m., seven minutes later. (Doc. 189-15:140:118:1-3; Doc. 189-2:20.) Shaw does not recall any time that Jenkins was on the clock and away from work for over an hour. (Doc. 189-15:141:124:17-21.) Further, according to Shaw, Birchfield's claim that Jenkins "went back to the smoke

area and sat down" after Shaw told him to go back to work did not happen. (Doc. 189-15:142:126:6-15.)  That is because Shaw took Jenkins to HR when he was caught smoking on the clock.  *Id.*

Birchfield's explanation is also not consistent with his deposition testimony. There, Birchfield testifies that he did not talk to the plant manager about the termination until after it occurred.  (Doc. 189-6:141:174:1-5.)  Even then, Cotton (or some other person) did not share with him the reasons for Jenkins' termination.  (Doc. 189-6:141:174:12-175:1.)

Jenkins filed charges with the EEOC following his termination.  (Doc. 182:14:2-6.)  Subsequently, Koch Foods arranged for "A to Z Investigation" to conduct an independent investigation into the allegations of sexual improprieties at Koch-Ala.  (Doc. 189-4:110 [filed under seal].)  McDickinson was interviewed by A to Z on June 7, 2016.  (Doc. 189-7:268:16-269:10; Doc. 189-4:110 [filed under seal].)  McDickinson resigned the next day.  (Doc. 189-4:111.)  Elrod advised Birchfield in August 2016 that he had lost confidence in his ability to manager.  (Doc. 189-9:239:258:2-259:1.) Birchfield resigned on August 7, 2016.  (Doc. 189-9:177:9:12-20.)

**Course of Proceedings Below**

Jenkins sued Koch-Ala, Koch Foods, Inc. ("Koch Inc."), and the two HR supervisors, McDickinson and Birchfield. (Doc. 1.)    Jenkins alleged that McDickinson subjected him to a racially and sexually hostile work environment and that Birchfield, McDickinson's supervisor and the highest ranking official of Koch-Ala, condoned this discriminatory conduct.  He further alleged that the Defendants retaliated against him after he complained about the discrimination. Jenkins also alleged that the Defendants invaded his privacy, committed assault and battery, and the tort of outrage (intentional infliction of emotional distress). Finally, he alleged that Koch-Ala and Koch Inc. acted negligently and wantonly in retaining and training McDickinson and Birchfield.  Jenkins' federal claims were based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.,* and 42 U.S.C. §1981. The tort claims were based upon Alabama law.

To the extent Jenkins' Complaint purported to assert claims for discrimination in compensation, the district court granted a motion to dismiss those claims filed by Koch-Ala and Koch Inc.  (Doc. 12; Doc. 43; Doc. 48.)  All parties then answered (Doc. 14; Doc. 16; Doc. 40; Doc. 50; Doc. 61) and the case proceeded through discovery.

Defendants filed separate motions for Summary Judgment and/or motions for Judgment as a Matter of Law. McDickinson, in the brief (Doc. 177-1) accompanying her motion (Doc. 177), denied having sex with Jenkins or engaging in any action that could amount to the alleged torts. (Doc. 177-1:4 fn 2.) She then proceeded to argue that the facts as alleged by Jenkins were insufficient to establish intentional infliction of emotional distress because the conduct was "consensual" and Jenkins "enjoyed himself." (Doc. 177-1:28-32.) Similar arguments were asserted with regard to assault and battery and invasion of privacy. (Doc. 177-1:32-41.) She finally argued that the tort of negligent and wanton hiring, training, supervision and retention does not lie against an employee. (Doc. 177-1:41-42.)

Birchfield's motion (Doc. 178) and brief in support (Doc. 178-1) were similar to those of McDickinson and made essentially the same arguments. (Doc. 178-1:17-33.) Birchfield's argument differs only in that he contends there is no evidence, disputed or otherwise, he ever touched or threatened to touch Jenkins. *Id.*

Koch-Ala included a renewed motion for judgment as a matter of law with its summary judgment motion. (Doc. 179.) In its motion, Koch-Ala contended:

- Jenkins' Title VII sex discrimination claims were due to be dismissed because he could not establish the *prima facie* elements of a hostile work environment or defeat the *Faragher/Ellerth* defense;

27

- Jenkins' Title VII and §1981 race claims were due to be dismissed for failing to exhaust his administrative remedies (Title VII only), and the inability to meet the *McDonnell Douglas* elements of a race discrimination claim;

- Jenkins could not meet the *McDonnell Douglas* standard of proof for his retaliation claim;

- It was not liable for the alleged torts because the actions of McDickinson and Birchfield were not within the line and scope of their employment and had not been ratified by Koch-Ala;

- Because there were no underlying torts, Koch-Ala could not be liable under the negligent and wanton retention claim; and,

- There was insufficient evidence to justify an award of punitive damages.

Koch Inc. adopted the arguments asserted by Koch-Ala (Doc. 181) and asserted arguments of its own: Koch Inc. is not the alter ego of Koch-Ala, was not Jenkins' employer, and had no contractual relationship with Jenkins.

Jenkins filed a consolidated response to the motions of Koch-Ala, McDickinson and Birchfield (Doc. 194), and a separate response to the motion of Koch Inc. (Doc. 193.) Reply briefs were also filed. (Doc. 195; Doc. 196; Doc. 197; Doc. 199.)

28

In its Memorandum Opinion and Order, the District Court grouped Jenkins' claims against the Koch Defendants into three federal counts: Title VII sexual harassment; Title VII and §1981 race discrimination and harassment; and Title VII and §1981 retaliation. The Court granted summary judgment as to all three counts.

Jenkins alleged that the Koch Defendants had subjected him to sexually motivated harassment by suspending him and terminating him because he refused to engage in sexual acts with McDickinson.

The District Court ruled that Jenkins could not establish a causal connection between McDickinson's propositions and his termination because: (1) there was insufficient evidence in the record that either McDickinson or Birchfield made the decision to terminate Jenkins; (2) the decision to terminate Jenkins occurred over two months after McDickinson's last proposition, and over five months after her first proposition; and (3) there was a legitimate, and well-documented, reason to terminate Jenkins that he failed to rebut.  (Doc. 222:14-18.)

Jenkins also claimed that the Koch Defendants targeted him as an African-American male and subjected him to unwanted sexual advances and harassment. (Doc. 222:18.)  The District Court concluded that Jenkins' termination claim[6] failed because Jenkins presented no evidence of white comparators who were treated more

---

[6]This was actually two claims brought pursuant to Title VII and §1981. (Doc. 222:18.)

favorably. (Doc. 222:19-20.)   The Court also concluded that Jenkins' racially motivated hostile work environment claim failed because the relationship between Jenkins and McDickinson was "consensual" and, therefore, not unwelcome. (Doc. 222:25.)   In addition, the Court concluded that McDickinson's requests to Jenkins that he permit Birchfield to watch while they had sex were not sufficiently severe or pervasive to state a hostile work environment claim. (Doc. 222:24-27.)

Jenkins did not oppose summary judgment on his retaliation claim. The District Court considered this claim abandoned and dismissed it. (Doc. 222:28.)

The District Court granted summary judgment on the state law claims brought against McDickinson[7], concluding that, because the relationship with Jenkins was "consensual and welcome" (Doc. 222:29), Jenkins could not establish the elements of the torts. (Doc. 222:28-30.)   Finally, having granted summary judgment on the three underlying torts, the Court granted summary judgment on the negligent and wanton supervision and hiring claim brought against the Koch Defendants. (Doc. 222:30.)

Final Judgment was entered on January 14, 2022 (Doc. 224), and Jenkins filed his Notice of Appeal on February 11, 2022. (Doc. 226.)

---

[7]While Birchfield originally had been named as a Defendant with regard to the state law claims, Jenkins abandoned those claims at summary judgment. (Doc. 222:28 n. 12.)

## SUMMARY OF ARGUMENT

The District Court erred in granting summary judgment as to Jenkins' sexual harassment, racial harassment, and state law claims. There are genuine issues of material fact concerning McDickinson's sexual advances, Jenkins' response to those advances, and the impact which those advances had upon Jenkins' terms and conditions of employment. The District Court improperly weighed the evidence and made credibility determinations in granting summary judgment to Defendants.

The District Court also erred in analyzing Jenkins' race discrimination and harassment claim. There is evidence from which a reasonable jury could conclude that McDickinson was motivated, at least in part, by Jenkins' race when she targeted him to be the subject of her sexual advances.

The District Court applied a wrong legal standard in concluding that McDickinson's sexual advances were "consensual." While Jenkins may have voluntarily acquiesced in McDickinson's sexual demands, there is evidence from which a reasonable jury could conclude that he did not welcome those demands but agreed to them for fear of losing his job.

Finally, the District Court's erroneous view with regard to the nature of the relationship between McDickinson and Jenkins led to the dismissal of Jenkins' state tort claims.

31

Due to these errors, the District Court's decision granting summary judgment on these claims should be reversed and the case remanded to the District Court for further proceedings.

## ARGUMENT

## I.  Jenkins Was Subjected To Sexually-Hostile Work Environment.

The District Court concluded that Jenkins' sexual harassment claim must fail because there was no evidence linking McDickinson or Birchfield to the decision to terminate Jenkins; no evidence to establish a causal link between McDickinson's last proposition and Jenkins' termination; and because Jenkins failed to rebut Koch-Ala's articulated reason for firing Jenkins.  (Doc. 222:15-18.) All three conclusions are in error.

### A.  Evidence Of McDickinson's And Birchfield's Involvement.

The District Court concluded that "Laura Cortes investigated Jenkins, suspended Jenkins, and ultimately signed Jenkins' termination paperwork, along with Jenkins' supervisor, Shaw.  Cortes even testified that the order to fire Jenkins came from Bobby Cotton, because Cotton "wanted [him] gone." (Doc. 222:16.)  But every one of these facts are in dispute.

It is correct that Shaw, upon seeing Jenkins taking a break while on the clock, took him to HR, where he met with Laura Cortes.  (Doc. 189-15:137:106:5-107:12.)

32

Cortes then called McDickinson, explained the situation, and "the decision was made to suspend Irish Jenkins pending an investigation into the matter." *Id.* Shaw was not involved in the decision to suspend Jenkins. *Id.* Cortes further explained that the decision to suspend Jenkins came from Birchfield. (Doc. 189-9:52:202:12-206:7.)

McDickinson conducted the investigation following Jenkins' suspension that resulted in his termination. (Doc. 189-15:135:98:11-99:6.) The day after the suspension, McDickinson showed Shaw camera footage of Jenkins clocking in on a Saturday and taking a smoke break. *Id.* McDickinson then told Shaw that Jenkins would no longer be employed. (Doc. 189-15:135:99:7-8.) Shaw testified that Human Resources made the decision to terminate Jenkins, and McDickinson is the person who told Shaw that Jenkins would no longer be employed. (Doc. 189-15:135:98:5-99:18.)

Cortes completed the paperwork for the termination, but she could not remember who made the decision to terminate Jenkins. (Doc. 189-14:15:56:3-61:4.) She explained that "usually the plant manager is not the one who tells HR who to terminate. I would usually get that information from either Melissa [McDickinson] or Mr. Birchfield." (Doc. 189-9:54:209:16-21.)

Birchfield testified that the Plant Manager did not have the authority to terminate an employee; while he could influence the decision, Birchfield was

33

responsible for making the final decision.  (Doc. 182-3:189:22-190:23.)  He further testified that McDickinson would have been the person to be involved in the decision to terminate Jenkins.  (Doc. 189-6:140:171:3-172:7.)

Finally, when Elrod got around to communicating with Koch-Ala about Jenkins' termination, he did not communicate with Shaw or Cortes for an explanation.  His communications were with McDickinson and Birchfield.  (Doc. 189-2:68-69.)  Indeed, Birchfield is the person who provided the justification for terminating Jenkins, falsely claiming that Jenkins ignored Shaw for over an hour while sitting in the smoke are.  *Id.*

There are genuine issues of material fact concerning the role which McDickinson and Birchfield played in Jenkins' termination and the District Court erred by resolving these issues in favor of Koch-Ala.

### B.    Evidence Of The Causal Link.

The District Court concluded that the period of time between McDickinson's last proposition in January 2016 and Jenkins's termination on March 25, 2016, was too long a gap for a factfinder to conclude that there was a causal relationship between the two.  (Doc. 222:16-17.)  But this conclusion ignores relevant facts.

First, the January 2016 proposition, while coming from McDickinson, occurred while Birchfield was in the room.  ( Doc. 189-3:86.)  This meeting came after

Birchfield's questioning of Jenkins on December 12, 2015, about have sex with McDickinson. (Doc. 189-6:238:10-329:5.)  On December 15, 2015, Birchfield sent an email to Rebecca Milam checking on Jenkins' attendance point status. After Milam responded Birchfield asked her to "let me know the minute he points out please." (Doc. 189-2:185.)  Milam testified that it was not typical for Birchfield, the Complex HR Manager, to get involved at the plant level on employee points.  (Doc. 189-14:99:1-100:6.)  Milam could not recall Birchfield asking about the point status for any other employee.  *Id.*

On February 24, 2016, Birchfield received an email to "Flag for follow up" Jenkins' statement of December 17, 2015, denying any involvement with McDickinson.  (Doc. 180-3:180-81.)  Then, on March 20 or 21, Birchfield called Shaw and told him he had received a complaint about Jenkins being out of h is work area while on the clock.  (Doc. 189-15:122:48:6-50:1.)  Birchfield did not tell Shaw who had complained, where Jenkins had been seen, and when he had been seen. (Doc. 189-15:123:49:19-50:19.)  Birchfield told Shaw that it was his responsibility to make sure his employees are in their work areas.  (Doc. 189-15:1123:50:14-16.) Shaw told Birchfield he had not seen Jenkins out of his work are.  (Doc. 189-15:137:105:13-106:5.)

35

The next day, when Shaw say Jenkins in the smoke area, he approached him, learned he was "on the clock" and took him to HR, where Cortes suspended Jenkins, after speaking to McDickinson. (Doc. 189-15:137:106:6-107:12.) As noted above, Cortes explained that the decision to suspend Jenkins came from Birchfield.

When viewed in the totality of the circumstances, a reasonable jury could conclude that Birchfield was upset with Jenkins because he was not being included in the sexual relationship with McDickinson and decided to subject Jenkins to heightened scrutiny in order to find a pretextual basis for terminating him. This conclusion is supported by the evidence of pretext, discussed below.

### C.     Evidence Of Pretext.

The District Court alluded to two potential legitimate reasons justifying Jenkins' termination: attendance problems and taking a smoke break while on the clock. (Doc. 222:17.) Conflating these two reasons, the District Court concluded that Jenkins was terminated by Cotton and Cortes for stealing company time.[8] This conclusion improperly resolved genuine disputes of fact.

The District Court noted that "[t]hroughout 2015 and 2016, Jenkins routinely was written up for his attendance problems. Indeed, in December 2015, he was given

---

[8]While the District Court claimed Jenkins did not rebut these events or contest them in argument (Doc. 222:19-20), this is not correct. Jenkins devoted an entire section of his brief in opposition to summary judgment to the false information used to suspend and terminate Jenkins. (Doc. 194:31-34.)

his final warning." (Doc. 222:17.)  This overstates the facts pertaining to Jenkins' attendance.

While Jenkins may have been "routinely written up for attendance problems," there was nothing unusual about this. Under Koch-Ala's no-fault attendance policy, employees would receive either 1 point or ½ point for an unexcused absence, tardiness, or leaving work early. (Doc. 189-1:66-69.) An employee who reached 7 points would be terminated. *Id.* Points would remain on an employee's record for 1 year unless removed pursuant to certain exceptions under the policy, *e.g.* perfect attendance for 2 calendar months. *Id.* Jenkins, like all employees of Koch-Ala, had the benefit of this program.  Part of this program insured that employees received notices whenever they received a point or part thereof. If an employee accumulated 6 points, he would be sent a Final Written Warning advising him of his status. As the evidence in this case establishes, Jenkins' points would go up and down. At times he would have his points reduced for perfect attendance; at others he would accrue a point. While he did have 6 points in December 2015, those points never increased and Birchfield's request that Milam "let me know when he points out" was never met, because Jenkins never earned sufficient points to be terminated. Consequently, Jenkins' points are irrelevant, as no one has claimed Jenkins was terminated for accruing seven points.

37

Koch-Ala's claim that Jenkins was stealing time is also subject to challenge. The time records for March 21 show that Jenkins clocked in at 4:28 a.m. and out at 9:30 a.m. for his break. Shaw claims he witnessed Jenkins outside smoking at 10:07 a.m., seven minutes after the end of his break. (Doc. 189-15:140:118-1-3; Doc. 189-2:20.) Shaw does not recall any time that Jenkins was on the clock but away from work for over an hour. (Doc. 189-15:141:124:17-21.) Koch-Ala's surveillance records do not substantiate Koch-Ala's contention that Jenkins was on the clock and smoking for over one hour. (Doc. 194:33-34.)

Regardless, according to Koch-Ala policy, taking more time than is allowed for breaks is a Type II violation. (Doc. 189-1:3.) "Violation of Type II rules generally will follow progressive disciplinary steps up to and including termination." *Id.* Koch-Ala utilizes progressive discipline: Verbal Warning; Written Warning; Final Warning with 2 Day Suspension; Termination.

Jenkins was accused of taking more time than is allowed for breaks, a Type II violation. While Shaw had previously told Jenkins that he should return from his breaks in a timely fashion, *i.e.* a verbal warning, Jenkins was never issued a Written Warning, nor a Final Warning with 2 day suspension, for taking more time than

38

allowed for breaks. No one associated with Koch-Ala has been able to explain why Jenkins did not get the benefit of this progressive disciplinary process.[9]

An employer's deviation from its own standard procedures may serve as evidence of pretext. *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006). Considering Koch-Ala's failure to follow its own progressive disciplinary process, the evidence of Birchfield's monitoring of Jenkins's attendance beginning in December 14, 2015, and the questionable basis for Koch-Ala's decision, a reasonable jury could conclude that Jenkins was not terminated because of his attendance or taking a smoke break while on the clock. Rather, he was terminated because he would not accede to McDickinson's sexual requests. The District Court erred by concluding otherwise and its judgment should be reversed.

## II.    Jenkins Was Subjected To Race Discrimination And Harassment.

Jenkins contends that he suffered a hostile-work environment and disparate treatment when he was "targeted as an African-American male and subjected to unwanted sexual advances and harassment." The District Court granted summary judgment on this claim because Jenkins did not identify comparators outside of his

---

[9]While Birchfield claims that Jenkins was terminated for stealing time, he also claims he was not the person who decided to terminate Jenkins. If so, he has no personal knowledge as to the basis for Jenkins' termination.

protected class, and because the alleged harassment was either welcomed or was not sufficiently severe or pervasive. (Doc. 222:18.) Neither reasons is justified.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his ... terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). The Supreme Court officially recognized harassment as a type of discrimination in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" constitutes sexual harassment. *Id. Vinson* also began to establish the structure for analyzing harassment claims.

Although the circuits vary in the way they describe the harassment inquiry, it essentially revolves around five issues. To prove sexual harassment under Title VII, a plaintiff must show (1) that he belongs to a protected group; (2) that he has been subjected to unwelcome sexual harassment; (3) that the harassment was based on his sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists. *Johnson v. Booker T. Washington Broad. Serv.*, 234 F.3d 501, 508 n. 7 (11th Cir. 2000).

When the Supreme Court articulated the structure for analyzing harassment, it did not rely on the *McDonnell Douglas* framework. Generally, courts do not use *McDonnell Douglas* when determining whether a set of facts constitutes harassment. *Pollard v. E.I DuPont de Nemours Co.*, 213 F.3d 933, 943 (6th Cir. 2000) (explaining that the *McDonnell Douglas* framework cannot apply to a hostile work environment sexual harassment claim because "there is no legitimate justification for such an environment, and thus recourse to the *McDonnell Douglas* test is not warranted"), *rev'd on other grounds*, 532 U.S. 843 (2001); *Martin v. Nannie & The Newborns, Inc.*, 3 F.3d 1410, 1417 n. 8 (10th Cir. 1993) (concluding that the plaintiff's failure to rebut the employer's legitimate nondiscriminatory reason for her termination was not relevant to a hostile work environment claim); *Moody v. Atlantic City Board of Educ.*, 870 F.3d 206, 213 n. 11 (3rd Cir. 2017) (burden-shifting framework is inapplicable because there can be no legitimate justification for a hostile work environment).

The Eleventh Circuit follows this approach. In *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501 (11th Cir. 2000), recognizing that sexual harassment cases "evolved quite separately from other Title VII cases," the Circuit declared it was unwilling to read the *McDonnell Douglas-Burdine* framework into non-retaliation sexual harassment cases. *Id.* at 511. Rather, "normal principles of pleading and proof allocation" should be used. *Id.*

41

Further, comparator evidence is generally not necessary in a sexual harassment case. "Unless there is evidence to the contrary, ... we also infer that the harasser treats members of the 'non-preferred' gender differently – and thus that the harasser harbors an impermissible discriminatory animus towards persons of the preferred gender." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 (11th Cir. 1998). As discussed below, the District Court erred by concluding that Jenkins' race-based sexual harassment claim must fail because of the failure to identify comparators.

Jenkins presented sufficient evidence for a reasonably jury to conclude that McDickinson targeted him as an African-American male and subjected him to unwanted sexual advances and harassment because of his race.

### A.    Jenkins Belongs To A Protected Group.

There is no dispute that Jenkins is a member of a group protected by Title VII. Both sexes are protected from sexual harassment. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998) ("Title VII's prohibition of discrimination because of sex protects men as well as women ....") (internal quotation marks and citation omitted). "[I]t cannot be assumed that because a man receives sexual advances from a woman that those advances are welcome." *EEOC v. Prospect Airport Services, Inc.*, 621 F.3d 991, 997 (9th Cir. 2010). Further, as African-

42

American male, he is also protected from race discrimination in the terms and conditions of employment.

### B. Jenkins Was Subjected To Sexual Advances Because Of His Race And Sex.[10]

The inference of discrimination is easy to draw in most male-female sexual harassment situations because the challenged conduct typically involves explicit or implicit proposals of sexual activity. *Oncale*, 523 U.S. at 80. "When a person 'sexually harasses' another, *i.e.*, makes comments or advances of an erotic or sexual nature, we infer that the harasser is making advances towards the victim because the victim is a member of the gender the harasser prefers." *Llampallas*, 163 F.3d at 1246. As the Eleventh Circuit recognized years ago, when a male supervisor makes sexual overtures to a female worker, "it is obvious that the supervisor did not treat male employees in a similar fashion. It will therefore be a simple matter for the plaintiff to prove that but for her sex, she would not have been subjected to sexual harassment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).

So, too, here. Jenkins describes how McDickinson pursued him relentlessly to engage in sexual conduct with her. McDickinson began her seduction by instructing Jenkins that he should take his smoke breaks with her in the back smoking

---

[10]Because McDickinson denies every have a sexual relationship with Jenkins, Jenkins' testimony must be accepted as true for purposes of summary judgment.

area, where she would stroke his hair, despite his protestations. Her advances were relentless. Every encounter with McDickinson was a sexual encounter. She urged Jenkins to leave his fiancé, telling him she was attracted to him sexually and was interested in pursuing a sexual relationship with him. She enlisted other employees in her efforts. Ultimately, she lured him to a secluded location in the plant and sexually assaulted him. From that point on, Jenkins was subjected to repeated and frequent sexual demands from McDickinson. A reasonable jury could conclude that McDickinson made the sexual advances towards Jenkins because of his sex.

A reasonable jury could also conclude that McDickinson was motivated by Jenkins' race when she made the sexual advances. In describing her sexual desires to Jenkins, McDickinson explained her preference for "black guys", telling him they were "different, better, and bigger." If not direct evidence of McDickinson's motivation for sexually harassing Jenkins, this comment is strong circumstantial evidence that Jenkins' race was a motivating factor in McDickinson's decision to harass him.

The District Court's erred by concluding that, without a white comparator, Jenkins could not establish his racially motivated hostile work environment claim.

44

### C.    The Harassment Was Severe Or Pervasive.

Only harassing conduct that is severe or pervasive[11] enough to alter the terms

or conditions of employment is actionable under Title VII. *Burlington Industries v.*

*Ellerth*, 524 U.S. 742, 752 (1998).  This standard was meant to "filter out complaints

attacking the ordinary tribulations of the workplace, such as the sporadic use of

abusive language, gender-related jokes, and occasional teasing. *Faragher v. City of*

*Boca Raton*, 524 U.S. 775, 788 (1998).

Consideration of this issue implicates both a subjective and objective

component.  First, there must be evidence that Jenkins perceived the harassment as

severe or pervasive enough to alter the terms and conditions of his employment and

create a discriminatorily abusive work environment. *Hulsey v. Pride Rests*, 367 F.3d

1238, 1247 (11th Cir. 2004).    And second, his subjective perception must be

objectively reasonable. *Id.*

There are genuine issues of material fact as to whether Jenkins subjectively

found the environment sufficiently offensive.  He testified that he did not encourage

the sexual advances.  When Jenkins would rebuff McDickinson's advances, she

---

[11]Although courts frequently evaluate both severity and pervasiveness, the requirement is in the disjunctive.  Only severity or pervasiveness must be proven. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010).

would respond by making him know that she was in charge, telling him he was "protected" and did not have anything to worry about.

And, from Jenkins' perspective, McDickinson was protecting him. In August 2015, after Jenkins' hours were reduced, McDickinson was remorseful that his hours had been cut because of her, and she gave Jenkins cash.

McDickinson would summons Jenkins to private or remote locations in the facility for the purpose of engaging in sexual conduct with him. These actions took Jenkins away from his job and put his employment at risk. McDickinson, herself, recognized that her conduct was affecting Jenkins when she texted Steven Jackson: "Be honest, do yo think I have I's head fucked up. I'm asking you because that's what he tells me."

In determining whether the conduct was objectively severe or pervasive, courts typically look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Faragher*, 524 U.S. at 787-88; *Johnson*, 234 F.3d at 509. Instead of requiring proof of each factor individually, courts consider the totality of the circumstances. *Hulsey*, 367 F.3d at 1247-48. No single factor is required. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

46

The evidence establishes that the harassment of Jenkins by McDickinson was frequent. Every time McDickinson encountered Jenkins she made it a sexual encounter. The conduct was severe. Jenkins was not experiencing the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. He was being summoned to remote parts of the plant so McDickinson could satisfy her sexual desires at work. Further, these were not mere utterances. These were repeated and frequent demands for sexual interaction during work hours. Finally, McDickinson's conduct interfered with Jenkins' work performance by distracting him from his duties while she would engage in sexual conduct with him. The District Court chose to ignore most of these interactions, focusing, instead, on McDickinson's requests that Jenkins allow Birchfield to watch them have sex. (Doc. 222:25-26.) This was error. "In sexual harassment cases, the courts must consider the alleged conduct in context and cumulatively. Therefore, we set forth all alleged harassing conduct so that we can look at the totality of the circumstances." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1243 (11th Cir. 1999). The "totality of circumstances" standard requires the Court to view Jenkins' environment as a whole even though no individual episode, viewed by itself, crosses the Title VII threshold. *Cf. Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D. Fla. 1991) (the analysis cannot carve the work environment into a series of

discrete incidents and measure the harm adhering in each episode; a holistic approach is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes).

Direct sexual advances from persons with high authority in the company can be sufficiently severe to be actionable, even if the advances are not numerous. That is because the disparity in power between the harasser and her victim can trap the victim into enduring the abusive environment. *Jennings v. Univ. of N. Carol.*, 482 F.3d 686, 697 (4th Cir. 2007); *EEOC v. Reeves & Assocs.*, 68 Fed. App'x 830, 832 (9th Cir. 2003); *Hare v. H&R Indus., Inc.*, 67 Fed. Appx 114, 117 (3rd Cir. 2003) (several of plaintiff's supervisors engaged in verbal and physical harassment). As Judge Thompson explained in *Moye v. Fleming Co., Inc.*, 924 F.Supp.1119, 1128 (M.D. Ala. 1996), the plaintiff's supervisor "used his supervisory power to determine where and when he and [plaintiff] interacted, and it was this power, which a co-employee did not have, that enabled him to harass her. It was [the harasser's] power as a supervisor that allowed him to force [plaintiff] to come to his office to give him reports which, while ostensibly designed to improve [plaintiff's] performance ... were actually a way for [the supervisor] to get [the plaintiff] alone so that he could sexually

48

proposition and harass her."  The describes closely how McDickinson was wielding her power over Jenkins in order to sexually proposition and harass him.

Jenkins did not describe offensive words, jokes, or trivial slights in the workplace. Rather, he described being stalked by McDickinson, both at work and in social settings, for the purposes of engaging in sexual contact with him.  He was forced to accept sexual advances from McDickinson in the workplace.  Certainly, these actions are sufficient to meet the severity test, if not the pervasiveness test.

### D.    The Harassment Was Unwelcome.

The District Court concluded that, even if Jenkins race was a but-for cause of McDickinson's sexual overtures, his claim must fail because the relationship between Jenkins and McDickinson was "consensual." (Doc. 222:22.) The District Court erred in reaching this conclusion for two reasons: First, whether a relationship is consensual is not controlling; second, there are genuine issues of material fact with regard to the "consensual" nature of the relationship.

In *Meritor Savings v. Vinson*, Michelle Vinson alleged that she had been pressured into having sexual relations on numerous occasions with her supervisor, Taylor.  *Meritor Savings Bank*, 477 U.S. at 60.  She alleged that she agreed to do so out of fear of losing her job.  Meritor Savings argued that it could not be found liable for Taylor's conduct because Vinson's submission to his advances had been

49

"voluntary." The Supreme Court rejected that argument, holding that whether Vinson's acquiescence was "voluntary" was not determinative; the correct question was whether Vinson, by her conduct, had indicated that the sexual advances were unwelcome. *Id.* at 68 (fact that sex-related conduct was voluntary, in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit under Title VII). The Court acknowledged that the distinction between voluntary submission and unwelcome conduct required fact-finders to make fine distinctions, often based on the credibility of the witnesses. While these distinctions and credibility assessments can be made, it is the fact finder, after considering all of the circumstances, who is to make these distinctions, not the district court on summary judgment. *Id.* at 68-69.

The role which the coercive power of a supervisor plays in harassment cases has been recognized by numerous courts. In *Cooke v. Stefani Management Services, Inc.*, 250 F.3d 564 (7th Cir. 2001), Cooke, a bartender at a Chicago restaurant, claimed his general manager subjected him to a litany of sexual propositions, inappropriate touching, and gestures of a sexual nature. Cooke claimed this treatment was unwelcome. Nevertheless, Cooke would frequently come to the restaurant on his days off and socialize with the general manager. Indeed, Cooke had sent a note to the general manager thanking him for a bottle of wine and saying "Here's looking at

50

many more fun days to come." *Id.* at 566.  Stefani Management argued that this evidence proved that Cooke did not find the conduct "unwelcome." *Id.* at 567.

The Seventh Circuit rejected this argument.  "Although this argument has some appeal, we ultimately reject it because the balance of power between a supervisor and employee is qualitatively different in a social setting that it is at work.  During his scheduled shifts, Cooke was not free to leave [the restaurant], or even turn and walk away from [the general manager] (an action that could be considered insubordinate), if he felt embarrassed." *Id.*

The District Court ignored the significant role which this power imbalance had in Jenkins' decision to accede to McDickinson's demands.  ("Everything about the relationship, apart from the power imbalance inherent within a supervisor-employee relationships, indicates that the relationship was indeed welcome and consensual." Doc. 222:22.)

In many ways, Jenkins was not the "average" employee.  He was an ex-felon, facing all of the challenges which ex-felons face in the workplace.  He felt blessed to have his job at Koch-Ala.  When McDickinson approached him about taking smoke breaks with her, he agreed, despite his concern that he would get in trouble for taking breaks in another area of the plant.  As he said, "I guess she was like showing me she did what she wanted to." (Doc. 182-2:115:8-12.)  And Jenkins' acquiescence was

51

reasonable. McDickinson was the HR Manager for the entire plant; the person responsible for enforcing the rules and imposing discipline.

During the smoke breaks, McDickinson would touch Jenkins and stroke his hair, despite his protestations that she not do it. (Doc. 192:128:10-129:4;275:8-13.) Ultimately, she forced herself on him, luring him into a secluded area of the plant where she performed oral sex on him. When asked why he did not turn around and walk away, he explained: "I didn't have anything. I needed my job, so I went through with it, man, to keep my job." (Doc. 182-2:119:13-17;120:10-16.) He understood how vulnerable he was, as an ex-felon. "Put my hand on her? No. Push her and go back to prison? No. I just – I don't know man. I just had got a blessing to get a job and I wanted to keep it. God blessed me with that job. So I just – I went along with what she asked me, what she did. She said she had me, man. She got me." (Doc. 182-2:120:17-121:2.)

While Jenkins and McDickinson frequently engaged in sexual contact, Jenkins testified that he never approached or asked McDickinson to engage in that conduct; it was always McDickinson who initiated the sexual acts. (Doc. 182-2:129:2-4;401:23;403:4-5.)

"It cannot be assumed that because a man receives sexual advances from a woman that those advances are welcome." *EEOC v. Prospect Airport Services, Inc.*,

52

621 F.3d 991, 997 (9th Cir. 2010). That would be a stereotype and welcomeness, being inherently subjective, must be based upon individual feelings and responses. *Id.*

Despite the evidence that Jenkins' felt coerced into engaging in sexual activity with McDickinson, the District Court concluded that there was no genuine issue of fact as to whether the relationship was consensual and welcome. (Doc. 222:28-29.) To support this conclusion, the District Court pointed out that Jenkins "enjoyed receiving oral sex"; that he "achieved an orgasm during almost every sexual encounter"; that he reciprocated McDickinson's advances by putting on a condom; that he would meet her all over town; and that he felt comfortable refusing McDickinson's requests if he wanted to, like breaking up with his fiancé or refusing to allow Birchfield to watch. (Doc. 222:29.)

But the record is not that one-sided. "[W]hether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Meritor Savings*, 477 U.S. at 68. In *Crutcher-Sanchez v County of Dakota*, 687 F.3d 979 (8th Cir. 2012), Crutcher-Sanchez, a correctional officer, alleged that she was sexually harassed by Chief Deputy Herron. Herron argued that their relationship was consensual; that Crutcher-Sanchez would initiate contact, spent Christmas day with him, engaged in mutual sexual activity in police vehicles, and went to his house several times to have sex.

53

*Id.* at 985. Despite this testimony, the Court of Appeals concluded Crutcher-Sanchez had made a sufficient showing of unwelcome harassment. "[V]oluntary sexual activity may also be unwelcome harassment." *Id.* Of particular note was the fact that Herron had told Crutcher-Sanchez "not to tell anyone about their sexual relationship." *Id.* Nowhere in *Crutcher-Sanchez* is there consideration of whether Ms. Crutcher-Sanchez enjoyed the sex, had an orgasm, or insisted that Herron wear a condom while they engaged in sex.

Here, there is even less evidence of welcomeness than there was in *Crutcher-Sanchez*. There is no testimony from McDickinson to contradict Jenkins' evidence that she was the instigator. Rather, McDickinson claims that no such sexual contact ever occurred.

The District Court put substantial weight on Jenkins' declaration that the relationship was "consensual." (Doc. 222:22.) However, Jenkins testified during this deposition that he did not understand the meaning of the word "consensual." (Doc. 182-2:334:10-336:3.) Regardless, labeling conduct as "consensual" merely suggests consent was given; that the action was taken voluntarily. But, as the Supreme Court noted in *Meritor Savings*, "'voluntariness' in the sense of consent is not a defense" to a claim of sexual harassment. *Meritor Savings*, 477 U.S. at 69.

The District Court erred by resolving factual disputes better left to the fact-finder. The evidence is sufficient to present a genuine issue of material fact as to whether Jenkins was targeted as an African-American male and subjected to unwanted sexual advances and harassment. The District Court's judgment should be reversed.

### III.   Jenkins' State Law Torts.

Jenkins also brought four state law claims against Defendants. The assault and battery, invasion of privacy, and outrage claims against McDickinson were dismissed on the grounds that the relationship between McDickinson and Jenkins was "consensual and welcome." (Doc. 222:28-30.)

Having dismissed the underlying tort claims, the District Court also dismissed the negligent and wanton supervision/hiring claims against the Koch Defendants because there was no viable underlying tort. (Doc. 222:30.)

As discussed above, by concluding that the relationship between McDickinson and Jenkins was "consensual and welcome," the District Court improperly weighed the evidence, made credibility determinations, and resolved factual disputes that must be left to a jury. The District Court's judgment granting summary judgment on Jenkins' state law claims should be reversed.

## CONCLUSION

Jenkins liked his job and, as an ex-felon, was happy to have it. He knew that the McDickinson, HR Manager for the debone plant, enforced the corporate policies and made decision concerning promotions, hours and disciplined. She was charged with protecting employees' rights. However, rather than protect employees, McDickinson used her power and authority to sexually harass Jenkins and coerce him into engaging in a sexual liaison. When she did not get all that she wanted, she and Birchfield decided that they needed to get rid of Jenkins, and they began looking for any grounds that could serve as a cover for their actions.

The District Court erred in granting summary judgment on Jenkins' sexual harassment, race discrimination and harassment, and state law claims. The District Court's judgment should be reversed and those claims remanded to the District Court for further proceedings.

Respectfully submitted,

 /s/ Charles E. Guerrier
Charles E. Guerrier
Alicia K. Haynes
Co-Counsel for Appellant Irish Jenkins

56

Of Counsel:

HAYNES & HAYNES, P.C.                  Heather Leonard
1600 Woodmere Drive                    HEATHER LEONARD, PC
Birmingham, AL 35226                   2105 Devereuz Circle, Suite 111
(205) 879-0377                         Birmingham, AL 35242
ceguerrier@haynes-haynes.com           (205) 977-5421
akhaynes@haynes-haynes.com

Cynthia Wilkinson
WILKINSON LAW FIRM PC
1717 3rd Avenue North, Suite A
Birmingham, AL 35203

**CERTIFICATE OF COMPLIANCE**

I certify this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B)(1), Fed. R. App. Proc., in that, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. Proc., this brief contains 11,563 words.

I further certify this brief complies with the typeface requirements of Rule 32(a)(5), Fed. R. App. Proc., and the type-style requirements of Rule 32(a)(6), Fed. R. App. Proc., in that this document has been prepared using Wordperfect in 14-point font in Times New Roman.

*/s/ Charles E. Guerrier*
Charles E. Guerrier (ASB-5123-E76Y)
Attorney for Appellant Irish Jenkins

58

CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2022, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send notification of such

filing to the following:

Rachel V. Barlotta
Sharonda C. Fancher
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
Wells Fargo Tower
420 North 20th Street, Suite 1400
Birmingham, AL 35203

Marion F. Walker
FISHER & PHILLIPS
2323 2nd Avenue North
Birmingham, AL 35203

 */s/ Charles E. Guerrier*
Charles E. Guerrier
Attorney for Appellant Irish Jenkins