# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
### CASE NO. 22-10480

---

**IRISH JENKINS, Jenkins**

**v.**

**KOCH FOODS, INC., et al., Appellees**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION
Case No. 2:17-cv-364-RAH**

---

**APPELLEE DAVID BIRCHFIELD'S MOTION TO DISMISS APPEAL OF
ALL CLAIMS**

| | |
|---|---|
| **MARION F. WALKER**<br>Of Counsel<br>Alabama Bar No. WAL016<br>**FISHER PHILLIPS LLP**<br>2100A South Bridge Parkway<br>Ste. 650<br>Birmingham, Alabama 35209<br>Telephone:  (205) 327-8534<br>Facsimile:  (205) 718-7607<br>Email:mfwalker@fisherphillips.com | **ANDREW J. BAER,** *Pro Haec Vice*<br>Of Counsel<br>**FISHER PHILLIPS LLP**<br>201 St. Charles Avenue<br>Suite 3710<br>New Orleans, LA 70170<br>Telephone (504) 522-3303<br>Facsimile (504) 529-3850<br>abaer@fisherphillips.com |

**COUNSEL FOR APPELLEES, DAVID BIRCHFIELD AND MELISSA
MCDICKINSON**

**Date: August 1, 2022**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT
No. 22-10480 Irish Jenkins v. Koch Foods Inc., et al.**

**Magistrate Judge Wallace Capel, Jr.**

**Magistrate Judge Stephen Michael Doyle**

**Barlotta, Rachel –** Counsel for Defendants/Appellees Koch Foods, Inc. and Koch Foods of Alabama, LLC

**Birchfield, David –** Appellee

**Carow, Michael - Vice-President for Human Resources Koch**

**Defendant/Appellee Koch Foods, Inc. and/or Koch Foods of Alabama, LLC**

**Edwards, Sonya –** Counsel for Plaintiff

**Elrod, Bobby –** Former Vice-President for Human Resources Koch

**Defendant/Appellee Koch Foods, Inc. and/or Koch Foods of Alabama, LLC**

**Fancher, Sharonda Childs –** Counsel for Defendants/Appellees Koch Foods, Inc. and Koch Foods of Alabama, LLC

**Fisher Phillips LLP –** Counsel for Defendants/Appellees Melissa McDickinson and David Birchfield

**Guerrier, Charles E. –** Counsel for Plaintiff/Appellant

**Haynes, Alicia K. –** Counsel for Plaintiff/Appellant

**Haynes & Haynes, PC -** Counsel for Plaintiff/Appellant

**Heather Leonard, PC –** Counsel for Plaintiff/Appellant

**District Court Judge R. Austin Huffaker, Jr.**

i

**Koch Foods of Alabama, LLC** – Defendant/Appellee

**Harmon, Bart Gregory** – Counsel for Alabama Department of Corrections Legal Division, Movant in the District Court

**Jackson, Steven** – Witness

**Karlson, Daisy Christina** – Counsel for Defendants/Appellees Koch Foods Inc. and Koch Foods of Alabama, LLC

**Koch Foods, Inc.** – Defendant/Appellee

**Leonard, Heather Newson** – Counsel for Plaintiff/Appellant

**McDickinson, Melissa** – Appellee

**District Court Judge Emily C. Marks**

**Reese, Annalese Herndon** – Former Counsel for Defendants/Appellees Melissa McDickinson and David Birchfield

**Smith Ashley Nicole of Miller Smith, LLC** – Counsel for Steven Jackson

Pursuant to Fed. R. App. 26.1, counsel also makes the following disclosures:

David Birchfield is an individual and has no corporate disclosure obligations.

David Birchfield ("Birchfield"), one of the Appellees in the above captioned matter, moves the Court pursuant to Fed. R. App. P. 27 to dismiss the instant appeal as to any and all claims brought against him individually. Birchfield contends the Court lacks jurisdiction over issues and claims not defended or litigated by the parties at the district court level and Appellant Irish Jenkins ("Jenkins") has abandoned the appeal of the individual claims against him on appeal. Appellant's counsel does not oppose dismissing the individual claims brought against Birchfield from this appeal.

## RELEVANT PROCEDURAL HISTORY

Jenkins filed his Original Complaint on June 5, 2017. Complaint, Doc. 1. In the Complaint, Jenkins lodged Alabama state law claims of Outrage, Assault and Battery, and Invasion of Privacy (the "state law claims") against Birchfield in his individual capacity. Complaint, Doc. 1:20-25. The state law claims were the only claims Jenkins brought against Birchfield. Complaint, Doc. 1; Memorandum Opinion and Order, Doc. 222:10-11, attached as Ex. A. Jenkins brought identical claims against Melissa McDickinson ("McDickinson"), an individual co-defendant in the litigation.

The case was litigated for nearly five years. On August 3, 2020, Birchfield filed a Motion for Summary Judgment seeking dismissal of the state law claims brought by Jenkins. *See* Birchfield Motion for Summary Judgment, Doc. 178. The

remaining parties also filed Motions for Summary Judgment similarly seeking dismissal. *See* McDickinson Motion for Summary Judgment, Doc 177, Koch Foods of Ala., LLC Motion for Summary Judgment and Renewed Motion for Judgment on the Pleadings, Doc 179  and Koch Foods, Inc. Motion for Summary Judgment, Doc 181.

<u>Response and Ruling on Summary Judgment Motions</u>

In opposition to Birchfield's Motion for Summary Judgment, Jenkins abandoned the state law claims against Birchfield. *See* Plaintiff's Response In Opposition to Defendant Koch Foods of Alabama, LLC Motion for Summary Judgment ("Jenkins' Summary Judgment Response"), Doc. 194:58-65, attached as Ex. B.[1] When arguing against the dismissal of the state law claims, Jenkins did not present any evidence opposing Birchfield's Motion and only argued against dismissal of the claims against McDickinson. *Id.*  In the absence of offering any evidence or any substantive argument that Birchfield's Motion for Summary Judgment should not be granted, Jenkins failed to meet his burden under Rule 56(c),

---

[1] Regardless of its title the Response filed by Jenkins, it addressed all pending Summary Judgment Motions except Birchfield's. *See, e.g.,* Ex. B where assault and battery claim titled to include all Defendants but only mentions McDickinson touching Jenkins, *Id.,* Doc 194, p. 60, until, without facts, refers to "… the assault of McDickinson and Birchfield . . . ." and "McDickinson's and Birchfield's perverted sexual conduct, questions, comments . . . ;" Outrage claim discussed only as to McDickinson's power over Jenkins and sex with him. *Id.,* at 64. Jenkins did not litigate McDickinson's Motion as to the invasion of privacy claim. Her argument on outrage was followed with a claim of vicarious liability against Koch Foods. *Id.* at 64.

Fed. R. Civ. P.  In effect Jenkins conceded summary judgment was due to be granted on claims against Birchfield, or otherwise waived any defense.

The district court granted all summary judgment motions and dismissed all claims against all parties. *See* Memorandum Opinion and Order, Doc. 222:28, Ex. A. In doing so, the district court stated that it "appears from the briefing that Jenkins only brings these state law claims against McDickinson and has abandoned these claims as to Birchfield." *Id.,* at  n. 12. Jenkins did not seek further argument or reconsideration by the court.

<u>Broad Notice of Appeal Presumptively Includes Claims Against Birchfield</u>

Despite abandoning the state law claims against Birchfield at summary judgment, Jenkins filed a broad notice of appeal "of all claims," thereby including an appeal of the state law claims against Birchfield. *See* Notice of Appeal, Doc. 226, Ex. C.  Jenkins confirmed that he abandoned these claims in his Initial Brief, stating "[w]hile Birchfield originally had been named as a Defendant with regard to the state law claims, Jenkins abandoned those claims at summary judgment." Initial Brief, p. 30, n. 7. To support the abandonment of the claims against Birchfield, Jenkins cited to the Memorandum Opinion and Order granting summary judgment as to all claims and abandonment of the Birchfield claims. *Id*.

Jenkins's abandonment or waiver of the state law claims against Birchfield causes a lack of jurisdiction by this Court and otherwise warrants dismissal of the appeal of claims against Birchfield..

## LEGAL ANALYSIS

### I.    THE APPELLATE COURT LACKS JURISDICTION OVER THE ABANDONED CLAIMS

Jenkins's abandonment of the state law claims against Birchfield deprive this Court of jurisdiction over those claims. Title 28 U.S.C. §1295 provides exclusive jurisdiction to this Court over appeals from a final decision of a district court of the United States. Because Jenkins did not defend, or otherwise litigate the issues laying the basis for the dismissal of the state law claims against Birchfield before the district court, any effort to do so on appeal is not jurisdictionally sound.  An issue not litigated or defended in the district court cannot be appealed. *See, e.g., T.R. by & through Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 885 (11th Cir.2022) (Defendants' failure to make argument on Fourth Amendment claim at district court waived the argument on appeal.), *citing Access Now, Inc. v. Sw. Airlines Co.,* 385 F. 3d 1324, 1331 (11th Cir. 2004)("An issue not raised in the district court and raised for the first time on appeal will not be considered by this court."); *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1352 (11th Cir.2017) (refusing to consider arbitrability of claims because it was not raised before the district court.)  "Ordinarily an appellate court does not give consideration to issues not raised below." *Hormel v. Helvering*,

312 U.S. 552, 556 (1941);*see also Garner v. G.D. Searle Pharm. Co.,* 581 Fed. Appx. 782, 784 (11th Cir.2014) (finding a party waived an argument on appeal by failing to provide record citations indicating when and how the issue had been raised below).

Birchfield submits this Court lacks jurisdiction over any claims against him on appeal because they were waived at the summary judgment stage. *See also Wilder v. Paulson*, 1:08-CV-1349-TCB-LTW, 2010 WL 11606948, at *6 (N.D. Ga. June 16, 2010), *report and recommendation adopted,* 1:08-CV-1349-TCB, 2010 WL 11607058 (N.D. Ga. July 15, 2010) (Finding the district court lacked jurisdiction as an appellate body when plaintiff's retaliation claim had been abandoned at the agency hearing when the plaintiff did not put forth any support for the claim).

## II. THE APPEAL OF STATE LAW CLAIMS AGAINST BIRCHFIELD WERE WAIVED WHEN NOT INCLUDED IN THE APPELLATE BRIEF

Jenkins did not raise any arguments seeking reversal of the summary dismissal of claims against Birchfield in the Initial Brief. A party waives arguments that are not raised in its initial brief on appeal. *See, e.g., Sapuppo v. Allstate Floridian Ins. Co.,* 739 F. 3d 678, 680 (11th Cir. 2014)(court does not review issues that party does not prominently raise on appeal); *Elnenaey v. Fid. Mgmt. Trust Co., Inc.,* No. 19-13253 *4 (11th Cir. Oct. 7, 2020)( *Markland v. Centro Grp., LLC*, 18-BK-23155, 2021 WL 1705754, at *10 (S.D. Fla. Mar. 24, 2021), *aff'd sub nom. In Re Centro*

*Grp., LLC*, 21-11364, 2021 WL 5158001 (11th Cir. Nov. 5, 2021). A party's passing reference or failure to cite authorities in support of an issue waives it. *Miccosukee Tribe of Indians of Fla. v. Cypress,* 814 F. 3d 1202, 1211 (11ᵗʰ Cir. 2015).

Jenkins did not raise any arguments seeking the reversal of the dismissal by the district court of claims against Birchfield. Rather, he agreed that the claims had been abandoned, stating, "[w]hile Birchfield originally had been named as a Defendant with regard to the state law claims, Jenkins abandoned those claims at summary judgment." Initial Brief, p. 30. Any existing appeal of the dismissal by the district court of claims against Birchfield should be dismissed as waived.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, David Birchfield moves the Court to dismiss any and all appeal of the dismissal of claims against him forthwith.

Respectfully submitted, this 1st day of August, 2022.

<div style="margin-left:auto">

*s/ Marion F. Walker*
**MARION F. WALKER**
Alabama Bar No. WAL016
**FISHER PHILLIPS LLP**
2100A South Bridge Parkway
Ste. 650
Birmingham, Alabama 35209
Telephone:  (205) 327-8534
Facsimile:  (205) 718-7607
Email: mfwalker@fisherphillips.com

</div>

**ANDREW J. BAER**
Of Counsel
**FISHER PHILLIPS LLP**
201 St. Charles Avenue
Suite 3710
New Orleans, LA 70170
Telephone (504) 522-3303
Facsimile (504) 529-3850
Email: abaer@fisherphillips.com
**COUNSEL FOR APPELLEES,**
**DAVID BIRCHFIELD AND**
**MELISSA MCDICKINSON**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of August, 2022, a copy of Appellee David

Birchfield's Motion to Dismiss Appeal  was filed using the Court's ECF/CM system,

which will send a notice of electronic filing to all counsel of record.

*s/ Marion F. Walker*
Of Counsel

7

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B)(1), Fed. R. App. Proc, in that, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. Proc., this brief contains 1548 words.

I further certify this brief complies with the typeface requirements of Rule 32(a)(5), Fed R. App. Proc., and the type-style requirements of Rule 32(a)(6), Fed. R. App. Proc., in that this document has been prepared using 14-point font in Times New Roman.

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

IRISH JENKINS,                        )
                                      )
        Plaintiff,                    )
                                      )
    v.                                )        Case No. 2:17-cv-364-RAH
                                      )        [WO]
KOCH FOODS, INC., *et al.*,           )
                                      )
        Defendants.                   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Irish Jenkins filed this employment discrimination lawsuit, alleging

numerous causes of action against his former employer, Koch Foods of Alabama

LLC (Ala-Koch); Ala-Koch's parent company, Koch Foods, Inc. (Koch Foods); and

Melissa McDickinson and David Birchfield, two former Ala-Koch employees who

served as human resource supervisors during Jenkins's employment. This matter

comes before the Court on the following motions: Ala-Koch's *Motion for Summary*

*Judgment and Renewed Motion for Judgment as a Matter of Law* (Doc. 179), Koch

Foods's *Motion for Summary Judgment as to Plaintiff's Claims and Memorandum*

*in Support* (Doc. 181), David Birchfield's *Motion for Summary Judgment and Brief*

*in Support* (Doc. 178), and Melissa McDickinson's *Motion for Summary Judgment*

*and Brief in Support* (Doc. 177). All four motions have been fully briefed and are

1

Koch required Jenkins to be re-trained on the company's harassment and anti-discrimination policy. (Doc. 180 at 9.) Suffice it to say, Jenkins was well-versed on the policy and its anti-harassment and anti-fraternization provisions.

Despite this knowledge, in 2015, although Jenkins was in a romantic relationship with another woman, he began an admittedly "consensual" sexual relationship with Defendant Melissa McDickinson, a human resources supervisor[1] at the Montgomery, Alabama de-bone plant, who herself was rumored to be in a sexual relationship with HR director David Birchfield. (Doc. 176-10; Doc. 189-15 at 42.)

The relationship began in October 2015 after McDickinson sent a message to Jenkins telling him that she was attracted to him. (Doc. 176-10 at 1.) Jenkins was clear in his deposition about who initiated the relationship, "I didn't present myself to her. She came at me, man." (Doc. 182-2 at 35.) McDickinson told Jenkins she wanted to "hang out" and that she had a sexual preference for black men. (Doc. 189-3 at 84.) She also told Jenkins that as long as he was with her, he could do whatever he wanted to at work. (*Id*. at 85.)

Between October 2015 and March 2016, Jenkins and McDickinson had sexual intercourse on upwards of ten occasions (Doc. 182-2 at 46), McDickinson performed

---

[1] McDickinson and Birchfield are sometimes referred to as supervisors and at other times as managers, both of which are terms used interchangeably in this opinion since the parties use the terms interchangeably.

33.) Jenkins could only recall trying to end the relationship "once or twice" because the affair posed a risk to his job and his relationship with his soon-to-be fiancé. (*Id.* at 47.)

Although he maintains the relationship was consensual, Jenkins also felt like he had no other choice but to engage with McDickinson. In his deposition, Jenkins testified, "I needed my job, so I went through with it, man, to keep my job." (*Id.* at 33.) And when asked why he did not physically separate from McDickinson, Jenkins responded, "Put my hand on her? No. Push her and go back to prison? No. . . . God blessed me with that job. So I just – I went along what she asked me . . . she had me, man. She got me." (*Id.*) Every time they engaged sexually, Jenkins says he "just wanted to get everything over with." (*Id.* at 117.)

## A. Rumor & Investigation

At some point during the summer of 2015, word spread throughout Ala-Koch that Jenkins was having sex with McDickinson in exchange for time off. (Doc. 180 at 11.) The rumors garnered enough traction for Ala-Koch to investigate. In August 2015, despite the rumors implicating Birchfield being in a sexual relationship with McDickinson, Ala-Koch assigned David Birchfield to investigate the rumors about McDickinson and Jenkins. And according to Birchfield, after investigating, all persons implicated in the rumors denied any such activity. (Doc. 180 at 11.)

5

## B. Birchfield's Propositions

No one else participated in or witnessed McDickinson and Jenkins's sexual escapades—but not for a lack of trying, according to Jenkins. Beginning sometime in November of 2015, a month or so into their affair, McDickinson began asking Jenkins if Birchfield could watch Jenkins have sex with her. (Doc. 189-3 at 85.) Each time, Jenkins refused. (Doc. 176-10 at 2.) Their relationship continued into the new year, as did McDickinson's attempts to obtain Jenkins's permission to allow Birchfield to watch them have sex.

Sometime in January 2016, Jenkins was called into McDickinson's office, and with Birchfield present, McDickinson asked if Jenkins had reconsidered allowing Birchfield to watch. (Doc. 189-3 at 86.) Again, Jenkins refused. (Doc. 176-10 at 3.) This was the last request made by McDickinson although the two may have continued their liaisons for several more months until Jenkins left Ala-Koch. (Doc. 182-2 at 51.)

## C. Jenkins's Absence Issues and Termination

Throughout his relationship with McDickinson, Jenkins's work attendance was perceived as "problematic." (Doc. 189-9 at 52.) Jenkins routinely was seen roaming the plant and leaving his work area to take smoke breaks—breaks that he would often take with co-workers, including McDickinson and Birchfield. While these

7

Birchfield wanted to fire Jenkins and another Ala-Koch employee. (*Id.* at 44). Jenkins also maintains that Birchfield falsely accused him of stealing company time and that he was actually fired because he refused to allow Birchfield to watch him have sex with McDickinson. (Doc. 1 at 10.) Cortes, however, states that Bobby Cotton made the decision to fire Jenkins because he "wanted [Jenkins] gone." (Doc. 189-9 at 54.) And given Jenkins's attendance track record, Cortes believed that Jenkins "should not have lasted [at Ala-Koch] as long as he did last." (*Id.* at 56.)

**D. Jenkins's Complaint, EEOC Charge, and Lawsuit**

Prior to his suspension, Jenkins never reported his sexual relationship with McDickinson, or her requests to allow Birchfield to watch their encounters, to anyone at Ala-Koch. When asked why he did not complain, Jenkins testified, "[W]ho could I speak to? . . . [T]he people I thought could help me was the ones that . . . that did what they did to me . . . ." (Doc. 182-2 at 51.)

However, after he was suspended, Jenkins contacted Bobby Elrod, Koch Foods's corporate director of human resources, and filed a complaint alleging that he had been harassed by McDickinson and also that McDickinson and Birchfield were involved in a sexual relationship. (Doc. 176-10 at 3; Doc. 182-12 at 9–10.) Neither Elrod nor anyone else at Ala-Koch followed up with Jenkins regarding his complaint.

9

- Count VIII—Outrage/Intentional Infliction of Emotional Distress Against All Defendants

## II.    JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to Jenkins's federal causes of action, and the Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Just as important, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this assessment, the Court must "view all the evidence and all factual inferences

11

theories, Jenkins presently only advances a claim for quid pro quo harassment and

therefore the Court will only address that claim.[4]

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to

discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). One way that

workplace sexual harassment can alter the terms and conditions of employment is if

an "employee's refusal to submit to a supervisor's sexual demands results in a

tangible employment action being taken against [him]." *Hulsey v. Pride Rests.*, 367

F.3d 1238, 1245 (11th Cir. 2004.)  This is sometimes called quid pro quo or tangible

employment action harassment.[5]  "An employer is liable under Title VII if it (even

unknowingly) permits a supervisor to take a tangible employment action against an

---

"got rid of my ass," and he was "gone"—presumably meaning after he was terminated. (Doc. 182-2 at 51.) Therefore, given that Jenkins cannot recall when the relationship ended, let alone whether he actually ever refused to participate in the relationship, and that it may have been after he was terminated, the Court cannot rely on Jenkins's "refusal" of McDickinson's advances as the basis for Jenkins's tangible employment action claim. *See Minix v. Jeld-Wen, Inc.*, No. 3:05CV685-MHT, 2006 WL 2971654, at *3 (M.D. Ala. Oct. 17, 2006), *aff'd*, 237 F. App'x 578 (11th Cir. 2007) (holding that a plaintiff cannot create an issue of fact as to causation where the plaintiff can "not remember when the harassment occurred"). Instead, the Court focuses on Jenkins's January 2016 refusal to permit Birchfield to watch Jenkins and McDickinson have sex.

[4]Although the Complaint alleges that he was "subjected . . . to a hostile work environment," Jenkins only argues for sexual harassment liability under a quid pro quo theory in his summary judgment briefing. (Doc. 194 at 55 ("Jenkins' sexual harassment claim is based on the first theory of sexual harassment; a claim for tangible job action sexual harassment.").) Therefore, his sexually-motivated hostile work environment theory is deemed abandoned. *See Brackin v. Anson*, 585 F. App'x 991, 994 (11th Cir. 2014) ("The parties bear the burden of formulating arguments before the district court, and grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned and will not be considered . . . .").

[5] While the Court recognizes that there has been a shift away from the "quid pro quo" terminology, *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998), for purposes of brevity and readability, the Court uses the phrase here as a stand-in for the tangible employment action theory.

either McDickinson or Birchfield made the decision to terminate Jenkins; (2) the decision to terminate Jenkins occurred over two months after McDickinson's last proposition, and over five months after her first proposition; and (3) there was a legitimate, and well-documented, reason to terminate Jenkins that Jenkins has failed to rebut.

First, the record is devoid of any evidence—other than Jenkins's own speculation[6]—that either McDickinson or Birchfield made the decision to terminate him. *See Walton v. Johnson & Johnson Servs., Inc.,* 347 F.3d 1272, 1282 n.7 (11th Cir. 2003) (finding no causal link where there was no evidence that the harassing supervisor "played a role in the decision to terminate" the plaintiff); *Taylor v. CSX Transp.,* 418 F. Supp. 2d 1284, 1300 (M.D. Ala. 2006) (finding no causal link where there was "no evidence indicating" that the alleged harassers were involved in any of the adverse employment decisions). Typically, when the harasser is involved in the decision-making process, there can be an inference of a causal connection. *Id.* at 1301. But when the decisionmaker was not the harasser, no such inference is warranted. And here, Jenkins fails to present any evidence that either Birchfield or McDickinson had a role in terminating him.

---

[6] In the argument section of his brief opposing summary judgment, Jenkins exclusively relies on evidence that he "believed" and "felt" that Birchfield and McDickinson fired him. (Doc. 194 at 55.) In the facts section of his brief, Jenkins cites to Shaw's deposition testimony as evidentiary support that McDickinson and Birchfield fired Jenkins, but a review of this testimony reveals that it does not support Jenkins's position, as Shaw testified that he did not know who issued the order to fire Jenkins. (Doc. 182-4 at 25–26.)

Oct. 17, 2006), *aff'd*, 237 F. App'x 578 (11th Cir. 2007) (quoting *Cotton v. Cracker
Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006)). "[T]his
period of time, without more . . . is too long for a factfinder to be able to conclude,
other than by mere speculation, that there was a causal relationship between" the
sexual propositions and the termination. *Id.* (finding a two-month gap between
adverse action and predicate harassment, in isolation, to be insufficient to establish
a causal connection, even when the ultimate decisionmaker of the employment
action was the harasser).

Third, Jenkins fails to rebut the Koch Defendants' evidence showing that
Jenkins was fired for a legitimate reason independent of the alleged harassment. *See
Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1312–13 (11th Cir. 2001)
(finding no causal link where the plaintiff failed to rebut the employer's legitimate
reason to take an adverse employment action); *see also Walton v. Johnson &
Johnson Servs., Inc.,* 347 F.3d 1272, 1282 (11th Cir. 2003) (finding no causal link
because "the undisputed evidence is that [the plaintiff] was terminated" for reasons
unrelated to the alleged harassment). Throughout 2015 and 2016, Jenkins routinely
was written up for his attendance problems. Indeed, in December 2015, he was given
his final warning. After that final warning, he was again caught taking a smoke break
while on the clock, was reported, and ultimately was terminated by Cotton and
Cortes for stealing company time.   Jenkins does not rebut these events or even

17

### a. Disparate Treatment

Where, as here, there is an absence of direct evidence of race discrimination, to establish a prima facie case of race discrimination supported by circumstantial evidence, Jenkins must show that he (1) belongs to a protected class, (2) was subjected to an adverse employment action, (3) was qualified to perform the job in question, and (4) that the Koch Defendants treated similarly situated employees "outside [Jenkins's] class more favorably." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). Because Jenkins has failed to present evidence of similarly situated employees outside of his class, he cannot establish a prima facie case of race discrimination.

As to the fourth element, Jenkins presents no evidence of white comparators; instead, he points to several alleged similarly situated black employees. (Doc. 194 at 53.) He argues that "it makes no difference that the individuals identified by Jenkins as receiving more favorable treatment than he are also African-American. If his race was a factor in the employer's employment decisions, the Defendants have violated . . . § 1981." (Doc. 194 at 53.)

What Jenkins seems to miss with this statement is that, when using circumstantial evidence to support a claim of discrimination, the comparison to similarly situated employees *outside* of the plaintiff's class is precisely what creates the inference that race was a factor in the employer's employment decisions. *See*

19

In Count II, Jenkins also brings a claim for a racially motivated hostile work environment under Title VII and 42 U.S.C. § 1981. To prove a claim under both statutes, Jenkins must prove the following:

> that he [or she] belongs to a protected group; (2) that he [or she] has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Brant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009) (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (discussing how the elements and analysis of a hostile work environment claim are the same under § 1981 and Title VII)).

In their summary judgment motions, the Koch Defendants argue that Jenkins cannot establish that he was subjected to sufficiently severe *unwelcome* harassment. (Doc. 199 at 29.) The harassment alleged here can be broken into two categories: (1) Jenkins's sexual relationship with McDickinson, and (2) McDickinson's propositions that Jenkins allow Birchfield to watch as she and Jenkins engage in sex acts. Both harassment categories fail to predicate a hostile work environment claim

21

The relationship lasted for months. When Jenkins and McDickinson were not

having sex, they regularly spoke on the phone with one another. When they were

having sex, they would meet all over town and at all times of the day. Jenkins met

with McDickinson at work and at various locations throughout town, at night and

during the day, with friends and family present and by themselves, at friends' houses

and in each other's cars. Jenkins testified that he would take the time to put a condom

on before having sex with McDickinson, that he enjoyed their sexual trysts, and that

he had an orgasm during each encounter except one occasion on which a co-worker

interrupted them in McDickinson's office. Further, there is no evidence that

McDickinson ever conditioned their relationship with threats, and Jenkins never

reported or complained to anyone during the months-long affair. *See Miles v. City

of Birmingham*, 398 F. Supp. 3d 1163, 1180 (N.D. Ala. 2019) (emphasizing that the

"crux of the welcomeness inquiry" is whether the "employee's conduct indicated

that the sexual advances were unwelcome" not whether the relationship is

characterized as unwelcome after-the-fact"); *Waltz v. Dunning*, No. 2:13-CV-00517-

JEO, 2014 WL 7409725, at *9 (N.D. Ala. Dec. 31, 2014) (finding sexual relationship

was not unwelcome when viewing the plaintiffs conduct in totality revealed a

consensual relationship).

And during each sexual encounter, Jenkins never physically or verbally

attempted to end the interaction or communicate to McDickinson that her advances

WL 10665813 (N.D. Ga. Jan. 20, 2009) (finding a jury issue as to whether oral sex was welcome where the plaintiff received oral sex to completion and then pushed the defendant away, ended the relationship, and complained about the incident to a third party).

Second, Jenkins has failed to provide sufficient evidence showing that McDickinson's verbal propositions were sufficiently severe or pervasive to state a hostile work environment claim. The severe or pervasive analysis first asks a court to consider whether the plaintiff subjectively perceived the harassment as severe or pervasive, and second asks the court to determine whether that perception is objectively reasonable. *See Lockett v. Choice Hotels Intern., Inc.*, 315 F. App'x 862, 865 (11th Cir. 2009) (per curiam). Courts typically use four factors when deciding whether conduct meets the objective inquiry: "(1) the frequency of the [discriminatory] conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's job performance." *Id.* at 865–66.

Here, construing the facts in the light most favorable to Jenkins, McDickinson asked Jenkins to allow Birchfield to watch them have sex; the first request occurring in November 2015 and the last in January 2016, two months before Jenkins was

Viewing all four severe or pervasive factors in totality, Jenkins has failed to present sufficient evidence showing that the workplace harassment—here, McDickinson's verbal propositions—was sufficiently severe or pervasive to support a hostile work environment claim. Therefore, summary judgment is due to be granted on Count II in favor of the Koch Defendants.

### 3. Retaliation (Count IV)

In Count IV, Jenkins brings a claim against the Koch Defendants alleging that he was retaliated against for complaining to Bobby Elrod about McDickinson's and Birchfield's alleged harassment. (Doc. 23 at 9.)  Like several of Jenkins's other allegations, he failed to respond to the Koch Defendants' summary judgment arguments regarding his retaliation claim. In fact, Jenkins completely ignores this claim in his brief opposing the Koch Defendants' summary judgment motion. Therefore, as to Count IV, Jenkins has abandoned this claim and it is due to be dismissed.[11] *See Brackin v. Anson*, 585 F. App'x 991, 994 (11th Cir. 2014) (per curiam).

---

[11] Nonetheless, summary judgment would still be appropriate because Jenkins's purported protected activity—complaining to Elrod—occurred *after* the adverse action (termination) was taken, negating causation. Jenkins originally claimed in a declaration that he complained to Elrod after he was fired, but in a subsequent declaration, he changed his story and asserted that he complained to Elrod while he was suspended but *before* he was fired. (Doc. 182-12 at 10; Doc. 189-3 at 86.)  Given the inherent contradiction in the statements, the Court finds that, at least in part, the second affidavit is a sham and Jenkins's secondary timeline will not be considered. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) ("[T]he affidavit should be disregarded as a sham. Its flat contradiction to the earlier [testimony] was unexplained and therefore was inadequate to raise a genuine issue of fact which was denied to exist by the earlier deposition."); *see also Baggett v. Rehau, Inc.*, No. CV 07-PWG-2224-S, 2009 WL 10674316, at *5 (N.D. Ala. Oct. 15, 2009), *report and recommendation adopted*, No. 2:07-CV-2224-LSC, 2010 WL 11530355 (N.D. Ala. Jan. 21, 2010), *aff'd,* 411 F. App'x 280 (11th Cir. 2011) (applying the sham affidavit rule to prior written evidence).  Similar alleged contradictions form the basis of the Defendants' Joint Objections and Motion to Exclude.

relationship was consensual and welcome. Indeed, Jenkins fails to grapple with his own testimony that he enjoyed receiving oral sex; that he achieved an orgasm during almost every sexual encounter; that he reciprocated McDickinson's advances and would make the conscious decision to put on a condom; that he would meet her all over town, at all times, and with co-workers, friends, and family present; that he never felt threatened by McDickinson; that he felt comfortable refusing McDickinson's requests if he wanted to—like refusing to break up with his girlfriend and refusing to allow Birchfield to watch; that he never complained or reported McDickinson once during their prolific, months-long affair; and that he himself described the relationship as consensual on multiple occasions, even after being fired.

Because the relationship was consensual and welcome, Jenkins's assault and battery, invasion of privacy, and outrage claims all collaterally fail. First, assault and battery requires a touching that was "harmful and offensive," an element that is absent from a consensual sexual interaction. *See Ex Parte Atmore Cmty. Hosp.*, 719 So. 2d 1190 (Ala. 1998); *see also Waltz v. Dunning*, No. 2:13-CV-00517-JEO, 2014 WL 7409725, at *9 (N.D. Ala. Dec. 31, 2014) (granting summary judgment as to assault and battery claim because "all of the evidence . . . considered together" made "clear" that the sexual relationship was consensual). Second, invasion of privacy requires an intrusion that would "outrage or cause mental suffering, shame or

2. The Motion for Summary Judgment filed by Koch Foods, Inc. (Doc. 181) is GRANTED;

3. The Motion for Summary Judgment filed by Melissa McDickinson (Doc. 177) is GRANTED;

4. The Motion for Summary Judgment filed by David Birchfield (Doc. 178) is GRANTED; and

5. The Defendants' Joint Objection and Motion to Exclude (Doc. 198) is DENIED as moot.

DONE, on this the 14th day of January, 2022.

                 _____/s/ R. Austin Huffaker, Jr._____
                 R. AUSTIN HUFFAKER, JR.
                 UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| IRISH JENKINS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| v. | ) | **2:17-cv-00364-RAH-JTA** |
| | ) | |
| KOCH FOODS, INC.; | ) | |
| KOCH FOODS OF ALABAMA, LLC; | ) | |
| DAVID BIRCHFIELD;    and | ) | |
| MELISSA MCDICKINSON; | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT KOCH FOODS OF ALABAMA, LLC'S MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

The Human Resource Department at the Koch Foods debone facility in Montgomery, Alabama was dysfunctional and out of control due to the ongoing actions of those charged with protecting employee' rights, the Complex Human Resource Manager and the plant Human Resource Manager.  What Irish Jenkins was forced to endure at the hands of David Birchfield and Melissa McDickinson is akin to a modern-day Sodom and Gomorrah that has been continually ignored by Koch's management team.  These two managers were entrusted with unlimited and unchecked power and control over the Montgomery work force.  Instead of working to the greater good, they abused the unlimited authority of their management positions to exploit and debase the most vulnerable of America's workers. Plaintiff Irish Jenkins submits this consolidated response in opposition to Defendants' Motions for Summary Judgment.  Docs. 177, 177-1, 178, 178-1, 179 and 180.

1

EXHIBIT B

## II.     JENKINS' FACTUAL ALLEGATIONS

Koch Foods, Inc. ("Koch") processes and sells chicken to various wholesale and government entities across the country. Koch is the sole member of several limited liability companies across the country[1], including Koch Foods of Alabama, L.L.C., (Koch-Ala), a chicken processing facility in Montgomery, Alabama. (*Id*.). Koch-Ala has three facilities that make up the Montgomery complex: the kill plant, the debone plant, and a hatchery. (*Id*.). The kill and debone facilities have separate human resource departments, each with their own manager. Both HR Managers reported to Birchfield, the Human Resources Complex Manager for Koch-Ala. Birchfield reported to Bobby Elrod ("Elrod"), the Corporate Director of Human Resources for all Koch entities who receives a paycheck from Koch Foods of Mississippi, LLC, keeps an office at the Gadsden facility for Koch Foods of Alabama, LLC, and reports him employer as being "Koch Foods".[2] Elrod oversees seven complexes. (Doc. 189-9 p. 178, PX164 Elrod/Jenkins p. 14:19-21). Elrod reports to Mark Kaminsky, the CEO of Koch Foods.[3] Mr. Kaminsky reports to Joe Grendys, the owner of Defendants Koch Foods, Inc. and Koch Foods of Alabama, LLC.[4]

### A.  KOCH HARASSMENT AND RETALIATION POLICIES AND TRAINING

Koch claims to show a Zero Tolerance policy on sexual harassment.[5] The policy specifically prohibits conduct of a sexual nature and includes: (1) suggesting, explicitly or implicitly, that an employee's or applicant's response to a sexual advance or request for sexual favors will or may affect the terms or conditions of his/her employment; (2) sexual flirtations, propositions, requests or demands for sexual favors; (3) unwelcome advances or touching; (4) graphic or suggestive

---

[1] Koch Foods operates in 6 states - Mississippi, Alabama, Georgia, Tennessee, Ohio and Illinois. (Doc. 189-9, p. 281, Elrod /Fuller, p. 31:12-32:23).
[2] Doc. 192-18, Elrod/Boyd, p. 31:5-11).
[3] https://www.forbes.com/companies/koch-foods/#f282d6f24485;( Doc. 189-9, p. 282, Elrod/Fuller, p. 35:15-36:17).
[4] Doc. 189-9, p. 280, PX 165, Elrod/Fuller, p. 23:5-16; p. 36:13-18).
[5] Doc. 189-1 pg. 53).

comments about an individual's dress or body; the display in the workplace of sexually suggestive objects, pictures and photographs; and (5) other verbal, physical or visual conduct of a sexual nature or based on sex.[6] The Complex HR Manager, David Birchfield, was responsible for making sure the HR Manager, Melissa McDickinson, followed the law.[7] Per Birchfield, HR Managers are held to higher standards than other employees.[8] Employees and managers that make up the Human Resource department at Koch are held to a higher standard because they are the gatekeepers of the Koch employment policies.[9] It was Birchfield's job as Complex HR Manager to ensure a workplace free of sexual harassment for employees at Koch Foods.[10]

Koch has a two-step procedure for reporting sexual harassment: the harassed employee may report to the shift manager, plant manager or complex HR manager or they may contact the Corporate Director of Human Resources, Bobby Elrod.[11] Koch provides two separate telephone numbers for contacting Mr. Elrod directly.[12] For someone at McDickinson's level, the decision maker on discipline "more than likely"  would  be Mr. Elrod with input from Birchfield who "would have been the person probably that provided all the information to him."[13]

Salaried employees receive annual harassment training which lasts approximately 45 minutes. [14]  At that training, Birchfield distributes the harassment policy and reads each section.[15] Birchfield would then conclude his reading of the policy by asking for questions, and if no questions, there was no discussion.[16] Deviating from these procedures could permit a court or jury

---

[6] Doc. 189-1 pg. 53).
[7] Doc. 189-6, p. 121, PX 156, Birchfield/Jenkins p. 93:1-17).
[8] Doc. 189-6, p. 154, PX 156, Birchfield/Jenkins p. 225:12-18).
[9] Doc. 192-3, PX 191, Birchfield/Fuller p.18:6-13; Doc. 189-6, p. 102, 154, 191, PX 156, Birchfield/Jenkins p. 18:6-13, 225:16-18, 374:19-375:16).
[10] Doc. 189-6, p. 123, PX 156, Birchfield/Jenkins p. 103:19-104:2).
[11] Doc. 189-1, p. 53-65).
[12] Doc. 189-1, p. 53-65).
[13] Doc. 192-3, PX 191, Birchfield/Fuller, p.32:7-16).
[14] Doc. 192-3, PX 191, Birchfield/Fuller 19:18-20:8; 21:7-16).
[15] Doc. 192-3, PX 191, Birchfield/Fuller 19:18-20:8; 21:7-16).
[16] Doc. 192-3, PX 191, Birchfield/Fuller, 94:20 – 96:3).

to construe discrimination may have occurred.[17]

Koch has an anti-fraternization policy that specifically prohibits employees from fraternizing with employees they supervise or dating or engaging in intimate relationships with anyone under their direct or indirect supervision. Intimate means an "in depth personal relationship . . . Don't be involved at a very deep level with people you work with or supervise or indirectly supervise."[18] McDickinson acknowledged the policy on August 4, 2014, along with the sexual harassment policy and all other policies.[19]

Koch also has an anti-retaliation policy which states that you cannot take action against someone who is ascertaining rights under this policy, including not taking action against someone who participated in an investigation.[20] Despite the policies and training by Koch, a culture of fear existed in HR, the administration, and management.[21] HR employees did not trust Elrod, Birchfield or McDickinson.[22]

## B.  BIRCHFIELD AND MCDICKINSON'S ROMANTIC RELATIONSHIP

Early in McDickinson's employment, it became evident to the HR staff that Birchfield and McDickinson were romantically involved.[23] McDickinson had Birchfield's first name tattooed on her wrist; she openly shared intimate details about his life; they would drink out of the same water bottle in front of people; the two would leave for two hour long lunches and McDickinson would not be required to clock out[24]; Birchfield and McDickinson would hang out in her office talking several times a week when Birchfield had never before left the kill facility to come to the debone

---

[17] Doc. 189-6, , PX 156, Birchfield/Jenkins p. 73: 7-15).
[18] Doc. 192-3, PX 191, Birchfield/Fuller, pp. 52:17-55:17; PX4).
[19] Doc. 189-1 pg. 53.
[20] Doc. 192-3, PX 191, Birchfield/Fuller, 115:6-116:6).
[21] Doc. 189-9, p. 25, PX 162, Cortes p. 93:7-94:5).
[22] Doc. 189-9, p. 25, PX 162, Cortes p. 93:7- 94:5).
[23] Doc. 189-9, p. 21-22, PX 162, Cortes p. 77:22- 81:7).
[24] Doc. 189-16, p. 18-19, PX 180, Simmons p. 67:19-23; 69:3-70:19).

facility[25]; she disclosed his financial information and she would confide in Laura Cortes, HR Generalist, and Steven Jackson, Union Steward,  about Birchfield.[26] Likewise, Birchfield let Randy Sharpley, Chief Union Steward, know he was intimate with McDickinson, talking "hoochie coochie" talk with her while on speaker phone in Sharpley's presence and talking about the color of her panties and tattoos.[27] Sharpley also saw Birchfield and McDickinson visit the plant on a Sunday and they were in the same vehicle.[28] Sharpley did not ask why McDickinson and Birchfield were together on a Sunday, because he already knew, "We already knew. Everybody knew" and he did not want to get fired.[29]  Sharpley also saw Birchfield pick up McDickinson for lunch and be gone for long periods or he would bring lunch to the office to eat with McDickinson.[30] "It's like look, if they didn't like you or heard that you said something, God forbid if you said anything about David and he knew it. If you said anything about the relationship or all of the rumor mills and stuff and that you said it, and he knew you said it, then you would have a target…"[31]

McDickinson also discussed her sexual escapades outside of her marriage with HR staff and allowed Laura Cortes[32] to listen while she discussed sexual positions with a Koch employee at another facility.[33] McDickinson and Birchfield invited the union steward, Steve Jackson, to watch them have sex with each other and they would invited others to join them in sex.[34] Birchfield would invite other Koch employees, including HR staff, to join in group sex.[35] Birchfield photographed certain people and events in compromising sexual situations as an insurance policy

---

[25] Doc. 189-16, p. 20, PX 180, Simmons p. 73:14-76:6.
[26] Doc. 189-9, p. 22-23, PX 162, Cortes p. 81:22-84:13.
[27] Doc. 189-15, p. 42, 68-69, PX 178, Sharpley p. 61:7-62:8, 64:3-19, 165:19-22, 166:16-167:6, 169:3-170:17, 171:7-172:2.
[28] Doc. 189-15, p. 43-44, PX 178, Sharpley p. 67:5-69:4.
[29] Doc. 189-15, p. 43-44, PX 178, Sharpley p. 68:6-69:4.
[30] Doc. 189-15, p. 46, PX 178, Sharpley p. 78:21-80:8.
[31] Doc. 189-15, p. 75, PX 178, Sharpley p. 195:16-196:8.
[32] Cortes was also uncomfortable with McDickinson's inappropriate and sexually suggestive conduct at a party McDickinson hosted. (Cortes 188:16-190:15). Cortes stopped being friends with McDickinson after McDickinson was suspended and was under investigation for having sex with a union man and taking an employee file out of the office to have it doctored up. (Cortes 87:3-21, 250:3-255:1, 287:13-288:23.
[33] Doc. 189-9, p. 23, 64-65, PX 162, Cortes p. 87:3-88:9; 251:9-254:18.
[34] Doc. 189-12, PX 170, Jackson sworn statement, p.36:16-38:18.
[35] Doc. 189-12, PX 170, Jackson sworn statement, p.40:14-48:14.

for later use; Jackson did the same, photographing McDickinson and Birchfield.[36]

### C.   MCDICKINSON   AND   BIRCHFIELD   SOLICIT   A   SEXUAL   RELATIONSHIP WITH JACKSON

Not only were McDickinson and Birchfield involved in an intimate relationship in violation of Koch's anti-fraternization policy, they solicited a sexual relationship with Steve Jackson, African American Union Steward. Jackson told Sharpley he was having sex with McDickinson.[37] Sharpley did not report this to Birchfield because Birchfield already knew based on Jackson's statement about being at McDickinson's house in Wetumpka and McDickinson pulling her shirt up and showing her breasts to Jackson and Birchfield.[38] Jackson referred to McDickinson as his "BFF" or best friend forever and called her "Miss America."[39] Jackson called Birchfield "boss man" or the "king."[40]

### D.   MCDICKINSON SEXUALLY HARASSES JENKINS

Irish Jenkins, ("Jenkins"), started working at Koch around April 26, 2013.[41] Jenkins was a good employee and in 2014, because of his good work ethic, his supervisor asked him to apply for the position of Inventory Clerk, which Jenkins was awarded.[42] As an Inventory Clerk, Jenkins was not allowed to be a member of the Union because it could create a conflict of interest.[43] Jenkins was a good, hard working employee that worked seven days a week most weeks.[44] Jenkins volunteered to work extra hours after his regular shift under the supervision of Randy Sharpley in Waste Water for approximately two years and Sharpley contends Jenkins "was an excellent worker."[45] Jenkins never gave Sharpley any problems, Sharpley never complained about Jenkins

---

[36] Doc. 189-2, PX 57, PX 66, PX 131,  PX63, PX67; Doc. 189-12, PX 170, Jackson sworn statement, p.46:12-47:21.
[37] Doc. 189-15, p. 48, PX 178, Sharpley p. 85:5-11.
[38] Doc. 189-15, p. 48, PX 178, Sharpley p. 85:12-22.
[39] Doc. 189-7, p. 45, PX 157, McDickinson/Jenkins p. 175:6-21.
[40] Doc. 189-7, p.45, PX 157, McDickinson/Jenkins p. 175:22-177:1.
[41] Doc. 182-2, p. 14, DX 2, Jenkins p. 42:3-43:9.
[42] Doc. 182-2, p. 18, DX 2, Jenkins p. 59:14-60:16.
[43] Doc. 189-15, p. 30, PX 178, Sharpley p. 16:9-17:2.
[44] Doc. 189-15, p. 35, PX 178, Sharpley p. 34:13-19.
[45] Doc. 189-15, p. 35, PX 178, Sharpley p. 33:12-43:3.

and Sharpley never knew any of Jenkins' other supervisors to complain about Jenkins.[46]  Jenkins was asked by Randy Sharpley to work in wastewater on the weekend because "he worked so good" and he would keep him working every weekend.[47]

Melissa McDickinson, HR Manager over the plant where Jenkins was employed, began stalking Jenkins on surveillance cameras to see when he was on break so she could approach him and spend time with him.[48] While on break she would touch Jenkins and stroke his hair.[49] When McDickinson stroked Jenkins' hair he would tell her, "don't do it."[50] Every time McDickinson encountered Jenkins she made it a sexual encounter.[51] McDickinson made sexual comments to Jenkins and referenced her sexual preferences, including telling Jenkins that black guys were different, better, and bigger, and taunted that she did not wear panties.[52] McDickinson instructed Steve Jackson, Union Steward, to give Jenkins her phone number and to tell Jenkins that she liked him and wanted to "talk."[53] Jenkins did not call McDickinson when Jackson gave him her number.[54] McDickinson persisted in her harassment of Jenkins.[55] She called Jackson's phone, instructing him to put Jenkins on the phone.[56] McDickinson forced herself on Jenkins sexually; "She started having sexual contact with me. She forced herself on me."[57] McDickinson admits having a sexual relationship or sexual contact with an employee violated Koch's policies and could result in her termination.[58]

---

[46] Doc. 189-15, p. 35, PX 178, Sharpley p. 34:4-12.
[47] Doc. 189-15, p. 35-36, PX 178, Sharpley p. 34:13-19, 38:13-15.
[48] Doc. 182-2, p. 35, 78, DX 2, Jenkins p. 128:10-129:4, 275:8-13.
[49] Doc. 182-2, p. 35, 78, DX 2, Jenkins p. 128:10-129:4, 275:8-13.
[50] Doc. 182-2 p. 35, DX 2, Jenkins p. 128:20-23.
[51] Doc. 182-2, p. 35, DX 2, Jenkins p. 10-12.
[52] Doc. 182-2 p. 35, DX 2, Jenkins p. 128:10-129:4, 275:8-17.
[53] Doc. 182-2, p. 28, DX 2, Jenkins p. 100:1-4, 18-23, 101:8-15.
[54] Doc. 182-2, p. 28, DX 2, Jenkins p. 101:4-7.
[55] Doc. 182-2, p. 35, DX 2, Jenkins p. 127:21-128:7.
[56] Doc. 182-2, p. 35, DX 2, Jenkins p. 127:21-128:7.
[57] Doc. 182-2, p. 50, DX 2, Jenkins p. 189:15-16.
[58] Doc. 189-7, p. 24-25, PX 157, McDickinson/Jenkins p. 92:22-93:7, 93:13-94:5.

McDickinson knew Jenkins was a vulnerable employee. McDickinson knew when Jenkins was first hired he lived in a halfway house after his release from prison and showed Jenkins his employment information maintained by Koch.[59] McDickinson came to Jenkins' while he was working in his department and told him that she would start taking smoke breaks with him in the back smoking area.[60] Jenkins was concerned because the smoking area was not near his department and he felt that he would be in trouble with his department for taking these breaks with McDickinson in another area of the plant.[61] Jenkins opined, "I guess she was like showing me she did what she wanted to."[62]

In November 2015, McDickinson began asking Jenkins to watch her having sex with Birchfield-McDickinson asked Jenkins to watch them several times and Jenkins refused each time.[63] In December 2015, Birchfield suspended Jenkins for three (3) days for an alleged "points violation."[64] When Jenkins returned to work, Birchfield and McDickinson drastically reduced his points balance and told Jenkins that he was "in" with them.[65]

In January 2016, McDickinson called Jenkins into her office, closed the door, and again asked him to watch her having sex with Birchfield. Jenkins again refused.[66] McDickinson's first sexual assault of Jenkins occurred in August 2016 when she called Jenkins' department and instructed Jenkins to assist her with returning human resource files from the "cage," an area enclosed by chain link fencing and a pad-locked gate.[67] In August 2016, McDickinson called the receiving department and told Jenkins to meet her inside the cage.[68] Once inside the cage,

---

[59] Doc. 182-2, p. 36, DX 2 Jenkins p. 131:2-19.
[60] Doc. 182-2, p. 32, DX 2 Jenkins p. 115:8-18.
[61] Doc. 182-2, p. 32, DX 2 Jenkins p. 115:8-18.
[62] Doc. 182-2, p. 32, DX 2 Jenkins p. 115:8-12.
[63] Doc. 189-3, p. 84-87, PX 96.
[64] Doc. 189-3, p. 84-87, PX 96.
[65] Doc. 189-3, p. 84-87, PX 96.
[66] Doc. 189-3, p. 84-87, PX 96.
[67] Doc. 189-15, p. 118, PX 179, Shaw p. 32:11-34:6.
[68] Doc 182-2, p. 31-32, 40, DX 2, Jenkins p. 113:13-114:7, 146:21-148:7,375:13-382:11,389:5-15.

McDickinson kneeled down by a filing cabinet and began going through files, but reached up to fondle Jenkins' genitals as he stood waiting to assist with the files. [69] McDickinson then unzipped Jenkins' pants, exposed his penis, and began performing fellatio on Jenkins.[70] Jenkins tried to step away but McDickinson continued performing oral sex on Jenkins.[71] When McDickinson finished assaulting Jenkins she reached for some old payroll receipts in case anyone wondered why she was in the cage.[72] Jenkins was shocked by McDickinson's assault, but stood still in the cage while she was assaulting him. [73] When asked why he did not turn around and walk away from McDickinson, Jenkins responded, "I didn't have anything. I needed my job, so I went through with it, man, to keep my job."[74] McDickinson seduced Jenkins at work on another occasion, waiting for him in his office in the receiving department when he reported to work at 4:30 am, and had sexual intercourse with Jenkins in the receiving department.[75]

Jenkins felt he was blessed to have a job and when it was suggested he could have put his hands on McDickinson and push her away from assaulting him, Jenkins responded, "Put my hand on her? No. Push her and go back to prison? No. I just -- I don't know, man. I just had got a blessing to get a job and I wanted to keep it. God blessed me with that job. So I just -- I went along what she asked me, what she did. She said she had me, man. She got me."[76] Jenkins understood McDickinson was his boss just like everyone in authority over him.[77] McDickinson made sure Jenkins knew she was in charge and could cause him to lose his job.[78] Based on what McDickinson

---

[69] Doc 182-2, p. 31-32, 40, DX 2, Jenkins p. 113:13-114:7, 146:21-148:7,375:13-382:11,389:5-15.
[70] Doc. 182-2, p. 32-33, DX 2, Jenkins p. 117:13-119:9.
[71] Doc. 182-2, p. 104, DX 2, Jenkins p. 376:20-378:10.
[72] Doc. 182-2, p. 34, DX 2, Jenkins p. 122:21-123:5.
[73] Doc. 182-2, p. 33, DX 2, Jenkins p. 119:13-17, 120:10-16.
[74] Doc. 182-2, p. 33, DX 2, Jenkins p. 119:13-17, 120:10-16.
[75] Doc. 182-2, p. 46-47, DX 2, Jenkins p. 173:20-174:21.
[76] Doc. 182-2, p. 33, DX 2, Jenkins p. 120:17-121:2.
[77] Doc. 182-2, p. 34, DX 2, Jenkins p. 124:15-20
[78] Doc. 182-2, p. 34, DX 2, Jenkins p. 122:5-14; 123:10-14..

told Jenkins he understood McDickinson and Birchfield ran the plant.[79] Birchfield described Jenkins as someone who is easily influenced by a stronger personality, a "go-along" type.[80]

Between August and October 2015, after the incident in the cage, McDickinson called Jenkins to her office at Koch and performed fellatio on him in her office.[81] Afterwards, gesturing to her computer monitor, she told Jenkins she could see everything and knew every time he was on break because it was all on camera.[82] McDickinson even showed Jenkins on the camera surveillance footage how she was watching him while he was on break.[83] When Jenkins would go on break McDickinson would come outside and sit beside him, and touch his hair, even after Jenkins refused her advances and told her no.[84] McDickinson performed fellatio on Jenkins more than three times in her office.[85] McDickinson told Brooke Smith, HR Clerk, that she had sex with Jenkins in her office at Koch Foods.[86]

Also in this period between August and October 2015, McDickinson asked Jenkins to join her, Steve Jackson, and Rebecca Milam at a bar, Déjà Vu.[87] When Jenkins, McDickinson, and Milam left the bar, McDickinson told Jenkins she would take him home and as they were leaving the bar she pulled over into a parking lot and performed oral sex, fellatio, on Jenkins. She then got out of her vehicle, walked around to the passenger side, opened the passenger door and, while not wearing any panties, sat on top of Jenkins and began to have sexual intercourse with him.[88] McDickinson's actions outside of work at Koch were concerning to Koch because she was held to

---

[79] Doc. 182-2 p. 52, DX 2 Jenkins p. 195:7-16, 196:4-11).
[80] Doc.189-6 p. 171, PX 156, Birchfield/Jenkins p. 293:18-294:12).
[81] Doc. 182-2, p. 35, 40-41, DX 2, Jenkins p. 128:8-20, 148:10-151:12, 152:12-153:13).
[82] Doc. 182-2, p. 35, 40-41, DX 2, Jenkins p. 128:8-20, 148:10-151:12, 152:12-153:13).
[83] Doc. 182-2 p. 41, 94, DX 2, Jenkins p. 151:7-12, 338:23-339:16).
[84] Doc. 182-2, p. 35, 94, DX 2, Jenkins p. 128:18-22, 338:23-339:16).
[85] Doc. 182-2 p. 107, DX 2, Jenkins p. 390:17-391:19).
[86] Doc. 189-16 p. 211-212, PX 183, Smith/Gray p. 151:23-152:2, 154:20-22).
[87] Doc. 182-2, p. 28, 39, DX 2, Jenkins p. 101:12-19, 143:15-23).
[88] Doc. 182-2, p. 45, DX 2, Jenkins p. 166:9-169:21).

a higher standard as a HR Manager.[89] Because McDickinson worked in Human Resources, Koch had the authority to dictate her off-work conduct.[90]

On two or three occasions Jackson asked Jenkins to ride with him to a nearby convenience store. [91] Unbeknownst to Jenkins, McDickinson would arrive at the same time. [92] When Jackson would go inside the store, McDickinson would tell Jenkins to come sit in her car and she would touch and fondle Jenkins' penis.[93] Jenkins did not kiss or touch McDickinson during these sexual assaults.[94]

McDickinson stalked Jenkins while he was off work and called Jenkins late one evening while he was home with his fiancé and told him he better come to work tomorrow, you better not be getting drunk, and told Jenkins to look outside his window as McDickinson was riding around his apartment complex where he lived with his fiancé.[95] McDickinson asked Jenkins to leave his fiancé and Jenkins refused.[96]

McDickinson talked to other employees, including Jackson, about having sex with Jenkins.[97] McDickinson frequently sent Jenkins and Jackson personal text messages, non-work related text messages.[98] McDickinson admits to referring to Irish Jenkins as "I" in text messages sent to Jackson and Jackson as her "BFF" or best friend forever.[99] McDickinson would text Jackson about Jenkins telling him she needed her "I" and ask where is my "I."[100] On July 11, 2015 at 6:13 pm, McDickinson texted Jackson, "Your mission tonight is to find I and let me know he is

[89] Doc. 189-6 p. 154, PX 156, Birchfield/Jenkins p. 225:12-18).
[90] Doc.189-6 p. 154, PX 156, Birchfield/Jenkins p. 226:14-22).
[91] Doc. 182-2, p. 30, DX 2, Jenkins p. 108:9-110:23).
[92] Doc. 182-2, p. 30, DX 2, Jenkins p. 108:9-110:23).
[93] Doc. 182-2, p. 30, DX 2, Jenkins p. 108:9-110:23).
[94] Doc. 182-2, p. 31, DX 2, Jenkins p. 110:19-111:7).
[95] Doc. 182-2, p. 34, DX 2, Jenkins p. 124:2-10, 125:3-12).
[96] Doc. 182-2, p. 36, DX 2, Jenkins p. 131:20-132:14).
[97] Doc. 189-12, PX 171 Jackson p. 89:13-90:5, 97:19-22)
[98] Doc. 189-7, p. 19, 40, PX 157, McDickinson/Jenkins p. 70:15-18, 154:11-155:18).
[99] Doc. 189-7, p. 19, 45, 50, PX 157, McDickinson/Jenkins p. 70:15-21, 175:6-15, 193:21-194:16).
[100] Doc. 189-4 p. 59-86, PX 126).

okay. Can you Please do that?" July 16, 2015 at 6:54 pm, McDickinson texted Jackson, "Where the fuck you be and where's my I??" July 16, 2015 at 9:08 pm, McDickinson texted Jackson, "Be honest, do you think I have I's head fucked up. I'm asking you because that's what he tells me." On July 16, 2015 at 8:42 pm, McDickinson texted Jackson, "I'm really upset about you not being able to find I. I guess I'm going to have to get I a phone LOL" On August 4, 2015 at 9:27 pm, McDickinson texted Jackson, "I might have been drinking tonight but one thing for sure is that I love me some I. I've never really understood why but I'm figuring it out. I appreciate you supporting my curiosity. You're the best and I love you…"[101]

McDickinson told Jenkins he was "untouchable," as long as she "dealt" with him, meaning have sex with him.[102] Employees received points if they were absent from work and excessive points could lead to an employee's termination.[103] After McDickinson began sexually assaulting Jenkins, she excused attendance points Jenkins should have received even though Jenkins informed McDickinson he objected.[104] McDickinson believed she controlled Jenkins. McDickinson told Laura Cortes, the HR Generalist, that since Cortes was having problems with her husband, McDickinson could say the word and command Jenkins to do something to Cortes' husband.[105]

Jenkins never approached or asked McDickinson to engage in any sexual conduct and it was always McDickinson who initiated any sex act.[106] Jenkins told McDickinson once or twice that he did not want to deal with her, meaning he did not want to have sex with her and was telling her no.[107] Jenkins also asked McDickinson to stop fondling and touching him; McDickinson would

---

[101] Doc. 189-4 p. 59-86, PX 126).
[102] Doc. 182-2, p. 27, DX 2, Jenkins p. 96:3-7).
[103] Doc. 182-2, p. 26-28, DX 2, Jenkins p. 93:15-17, 96:8-97:3, 95:21-96:2, 98:2-6).
[104] Doc. 182-2, p. 26-28, DX 2, Jenkins p. 93:15-17, 96:8-97:3, 95:21-96:2, 98:2-6).
[105] Doc. 189-9, p. 50, PX 162, Cortes, p. 196:14-197:10).
[106] Doc. 182-2, p. 35, 110, DX 2, Jenkins p. 129:2-4; 401:23,402:4-5).
[107] Doc. 182-2, p. 48, 50, DX 2, Jenkins p. 179:2-180:2, 189:10-18).

tell Jenkins he was "protected" and that he did not have anything to worry about.[108]

From August until he was fired on March 31, 2016, Jenkins recalls having sexual intercourse with McDickinson nine (9) or ten (10) times.[109] Jenkins never performed oral sex on McDickinson, never touched her sexually and never took her clothes off.[110] Jenkins was not attracted to McDickinson and told her he did not want her to touch him and he did not want to have a sexual relationship with her.[111]

Before Jenkins was fired, he complained to Bobby Elrod[112] that McDickinson and Birchfield sexually harassed him and played Elrod a recording of Jenkins' and Birchfield's meeting on December 17, 2015.[113] Elrod shut Jenkins down from complaining.[114] Elrod does not recall the date Jenkins called to complain.[115] Elrod made a note when he talked to Jenkins stating, "talking to him inappropriately."[116] Jenkins was also told that other employees, including Laura Cortes and Kathy Denton, had complained to Elrod about Birchfield and McDickinson.[117]

## E. PHOTOGRAPHS OF MCDICKINSON, BIRCHFIELD AND EMPLOYEES

While Jenkins was employed with Koch, Jackson, Union Steward, showed Jenkins several pictures of Birchfield and McDickinson naked in bed.[118] Jackson also showed Huey Marshall, III, Maintenance Supervisor, pictures of Jackson, McDickinson and Birchfield on vacation in Florida.[119] Birchfield and Jackson were in boxer shorts.[120] Jackson also told Marshall that

---

[108] Doc. 182-2, p. 48, DX 2, Jenkins p. 180:8-16).
[109] Doc. 182-2, p. 46, DX 2, Jenkins p. 172:7-14, 190:6-9).
[110] Doc. 182-2, p. 50, DX 2, Jenkins p. 186:13-187:9).
[111] Doc. 182-2, p. 50, DX 2, Jenkins p. 176:19-11, 187:12-13).
[112] Doc. 189-9 PX 164 Elrod/Jenkins p. 18:1-21:11
[113] Doc. 182-2 Jenkins p. 192-193, 242
[114] Doc. 182-2 Jenkins p. 291
[115] Doc. 189-9 PX 164 Elrod/Jenkins p. 21:18-22;
[116] Doc. 189-9 PX 164 Elrod/Jenkins p. 28:16-20
[117] Doc. 189-3, p. 84-87, PX 96).
[118] Doc. 182-2 p. 9-11, DX 2, Jenkins p. 25:10-19, 27:1-14, 28:18-29:1, 29-8-15, 32:8-15).
[119] Doc. 189-13, p. 426, PX 174, Marshall p. 117:21-118:15).
[120] Doc. 189-13, p. 426, PX 174, Marshall p. 117:21-118:15).

Birchfield wanted to have three way sex with him and McDickinson.[121] Jackson also showed Sharpley pictures on his phone of McDickinson and Birchfield for proof of what he was talking about.[122]

Jackson saw Birchfield taking pictures of HR Generalist Rebecca Milam when she was naked at McDickinson's home, and he did not ask Milam's permission to take the picture.[123] Birchfield showed Jackson three or four pictures of McDickinson and Brooke Smith, HR Clerk, naked standing next to each other and McDickinson was touching Smith's breasts.[124] Jackson also took pictures of McDickinson and Birchfield engaging in sexual conduct with employees, and of Birchfield naked.[125] He wanted these pictures as evidence to protect himself.[126]

### F.    JENKINS' COMPLAINTS

After HR Manager Alesia Simmons left her employment with Koch, Jenkins called her for advice and asked what he should do, complaining that he had been threatened by Birchfield for having sex with McDickinson and that Birchfield told Jenkins that if he was going to have sex with McDickinson then he better make sure Birchfield was present to watch.[127] Jenkins was afraid he was going to be terminated.[128] Simmons told Jenkins to call a lawyer.[129]

Jenkins was reluctant to complain to Shaw, his supervisor[130], about McDickinson's sexual assaults.[131] Jenkins' work hours had been reduced.[132] Shaw was the person who told Jenkins his hours were being cut and Jenkins did not believe Shaw would help him.[133] From what Jenkins was

---

[121] Doc. 189-13, p. 426, PX 174, Marshall p. 116:7-12).
[122] Doc. 189-15, p. 57, PX 178, Sharpley p. 123:5-18).
[123] Doc. 189-13, p. 114, PX 171, Jackson/Gray p. 445:7-12).
[124] Doc. 189-13, p. 104, 116-117, PX 171, Jackson/Gray p. 405:10-406:11, 453:8-454:21).
[125] Doc. 189-13, p. 68, 92, PX 171, Jackson/Gray p. 261:14-262:8, 355:11-356:4, PX 66 Pictures filed under seal).
[126] Doc. 189-13, p. 68, 92, PX 171, Jackson/Gray p. 261:14-262:8, 355:11-356:4, PX 66 Pictures filed under seal).
[127] Doc. 189-16, p. 7-8, PX 180, Simmons p. 23:6-27:10).
[128] Doc. 189-16, p. 41-42, PX 180, Simmons p. 158:22-162:13).
[129] Doc. 189-16, p. 7-8, PX 180, Simmons p. 23:16-27:13).
[130] Doc.189-1, p. 73-74
[131] Doc. 182-2, p. 51, DX 2, Jenkins p. 193:6-11).
[132] Doc. 182-2, p. 51, DX 2, Jenkins p. 193:6-11).
[133] Doc. 182-2, p. 51, DX 2, Jenkins p. 193:6-11).

told by McDickinson and Birchfield's actions, McDickinson and Birchfield ran the Koch plant.[134] Birchfield told Jenkins he was the Complex Manager over all the plants.[135] Jenkins believed that it would do no good to ask a HR employee for help because "that's who was doing it" to him.[136] The only people Jenkins knew, per Koch policy, that he could talk with about any matter were his supervisors, McDickinson and Birchfield.[137]

Jenkins complained to Bobby Elrod that McDickinson and Birchfield sexually harassed him and played Elrod a recording of Jenkins' and Birchfield's meeting on December 17, 2015.[138] Elrod did nothing to help Jenkins or stop or prevent the harassment.[139] Jenkins was also told that other employees, including Laura Cortes and Kathy Denton, had complained to Elrod about Birchfield and McDickinson.[140] Birchfield told Jenkins that Denton had previously threatened to file a lawsuit against Koch for discrimination and retaliation.[141]

## G.   OTHER EMPLOYEE COMPLAINTS ABOUT MCDICKINSON AND BIRCHFIELD

### 1.   Fuller Complaints April – May 2015

McDickinson sexually harassed other employees, including HR Clerk Harvey Fuller. Fuller worked for Koch at the Montgomery complex from February 2015 to May 2015. McDickinson supervised Fuller.[142]  McDickinson would stand behind Fuller, leaning over him and pressing her breasts into his shoulder while her other hand was massaging his other shoulder.[143] McDickinson found excuses to touch Fuller's chest, brush his shoulders or fix his tie.[144] As with

---

[134] Doc. 182-2, p. 52, DX 2, Jenkins p. 195:7-16).
[135] Doc. 182-2, p. 52, DX 2, Jenkins p. 196:4-11).
[136] Doc. 182-2, p. 52, DX 2, Jenkins p. 196:19-197:4).
[137] Doc. 182-2, p. 53, DX 2, Jenkins p. 198:8-12).
[138] Doc. 189-3, p. 84-87, PX 96).
[139] Doc. 189-3, p. 84-87, PX 96).
[140] Doc. 189-3, p. 84-87, PX 96).
[141] Doc. 189-3, p. 84-87, PX 96).
[142] Doc. 189-11, p. 81, PX 168, Fuller p. 63:9-13).
[143] Doc. 189-11, p. 103, PX 168, Fuller p. 151:6-152:20).
[144] Doc. 189-11, p. 125, PX 168, Fuller p. 239:13-240:3).

Jenkins, McDickinson approached Fuller with requests for sex and sexual favors.[145] On one occasion, McDickinson was attempting to clear her throat in the office.[146] When Fuller asked what was wrong, she replied that she would "like to have your big black cock in my throat."[147] On another occasion away from the office, she suggested that she wanted Fuller to be her big black dick at work.[148] McDickinson suggested that Fuller needed to leave his family to "get with someone who is going places" and implied that by complying with her requests, Fuller would improve his employment situation.[149]

When McDickinson would ask Fuller to sit on her lap, he would respond with "you're my boss . . . I'm not going to sit in your lap, Melissa."[150] She would interweave sexual innuendoes into work conversations.[151] She would call Fuller's cell phone and tell him, "I can have a plan for you; you just need to understand my ways," implying if he acceded to her sexual demands it would benefit him at work.[152] She would call Fuller at 2:00 a.m. while he was in bed with his wife.[153] Fuller understood McDickinson to be demanding he engage in a relationship with her to ensure the security of his job.[154]

McDickinson even visited Fuller at a bar he co-owned and ran with other business partners. [155] While Fuller stood behind the bar working, McDickinson commented how good Fuller looked, how handsome he was standing behind a bar and how much she wanted his "big black dick."[156] A co-worker, Rebecca Milam, was present when McDickinson made these comments.

[145] Doc. 189-11, p. 197, PX 168, Fuller p. 526:15-18).
[146] Doc. 189-11, p. 68, PX 168, Fuller p. 10:1-13).
[147] Doc. 189-11, p. 68, PX 168, Fuller p. 10:1-13).
[148] Doc. 189-11, p. 69, PX 168, Fuller p. 14:1-15:1).
[149] Doc. 189-11, p. 69, PX 168, Fuller p. 14:1-15:1).
[150] Doc. 189-11, p. 86-87, PX 168, Fuller p. 84:23- 85:6).
[151] Doc. 189-11, p. 69, PX 168, Fuller p. 13:12-15).
[152] Doc. 189-11, p. 87-89, PX 168, Fuller p. 88:21- 96:20).
[153] Doc. 189-11, p. 100, PX 168, Fuller p. 137:12-138:4).
[154] Doc. 189-11, p. 104, 114, PX 168, Fuller p.154:3-13; 195:15-23).
[155] Doc. 189-11, p. 72, PX 168, Fuller p. 28:7-21).
[156] Doc. 189-11, p. 72, PX 168, Fuller p. 28:7-21).

[157] McDickinson informed Milam that Fuller was off-limits and when Milam came to work in HR, telling Milam "he's mine already."[158] McDickinson flirted with Fuller and kissed him in public without asking his permission or giving any advance warning.[159] McDickinson ended a conversation with Fuller by moving in to kiss him after asking when he going to leave his family for her.[160]

Fuller heard from one or more coworkers that McDickinson had announced she wanted him to be her "working Nigger" and wanted his "big black dick."[161] McDickinson's conduct toward Fuller made him uncomfortable and he refused her advances.[162] Fuller was afraid to complain to Birchfield about McDickinson's sexually aggressive conduct toward him because he had heard they were in a sexual relationship.[163]

While still employed at Koch, Fuller called the temporary service, Onin, who first hired him to work with Koch and complained to Barbara Thomas Martinez that he was being sexually harassed by his manager (McDickinson) at Koch Foods.[164] Martinez recorded Fuller's complaints and advised Fuller to talk to his HR, which would be McDickinson.[165] Thomas-Martinez summarized her conversation with Fuller in the following note:

> "Mr. Fuller called Barbara Thomas Wednesday April 15 at 12:08pm to complain about the way he was getting treated at Koch Foods. Mr. Fuller claims that he is being harresed [sic] by the HR Manager [sic] Barbara Thomas explian [sic] to him that he should report it to upper management and should do so soon. This is Mr. Fuller second [sic] complain [sic] the first was made a few weeks ago."[166]

---

[157] Doc. 189-11, p. 72, PX 168, Fuller p. 28:7-21).
[158] Doc. 189-11, p. 72, PX 168, Fuller p. 28:7-21).
[159] Doc. 189-11, p. 69, PX 168, Fuller p. 14:1-15:1).
[160] Doc. 192-4, PX 192, Sutton p. 29:18-22.30:1-35:23).
[161] Doc. 189-11, p. 124-125, PX 168, Fuller p. 233:20-235:17; 237:10-15.).
[162] Doc. 189-11, p. 100-101, 104, PX 168, Fuller p. 140:14-16; 141:18-23;154:3-13).
[163] Doc. 189-11, p. 95, PX 168, Fuller p.118:2-6).
[164] Doc. 192-9, PX 197 Martinez p. 9:7-22; 11:7-22; 14:1-12.).
[165] *Id.*; Exhibit 11, P0465-0466).
[166] *Id.* Exhibit 11, P0465-0466).

Fuller called Onin again on May 29, 2015 to complain that he had just been terminated and not told a reason for his termination.  (*Id.*).

Fuller also complained to Laura Cortes, an HR Generalist at Koch. Cortes had actually witnessed McDickinson touching Fuller at work.[167] McDickinson came up behind Fuller, "put her body onto his, and laid her cheek onto his back, the small – in the middle of his shoulder blades."[168] Fuller complained to Sutton after McDickinson kissed him at the bar that Fuller managed.[169] After Fuller refused McDickinson's advances and her invitation to ditch his family and get with her, McDickinson stormed off, apparently upset with Fuller.[170] Sutton described it as not a full-blown temper tantrum, but "an upset look on her face and exiting our [Fuller and Sutton's] presence quickly."[171]

On October 9, 2015, former HR clerk Harvey Fuller filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging McDickinson, his supervisor and HR manager, sexually harassed him.[172] Jenkins was present when Birchfield paid Charles Smith $200.00 to threaten Fuller regarding his claims after he filed his EEOC Charge.[173] [174]

## 2. Sharpley and Davenport Complaints August 2015

Approximately one year after McDickinson started working at Koch Foods, she became the subject of a sexual harassment complaint. On August 5, 2015, Birchfield went to see Chief Union Steward Randy Sharpley, who was also a Waste Water Technician over Waste Water and the Yard in the Debone Plant, Birchfield asked him if he thought McDickinson was "fooling

---

[167] Doc. 189-9, p. 30, PX 162, Cortes, p.115:10- 17).
[168] Doc. 189-9, p. 30, PX 162, Cortes, p.115:10- 17).
[169] Doc. 192-4, PX 192 Sutton p. 30:1-35:23).
[170] Doc. 192-4, PX 192 Sutton, p. 59:7-19).
[171] Doc. 192-4, PX 192 Sutton, p. 59:7- 19).
[172] Doc. 242-1, p. 3-4, PX 2, Fuller EEOC Charge; Doc. 242-6, p. 47, PX 120, pp. 182:4-183:02).
[173] Doc. 182-2, p. 85, DX 2, Jenkins p. 301:11-20).
[174] *See Robert Harvey Fuller v. Koch Foods, Inc. et al*, 2:17-cv-00096-ALB, Doc. 225 (Judge Brasher denying Summary Judgment on Plaintiff Fuller's claims)).

around" with Jenkins, Sharpley told Birchfield, "yeah, it's all over the plant."[175] Birchfield investigated complaints that McDickinson was sleeping with two male employees, Steve Jackson and Irish Jenkins, and that she was excusing attendance points in exchange for sex.[176] McDickinson told Sharpley that Jenkins pointed out a time or two where she deleted some of his points.[177] Sharpley knew McDickinson was taking points off for Jenkins and Jackson when they missed a time clock punch or left early.[178] Sharpley met with McDickinson regarding employee points and she told him that Jenkins pointed out a time or two when he received seven points. [179] She told Sharpley she deleted some of Jenkins' points because she did not want to fire him.[180] Birchfield was also investigating McDickinson for sleeping with a third male employee and doctoring another employee file.[181]

Birchfield also asked Sharpley about Steve Jackson and McDickinson seeing each other.[182] Sharpley believed Birchfield already knew McDickinson was coming onto Jenkins and Jackson by the way Birchfield posed the rhetorical questions.[183] Birchfield and Sharpley were in the wastewater department, not Birchfield's office, when Birchfield asked Sharpley about McDickinson having sex with Jackson and Jenkins.[184] Sharpley also heard employees talking about Birchfield sleeping with McDickinson and Birchfield hiring McDickinson for the HR Manager position over Alesia Simmons, a current employee.[185] Simmons complained to Elrod about being passed over and Birchfield fired Simmons after her complaints because he was

[175] Doc. 189-15, p. 36-37, PX 178, Sharpley p. 39:6-22,40:3-8, 41:1-15,43:3-15).
[176] Doc. 189-1 p. 96-99, Birchfield Investigative Notes; Doc. 189-15, p. 29, 31, PX 178, Sharpley p. 9:12-15, 10:15-21, 20:5-10).
[177] Doc. 189-15, p. 39, PX 178, Sharpley p. 50:6-17).
[178] Doc. 189-15, p. 38-39, PX 178, Sharpley p. 48:23-49:13).
[179] Doc. 189-15, p. 39, 71, PX 178, Sharpley p. 50:6-51:10, 178:9-179:11).
[180] Doc. 189-15, p. 39, 71, PX 178, Sharpley p. 50:6-51:10, 178:9-179:11).
[181] Doc. 189-9, P. 74, PX 162, Cortes p. 289:19-292:7).
[182] Doc. 189-15, p. 37, PX 178, Sharpley p. 41:20-23).
[183] Doc. 189-15, p. 38, PX 178, Sharpley p. 46:18-47:13).
[184] Doc. 189-15, p. 37, PX 178, Sharpley p. 43:3-11).
[185] Doc. 189-15, p. 38, PX 178, Sharpley p. 46:18-47:19).

"covering his tracks."[186] McDickinson admitted to Sharpley that she, McDickinson, had no prior human resources experience and she was in over her head.[187]

Randy Davenport, Debone Plant Manager, noticed McDickinson in Jenkins' department and asked Jenkins why she was coming from his department.  This was following the "cage" incident where McDickinson first performed fellatio on Jenkins.[188] In August 2015, Davenport submitted a letter to his boss, Regional Vice-President Wally Lewis, in which Davenport raised numerous issues relating to Birchfield and McDickinson.[189] Davenport informed Lewis that two HR clerks, Laura Cortez and Kathy Denton, told him "there are many issues within the HR Dept. with HR Manager that made" them feel "very uncomfortable and threatened."[190] Davenport reported Denton complained that McDickinson sexually harassed male HR clerk Harvey Fuller, and that McDickinson had an "ongoing sexual relationship" with "both Irish Jenkins and Steve Jackson."[191] Denton told Davenport she was bringing the issues to him because she was "afraid [Birchfield would] not do anything." [192] Davenport also spoke to Birchfield about these issues on or about August 13, 2015.[193]

Birchfield thereafter began an investigation to determine the relationship between McDickinson, Jenkins and Jackson.[194] Birchfield claims he conducted the investigation because it concerned the HR Manager and that person's reputation and standing inside the plant was at stake.[195] Birchfield's response to these serious allegations was to discipline and suspend Denton[196]

---

[186] Doc. 189-15, p. 38, 47, 76, PX 178, Sharpley p. 46:18-47:19, 81:23-83:22, 200:4-8).
[187] Doc. 189-15, p. 55, PX 178, Sharpley p. 114:19-115:12).
[188] Doc. 182-2 p. 59, DX 2, Jenkins p. 222:22-223:7
[189] Doc.189-2 p. 62-66, PX 49; Doc. 189-13, PX 173 Lewis/Gray p. 56:4-21, p. 57:3-18, P. 69:6-10.
[190] Doc.189-2 p. 62-66, PX 49; Doc. 189-13, PX 173 Lewis/Gray, p. 56:4-16.
[191] Doc. Doc. 189-2 p. 62-66, PX 49; Doc. 189-13, PX 173 Lewis/Gray p. 56:4-16.
[192] Doc. 242-1, pp. 314-319.
[193] Doc. 189-1 p. 96-97 Birchfield Investigative Notes.
[194] Doc. 189-6 p. 154, PX 156, Birchfield/Jenkins p. 226:23-227:8).
[195] Doc. 189-6 p. 155, PX 156, Birchfield/Jenkins p. 230:2-18).
[196] Doc. 189-1 p. 118-119, PX 28

for taking her concerns to Davenport, the Plant Manager.[197] McDickinson admits, per Koch policies, Denton was allowed to complain to Davenport.[198] Birchfield documented that he spoke to Sharpley on August 5, 2015, and waited until August 12, 2015 to speak with Jenkins.[199] Jenkins denied the allegations and was evasive when he was questioned by Birchfield—Birchfield always had concerns when someone was evasive and was concerned that Jenkins may have been scared to tell him he was involved with McDickinson.[200] On August 26, 2015, McDickinson submitted a written statement to Birchfield denying the allegations made against her and stating she was "aware of the rumors that have been perpetrated by both Randy Davenport [and] Kathie Denton."[201] After the investigation Denton complained that she and Davenport were not satisfied with the investigation.[202]

Employees throughout the plant were talking about McDickinson and believed McDickinson and Birchfield were romantically involved, that she was having sexual relations with Assistant Chief Union Steward Steve Jackson, and that she was having sexual relations with hourly employee Irish Jenkins.[203] Because McDickinson frequently called Jenkins, after Davenport's complaint she told Jenkins he "might need to erase the calls after Randy Davenport wrote a letter on us."[204]

However, despite the complaints by Sharpley, Denton, and Davenport, and being the subject of constant talk in the workplace involving allegations that she was romantically involved with Birchfield, on September 25-29, 2015, McDickinson and Birchfield went on vacation in

---

[197] Doc. 189-9, p. 24-25, PX 162, Cortes, p. 91:2-94:5, 95:20-96:14).
[198] Doc. 192-2, PX 190, McDickinson/Gray  p. 74, PX 120, p. 289:18-290:20.
[199] Doc. 189-6 p. 170, PX 156, Birchfield/Jenkins p. 290:6-16).
[200] Doc. 189-6 p. 172-173, PX 156, Birchfield/Jenkins p. 300:9-10-301:4.
[201] Doc. 189-4 p. 39-40, PX 123, McDickinson August 26, 2015 Statement.
[202] Doc. 189-6 p. 161, PX 156, Birchfield/Jenkins p. 254:22-255:13.
[203] Doc. 192-2, PX 190, McDickinson pp.54-55, 212:21-213:19; Doc. 189-15, PX 178 Sharpley p. 11:16-20
[204] Doc. 182-2, p. 35, DX 2, Jenkins p. 126:5-17.

Panama City Beach, Florida and stayed in the same condo with Steven Jackson.[205] Birchfield and McDickinson were not married when they went on this Florida vacation and stayed in the same room.[206] In fact, McDickinson was married to her current husband.[207] Birchfield paid for the condo.[208] During this vacation Jackson witnessed McDickinson get Birchfield's first name, "David," tattooed on her inner wrist.[209] Employees were also talking about Birchfield moving into McDickinson's house and that he was living with her. Bobby Elrod, Vice President HR, took this seriously and, in August/September 2015, had a drive by of McDickinson's house and took a picture of what appeared to be Birchfield's car in the driveway.[210] McDickinson told Jackson that Birchfield moved in with her and had often spent the night with her before moving in with her.[211] Jackson was also invited to the home by McDickinson and witnessed McDickinson and Birchfield having sex in the living room while he was seated on an adjacent chair, "They just started having sex. They were kissing, hugging; next thing I know, she's doing oral sex to him."[212] McDickinson also liked to take her clothes off and walk around without clothes in front of Jackson.[213] Jackson also had sex with HR Generalist Brooke Smith in front of McDickinson and Birchfield.[214]

Jenkins normally worked until 5:00 or 6:00 p.m., but after Davenport complained, Birchfield instructed Jenkins' supervisor to make him clock out at 1:30 p.m.[215] Jenkins asked if he did anything wrong to have his hours taken away from him and his supervisor, Jeffrey Shaw, told him he had a "bullseye" on his back.[216] After Jenkins' hours were cut, McDickinson asked him to

---

[205] Doc. 192-10, PX 198 McDickinson Interrogatory Answers, p. 9, Response to Interrogatory 21; Doc. 192-1, PX 189 Birchfield/Gray p. 444:3-5; Doc. 189-13, p. 42-43, PX 171, Jackson/Gray p. 156:22-158:6; Doc. 189-3 p.78, PX 94 Jackson Declaration p. 3.
[206] Doc. 189-7, p. 84, PX 157, McDickinson/Jenkins p. 330:3-6; Doc. 189-13, p. 42-43, PX 171, Jackson/Gray p. 156:11-158:6.
[207] Doc. 182-4, p. 395, DX 7, McDickinson/Fuller p. 158:7-159:15.
[208] Doc. 189-13, p. 43, PX 171, Jackson/Gray p. 158:18-19.
[209] Doc. 189-3, p. 78, PX 94, Jackson Declaration p. 3; Doc. 189-13, p. 44, PX 171, Jackson/Gray p. 164:3-9.
[210] Doc. 242-7, p. 105-106, PX 129, Elrod p. 415:1-419:1.
[211] Doc. 189-13, p. 46, 111, PX 171, Jackson/Gray p. 170:13-15, 23-171:2; 432:7-13).
[212] Doc. 189-13, p. 55-58, PX 171, Jackson/Gray p. 207:13-209:9, 209:14-210:1, 210:5-9, 217:21-218:6).
[213] Doc. 189-13, p. 56, PX 171, Jackson/Gray p. 210:23-212:12).
[214] Doc. 189-13, p. 109, PX 171, Jackson/Gray p. 424:18-425:2).
[215] Doc 182-2, p. 43, DX 2, Jenkins p. 159:16-161:23).
[216] Doc. 182-2 p. 43-44, 57, DX 2, Jenkins p. 161:17-162:12, 214:2-14, 217:1-3).

meet her at the gas station near the plant and she told Jenkins that Birchfield wanted to fire Jenkins and Jackson, but she was not going to fire him.[217] McDickinson also appeared remorseful that Jenkins' hours were cut because of her and gave Jenkins cash.[218]

Elrod never questioned Sharpley about McDickinson, Birchfield, Jackson or Jenkins.[219] Birchfield never investigated whether McDickinson was sending personal or sexual text messages to Jenkins or calling him after work hours.[220]

### 3.    Foxhall Complaints

In August 2015, Birchfield interviewed Johngernita Foxhall (Jenkins' fiancé) about McDickinson having sex with Jenkins. Foxhall was called to the HR office and directed to McDickinson's office. [221] There, Birchfield opened the door waiting on Foxhall.[222] Foxhall and Jenkins are currently engaged and were dating at the time. Birchfield asked Foxhall if she heard the rumor about McDickinson and Jenkins.[223] Foxhall told Birchfield she heard people talking about McDickinson liking Jenkins, and McDickinson, Jackson, Milam and Jenkins going out together to a club.[224] Foxhall also reported to Birchfield that McDickinson called Jenkins one evening when she was home in bed with Jenkins and McDickinson got personal on the call.[225] Birchfield listened and asked Foxhall what McDickinson saw in Jenkins, "why was she so into him like that?" and told Foxhall "you know that's my woman."[226] Foxhall said she had heard that

---

[217] Doc. 182-2, p. 44, DX 2, Jenkins p. 164:9-165:20).
[218] Doc. 182-2, p. 43-44, DX 2, Jenkins p. 158:18-160:3; 164:3-165:5).
[219] Doc. 189-15, p. 64, PX 178, Sharpley p. 152:2-7).
[220] Doc. 189-7, p 12, 19, PX 157, McDickinson/Jenkins p. 42:1-8, 43:1-8, 43:3-6, 71:19-23).
[221] Doc. 189-11 p. 11-12, PX 167, Foxhall p. 32:11-34:3).
[222] Doc. 189-11 p. 11-12, PX 167, Foxhall p. 32:11-34:3).
[223] Doc. 189-11 p. 12, PX 167, Foxhall p. 34:3-14).
[224] Doc. 189-11 p. 12, PX 167, Foxhall p. 34:17-35:8, 37:8-12).
[225] Doc. 189-11 p. 7, 12, PX 167, Foxhall p. 16:7-18, 37:18-38:23).
[226] Doc. 189-11, p. 13, PX 167, Foxhall p. 38:20-39:23, 43:19-44:5).

Birchfield and McDickinson were together, but did not know with certainty until Birchfield confirmed this during their conversation.[227]

On one occasion, Foxhall saw McDickinson with her hair twisted up and Foxhall asked McDickinson why her hair was twisted and McDickinson responded stating, "I want my hair like Irish." Jenkins had his hair styled in dreads or dreadlocks at the time.[228] Foxhall percieved this as McDickinson flirting with Jenkins and Foxhall also noticed that every time she looked up McDickinson was in Jenkins' face at break time. [229]  When Jenkins was on break, McDickisnon was there as well.[230] Every day Foxhall saw McDickinson smoking with Jenkins at every break.[231] Foxhall even showed up early to work to see if McDickinson was hanging around Jenkins and saw McDickinson and Jenkins sitting alone in the parking lot outside at 5:15 a.m.[232] Jenkins had to be at work at 4:30 a.m.[233] Foxhall never confronted McDickinson because McDickinson was "over everybody" and she felt like she would have lost her job, had she done so.[234] In fact, Foxhall believed that as long as McDickinson was "laying" with her man, Jenkins, she would have her job because McDickinson told her to "fuck" her supervisor and she "will always have a job."[235] But Foxhall told Birchfield during their meeting that if she ever caught McDickinson with Jenkins she would "beat her ass" and Birchfield told her "no, don't do that, call me when you catch her."[236] After Foxhall complained to Birchfield he gave her a check "as a loan" on or about August 12, 2015, for $250.00.[237] Foxhall tried to pay Birchfield back but he would not accept the money.[238]

---

[227] Doc. 189-11, p. 13, PX 167, Foxhall, p. 39:01-23).
[228] Doc. 189-11, p. 17, PX 167, Foxhall p. 55:5-23, 56:5-9).
[229] Doc. 189-11, p. 17, PX 167, Foxhall p. 56:10-57:6).
[230] Doc. 189-11, p. 17, PX 167, Foxhall p. 56:10-57:6).
[231] Doc. 189-11, p. 20, PX 167, Foxhall p. 69:4-6).
[232] Doc. 189-11, p. 19, PX 167, Foxhall p. 63:18-64:11).
[233] Doc. 182-2, p. 43, DX 2, Jenkins p. 160:18-19).
[234] Doc. 189-11, p. 19, PX 167, Foxhall p. 64:21-65:10).
[235] Doc. 189-11, p. 20, 29, PX 167, Foxhall p. 69:13-70:13, 104:15-105:5, 105:10-17).
[236] Doc. 189-11, p. 22, PX 167, Foxhall p. 74:2-12).
[237] Doc. 189-11, p. 23, PX 167, Foxhall p. 78:13-80:3; Doc. 189-6, p. 169, PX 156 Birchfield/Jenkins p. 288:9-21).
[238] Doc. 189-11, p. 28, PX 167, Foxhall p. 101:17-102:1).

Birchfield considered the money he gave to Foxhall a gift.[239] Birchfield gave Foxhall the money the day before he interviewed Jenkins in his August 2015 investigation.[240]

## H.   AUGUST 2015 JENKINS AND JACKSON SUSPENDED

August 2015, Birchfield informed Jenkins he was being suspended because of the sexual relationship between McDickinson and Jenkins.[241] McDickinson told Jenkins Birchfield was going crazy because she was having sex with Jenkins.[242] Also, Birchfield suspended Jackson at the same time and questioned Jackson about McDickinson sleeping with Jenkins.[243] When Jackson was suspended no one talked to him about any attendance points he had allegedly accumulated and Birchfield only spoke to him about the allegations that McDickinson was sleeping with Jenkins.[244] Birchfield called Jackson to his office and asked him if he knew anything about McDickinson's relationship with Jenkins.[245] Jackson told Birchfield he did not know anything about McDickinson and Jenkins sleeping together.[246]  He lied because he thought Birchfield was going to fire him.[247] Jenkins and Jackson's pictures were posted at the gate to the plant stating they were not allowed back on the premises per Birchfield.[248] Shaw, Jenkins' supervisor, informed Jenkins the decision to suspend him came from Birchfield.[249]

Birchfield called Jenkins to the office and accused him of having nineteen (19) points.[250] Jenkins never saw anything showing he had nineteen (19) points; his supervisor never informed him he had nineteen (19) points; he never received a warning; and Birchfield never said anything

---

[239] Doc. 189-6, p. 169, PX 156, Birchfield/Jenkins p. 286:7-9).
[240] Doc. 189-6, p. 169-170, PX 156, Birchfield/Jenkins p. 288:22-289:12).
[241] Doc. 182-2, p. 24, DX 2, Jenkins p. 84:23-85:22).
[242] Doc. 182-2, p. 25, DX 2, Jenkins p. 87:2-14).
[243] Doc. 189-13, p. 30-31, PX 171, Jackson/Gray p. 109:18-110:7).
[244] Doc. 189-13, p. 30-31, PX 171, Jackson/Gray p. 109:18-110:1).
[245] Doc. 189-13, p. 34, PX 171, Jackson/Gray p. 124:1-20).
[246] Doc. 189-13, p. 31, PX 171, Jackson/Gray p. 110:8-111:1, 112:1-11).
[247] Doc. 189-13, p. 31, PX 171, Jackson/Gray p. 110:8-111:1, 112:1-11).
[248] Doc. 182-2, p. 25, DX 2, Jenkins p. 87:18-88:15).
[249] Doc. 182-2 p. 77, DX 2, Jenkins p. 271:15-23).
[250] Doc. 182-2 p. 97, DX 2, Jenkins p. 350:11-13).

previously about these points.[251] Birchfield asked Jenkins, "why in the fuck was Melissa letting him get away with stuff like that," he had nineteen points as well as "home boy Steve," referring to Steve Jackson.[252] McDickinson told Jackson Birchfield wanted to fire him and Jenkins. "David's words were at one point, to her, that either fire those niggers - - you know, that she's got to fire both of us. And she said that - -she told David that, no, you fire them because they haven't done anything, because it was personal stuff, us hanging out.[253] Jenkins begged to work seven days a week so he knew he did not have nineteen points.[254] Jenkins contends Birchfield gave him points he did not earn to terminate him.[255]

## I.   HUMAN RESOURCE EMPLOYEE COMPLAINTS

Kathy Denton, HR Generalist, reported her concerns to Randy Davenport, Plant Manager, about McDickinson and Birchfield being romantically involved and the unprofessionalism in the HR office by McDickinson; she also complained that McDickinson was unqualified for the HR manager position.[256] Laura Cortes, HR Generalist, also complained to the HR Manager, Shawn Collins about McDickinson and Birchfield's inappropriate actions in the workplace and specifically referenced "that sent Laura Cortes' written complaint to Bobby Elrod and Elrod forwarded the complaint to Birchfield to investigate."[257] Alisha Simmons, HR Clerk, called Elrod to personally complain about McDickinson and Birchfield.[258] Denton also complained to Birchfield that McDickinson was having sex with everybody that walked through the door and

---

[251] Doc. 182-2 p. 97, DX 2 Jenkins p. 351:1-23).
[252] Doc. 182-2 p. 98, DX 2 Jenkins p. 352:7-14).
[253] Doc. 189-13, p. 31, PX 171, Jackson/Gray p. 113:05-114:17.
[254] Doc. 182-2 p. 98, DX 2, Jenkins p. 352:15-17.
[255] Doc. 182-2 p. 98, DX 2, Jenkins p. 352:18-23.
[256] Doc. 189-9, p. 24-25, PX 162, Cortes p. 89:2-92:3; PX87, 00638
[257] Doc. 189-8, PX 161, Collins Depo, p.122:9-123:16.
[258] Doc. 189-16, p. 12-13, PX 180, Simmons p.43:1-23; 44:21-45:7; 46:10-47:23.

told him she complained to Davenport and that these complaints were going "higher."[259] Prior to these complaints, Harvey Fuller also complained.[260]

On October 28, 2015, payroll clerk Alycia Hughes complained to her supervisor that "there has also been talk" that: Birchfield and McDickinson were living together; McDickinson was doing school work on company time and having an employee write a school paper for her; and McDickinson was arriving and leaving "at random hours," thereby delaying work which needs her approval.[261]

On July 29, 2016, HR Generalist Laura Cortes submitted a 38-page statement to Bobby Elrod, Vice President Human Resources, in which she listed numerous complaints about McDickinson and Birchfield dating back to 2014.[262] Cortes told Elrod that shortly after McDickinson was hired, it was rumored McDickinson and Birchfield were romantically involved with one another and that McDickinson sexually harassed Fuller.[263] Cortes also verbally complained to Shawn Collins, HR Manager, prior to submitting her complete written complaint about McDickinson and Birchfield.[264] Cortes previously complained to Birchfield on August 14, 2015 about the allegations regarding McDickinson having sex with employees.[265] After Cortez complained about Birchfield and McDickinson, Birchfield denied her a promotion to the position of HR Manager, even though she was the most qualified, because he did not rust her after she complained to Elrod that McDickinson and Birchfield were having a sexual relationship.[266] Birchfield suspended and later terminated Cortez.[267]

---

[259] Doc. 189-6 p. 157, PX 156 Birchfield/Jenkins p. 239:19-240:13.
[260] Doc. 189-9, p. 17, PX 162, Cortes p. 61:13-18.
[261] Doc. 242-1, p. 31, PX 10, Hughes Email to Bruno of October 28, 2015.
[262] Doc. 192-11, PX 199 Cortes Complaint; Doc.189-9, PX 165, Elrod Depo in Fuller, p. 434:10-440:5.
[263] Doc. 192-11, PX 199, Cortes Complaint.
[264] Doc. 189-8, PX 161, Collins p. 9:14-16, 184:7-185:14.
[265] Doc. 189-6 p. 157, PX 156 Birchfield/Jenkins p. 253:1-254:6
[266] Doc. 189-3 p. 79, PX 94 Jackson Declaration p. 4
[267] Doc. 189-3 p. 79, PX 94 Jackson declaration p. 4

## J.   GRAY SEXUAL HARASSMENT AND COMPLAINTS

On November 14, 2015, McDickinson invited plant nurse, Ka'Toria Gray to her house. Gray reluctantly went to McDickinson's house late in the evening. When she arrived, Birchfield was there and so was Steve Jackson. McDickinson and Birchfield acted inappropriately toward Gray and, at one point, McDickinson began performing oral sex on Birchfield in Gray's presence. At this point Gray left McDickinson's home. Birchfield instructed Jackson to lie if anyone questioned him about this incident and to specifically state that he (Birchfield) was not present.[268]

Gray filed a charge of discrimination with the EEOC on April 18, 2016. Koch hired Robert and Deborah Callahan with A to Z Investigations in May 2016 to investigate Gray's complaints of sexual harassment. They questioned several employees, including McDickinson and Birchfield, both of whom were questioned on June 7, 2016.[269] Jackson was also questioned during this investigation and provided false information about the incident with Gray because he feared for his job and that Birchfield would retaliate against him.[270] Birchfield, aware of the investigation, counseled Jackson on what to say when he was interviewed, instructing Jackson to say William Sommerville was there that evening, that Birchfield was not living with McDickinson, and that Jackson had only been to their house a few times.[271]

The Callahans also questioned Brooke Smith, HR Clerk, on August 10, 2016.[272] A summary of the interview with Smith was provided to Koch. Smith reported to A to Z that McDickinson and Birchfield engaged in inappropriate sex acts toward her and others, engaged in sex acts in her presence, and that she was fired because she would not have sex with Birchfield. Smith's specific statements to A to Z are set forth in the A to Z investigative documents filed under

---

[268] Doc. 189-3 p. 78, PX 94 Jackson Declaration p. 3.
[269] Doc. 189-4, PX 129. FILED UNDER SEAL.
[270] Doc. 189-3 p. 79, PX 94 Jackson Declaration p. 4.
[271] Doc. 189-13, p. 121, PX 171, Jackson/Gray p. 471:23-473:1.
[272] Doc. 242-1, PX 1 #1061-1070. FILED UNDER SEAL.

seal.[273] During the A to Z investigation Birchfield bought himself, Jackson, and McDickinson TracFones and told them they did not need to talk on their personal phones.[274] Birchfield told Jackson that he needed to get rid of his personal iPhone and the TracFone, and that he was getting rid of his phones.[275] McDickinson and Birchfield told Smith they bought burner phones because they were being investigated and that they were going to get rid of their old phones and only communicate through the new burner phones purchased by Birchfield. [276] Smith saw Birchfield, McDickinson, and Jackson activate the phones and use these burner phones per Birchfield's instruction.[277]

On June 8, 2016, the day after she was questioned by the A to Z investigators, McDickinson resigned Birchfield her employment with Koch Foods.[278] She identified her last day of employment as June 10, 2016.  McDickinson told Jackson she resigned because Birchfield said that needed to happen so he could keep his job.[279]

## K.    DECEMBER 2015 COMPLAINTS ABOUT MCDICKINSON

In mid-December 2015, allegations arose again that McDickinson was having sex with Jenkins. [280] On December 14, 2015, Birchfield emailed Rebecca Milam, HR Clerk, and McDickinson, asking "What is his point status for attendance?"[281] Birchfield instructed Milam, "Let me know the minute he points out, please." *Id.* If an employee "points out" they are not adhering to the attendance policy and have enough points to be terminated.[282] Birchfield targeted Jenkins to terminate him for points and never called about any other employee.[283] It was not typical

---

[273] Doc. 242-1, A to Z #1061-1070. FILED UNDER SEAL.
[274] Doc. 189-13, PX 172 Jackson/Jenkins p. 437:11-438:439:1
[275] Doc. 189-13, PX 172 Jackson/Jenkins p. 439"3-440:1
[276] Doc. 182-16, PX 182 Smith/Gray p. 195:10-196:21
[277] Doc. 182-16, PX 182 Smith/Gray p. 195:10-196:21
[278] Doc. 242-1, PX 14, p. 111, McDickinson resignation letter; Doc. 189-7, PX 157, McDickinson/Jenkins p. 273:4-21, 274:21-275:6.
[279] Doc. 189-13, PX 172 Jackson/Jenkins p. 443:17-23
[280] Doc. 242-1, pp. 321-322, PX 49, Birchfield Investigation Notes.
[281] Doc. 189-2 p. 184-185, PX 67, Birchfield 12-14-15 Email
[282] Doc. 189-15, PX 179  Shaw p. 74:12-17
[283] Doc. 189-14, PX 175 Milam/Jenkins p. 99:1-16

for Birchfield to reach out to Milam and ask about an employee's points.[284] On Jenkins' December 2015 calendar, someone made changes to the calendar and initialed "RM" for Rebecca Milam. [285] Milam testified she did not write her initials on this calendar and that her handwriting was not on the document.[286] Birchfield also emailed Milam on December 14, 2015, stating he knew what Jenkins' points calendar says, even though Birchfield would not have had access to this document in his office.[287]

Birchfield called Jenkins to his office and asked him if he was having sex with McDickinson and yelled at Jenkins. Jenkins recorded the conversation.[288] When Jenkins met with Birchfield he asked Jenkins if he said he was "fucking" McDickinson, accused Jenkins of going around the plant stating he was "fucking" McDickinson, and showed Jenkins' attendance calendars reflecting things McDickinson was doing for Jenkins.[289] Birchfield raised his voice  and cursed at Jenkins, later admitting his conduct was not acceptable for Human Resources management and he should not have used the word "fuck."[290]

On December 7, 2015, Birchfield issued an Employee Warning Report to Jenkins claiming he was seen smoking in an unauthorized area.[291] Jenkins refused to sign the warning.[292]

Birchfield and McDickinson called Jenkins to meet them to allegedly discuss attendance points that Jenkins had accumulated. [293] However, the meeting turned to  McDickinson having sex with Jenkins.[294] Birchfield and McDickinson asked Jenkins about allowing Birchfield to watch

---

[284] Doc. 189-14, PX 175 Milam/Jenkins p. 100:1-6
[285] Doc. 189-14, PX 175 Milam/Jenkins p. 100:21-102:5
[286] Doc. 189-14, PX 175 Milam/Jenkins p. 100:21-102:5
[287] Doc. 189-14, PX 175 Milam/Jenkins p. 102:11-103:5
[288] Doc. 182-2 p. 37, DX 2 Jenkins p. 135:8-136:21.
[289] Jenkins p. 89:20-90:21, 92:6-17.
[290] Doc. 189-6 p., PX 156 Birchfield/Jenkins p. 373:5-374:18
[291] Doc. 189-2 p. 1-2, PX 31
[292] Doc. 189-2 p. 5-6, PX 33
[293] Doc. 182-2 p. 85, DX 2 Jenkins p. 302:12-303:21.
[294] Doc. 182-2 p. 85, DX 2 Jenkins p. 302:12-303:2.

Jenkins and McDickinson have sexual intercourse.[295] In November 2015, McDickinson had previously requested that Jenkins let Birchfield watch her have sex with him.[296] Jenkins became upset and refused Birchfield's and McDickinson's request.[297]

Sunday, January 3, 2016, Jenkins was accused of being late to work and was to receive an attendance point.[298] Jenkins protested this point—Koch's timeclock records showed that Jenkins clocked in Sunday at 6:00 a.m.[299] He was not late nor did he leave early.[300] Jenkins was off work on January 2, 2016 for a family death and was off work on Monday and Tuesday for two doctors appointments.[301] Jenkins was somehow scheduled to work a four (4) hour shift on January 2, 2016, although he was taking approved bereavement leave.[302] This was done to set him up so that he would not show up for his shift.[303]

## L.   BIRCHFIELD FALSIFIED INFORMATION TO SUSPEND AND TERMINATE JENKINS

Birchfield and McDickinson made the decision to fire Jenkins.[304] Birchfield called Shaw on March 20 or 21st stating there had been a complaint that Jenkins was out of his work area and Shaw let Birchfield know he had not seen Jenkins out of his work area.[305] McDickinson participated in the investigation leading up to Jenkins' termination.[306] Human Resources informed Shaw that Jenkins was being suspended.[307] Shaw believes McDickinson was the person who instructed that Jenkins was to be suspended.[308] Shaw, Jenkins' supervisor, did not participate in

---

[295] Doc. 182-2 p. 57, 83, 86, DX 2 Jenkins p. 215:8-13, 293:2-9, 303:22-304:16.
[296] Doc. 182-2 p. 83,86, DX 2 Jenkins p. 293:5-12, 304:19-305:6, 306:18-21.
[297] Doc. 182-2 p. 86, DX 2 Jenkins p. 305:23-306:1.
[298] Doc. 189-14, PX 175 Milam/Jenkins p. 108:1-110:8, 119:23-112:13, 117:20-118:4
[299] Doc. 189-14, PX 175 Milam/Jenkins p. 108:1-110:8, 119:23-112:13, 117:20-118:4
[300] Doc. 189-14, PX 175 Milam/Jenkins p. 108:1-110:8, 119:23-112:13, 117:20-118:4
[301] Doc. 189-14, PX 175 Milam/Jenkins p. 112:13-23, 115:2-13
[302] Doc. 189-14, PX 175 Milam/Jenkins p. 112:13-23, 115:2-13
[303] Doc. 189-14, PX 175 Milam/Jenkins p. 112:13-23, 115:2-13
[304] Doc.189-15, PX 179 Shaw p. 98:5-7
[305] Doc.189-15, PX 179 Shaw p. 105:13-106:5
[306] Doc.189-15, PX 179 Shaw p. 98:13-99:6, 99:6-8
[307] Doc.189-15, PX 179 Shaw p. 101:20-102:12
[308] Doc.189-15, PX 179 Shaw p. 101:20-102:12

the decision to suspend or fire Jenkins.[309] After Jenkins was suspended and before he was fired, he called Bobby Elrod, VP of HR, and complained about Birchfield and McDickinson documenting against him and that McDickinson had sexually harassed him.[310] Jenkins contacted Elrod because he wanted to keep his job and needed his job—Elrod ignored his complaints.[311]

When Jenkins was suspended he reported that everyone goes and smokes while on the clock.[312] Sharpley smoked while employed with Koch and he never had to clock out to take a smoke break. [313] He never saw employees filing grievances with the Union for being fired for taking a smoke break.[314] Sharpley took smoke breaks with Birchfield to smoke cigarettes as well as Cuban cigars, and he smoked Cuban cigars with Birchfield in front of the building, an area not designated for smoking.[315] Birchfield had also smoked with Jenkins more times than he could count.[316] Sharpley also smoked cigarettes with McDickinson standing outside the door to Human Resources.[317] When Jenkins would finish his regular shift and volunteer to help Sharpley, Sharpley allowed Jenkins and other employees to smoke outside the wastewater area because he did not want them to stop working to go smoke in a designated smoking area.[318]

Johngernita Foxhall would leave the production line and return to smoke with McDickinson and Jenkins after her break, when she was not supposed to be there.[319] Foxhall would sit between McDickinson and Jenkins and smoke another cigarette just to see if McDickinson was pursuing Jenkins.[320] McDickinson never disciplined Foxhall about smoking on the clock.[321]

---

[309] Doc.189-15, PX 179 Shaw p. 107:2-18
[310] Doc. 182-2, p. 53, Jenkins p. 198:23-199:9.
[311] Jenkins p. 56:14-57:9
[312] Doc.189-15, PX 179 Shaw p. 116:6-13
[313] Doc. 189-15, p. 33, PX 178, Sharpley p. 25:11-26:7.
[314] Doc. 189-15, p. 33, PX 178, Sharpley p. 25:11-26:7.
[315] Doc.189-15, p. 33-34, PX 178, Sharpley p. 28:7-23-29:19.
[316] Doc. 189-6, PX 156 Birchfield/Jenkins p. 370:10-14
[317] Doc. 189-15, p. 34, PX 178, Sharpley p. 29:20-30:12.
[318] Doc.189-15, p. 34, PX 178, Sharpley p. 31:13-32:20.
[319] Doc. 189-11, p. 14, Foxhall p. 44:15-45:10, 135:21-136:13
[320] Doc. 189-11, p. 14, Foxhall p. 44:15-45:10, 135:21-136:13
[321] Doc. 189-11 p. 14, Foxhall p. 45:11-14, 136:14-19, 137:9-23, 152:5-22

After Jenkins complained, Elrod requested information from Birchfield about why Jenkins was suspended. Birchfield accused Jenkins of being away from work while on the clock for over an hour on March 21, 2016, and on March 31, 2016. Birchfield stated, "On that particular day for over an hour until his supervisor, Jeff Shaw, caught him."[322] However, Koch's time records prove that on March 21st Jenkins clocked in at 4:28 a.m. and out at 9:30 a.m. for break and then clocked back in at 10:00 a.m. Shaw allegedly witnessed Jenkins outside smoking seven (7) minutes later.[323] Shaw hand wrote a statement documenting that on "March 21st at 10:07 AM" he observed Jenkins in the smoke area.[324] At most, Jenkins had only been in the smoking area seven (7) minutes, not over an hour as Birchfield alleged.[325] Shaw does not recall any time that Jenkins was on the clock and away from work for over an hour.[326] Birchfield's claim that Jenkins was away from work for over an hour is false.[327]

Birchfield submitted a second false allegation to Elrod regarding Jenkins in his March 31, 2016 email, "After Jeff told him to go back to work he went back to the smoke area and sat down."[328] Shaw testified this never happened and Birchfield's allegation is untrue. *Id.* When Shaw saw Jenkins in the smoke area on March 21, 2016, he immediately took Jenkins to Human Resources.[329] Jenkins was issued an Employee Warning.[330]

On March 31, 2016, Birchfield had McDickinson obtain camera surveillance footage of Jenkins on March 21, 2016.[331] McDickinson took screen shots of the surveillance footage of Jenkins clocking in and out on March 21, 2016. However, Koch's surveillance records do not

---

[322] Doc. 189-2, p. 68
[323] Doc.189-15, PX 179 Shaw p. 118:1-3; Doc. 189-2 p. 20)
[324] Doc. 189-2 p. 20; Doc.189-15, PX 179 Shaw p. 108:13-18, 118:1-3).
[325] Doc.189-15, PX 179 Shaw p. 124:22-125:4).
[326] Doc.189-15, PX 179 Shaw p. 124:17-21).
[327] Doc.189-15, PX 179 Shaw p. 125:18-23).
[328] Doc. 189-2 p. 68; Doc. 189-15, PX 179 Shaw p. 126:6-22)
[329] Doc.189-15, PX 179 Shaw p. 126:12-15
[330] Doc. 189-5 p. 25-28, PX 147
[331] Doc 189-7 PX 157, McDickinson/Jenkins p. 456:13-457:8, 462:3-6, 463:3-6, 465:13-15

support Koch's contentions that Jenkins was on the clock and smoking for one hour.  McDickinson and Birchfield labeled the first camera shot as "Irish clocking in from break @ 10:00 am on 3/21/2016".  PX98, bates 03841.  The time stamp on the video clearly shows 9:00:01AM and not 10:00 AM as indicated in the description.  Id.  The second page of two video screen shots indicate an area with several people and no one identified as Jenkins in the photos. Id at 3842.  The third page of one video still shot, also time stamped at 9:09:18 depicts two men walking inside the building and not in the smoking area.  This depiction is labeled, "Irish caught by his supervisor Jeff Shaw @ 9:09:18 on 3/21/2016."  If the first that photo is of Jenkins at the time clock then he is clocking out, and not in, for a break at 9:00 am not Willingham's report that clearly shows a missed punch (MP).  Id., comparing bates 3823 and 3824.  Further, Jenkins time entries have exact times of 9:30, 10:00 and 11:30, unlike the sporadic time entries of Willingham's time punches. Jenkins contends that his punches have been changed to comport with McDickinson's and Birchfield's allegations that he was stealing time.   This is further noted in comparing the time records that indicate an out punch of 11:30:00 AM on March 21 for Jenkins but that same entry is missing on the Kronos report for Jenkins.  Id, comparing 3823 and 3818.

What is apparent from the records presented is that Willingham, Jenkins' white co-worker took longer breaks than 30 minutes and was not disciplined.  Id at 3822 and 3824.

Human Resources was supposed to be involved in the termination of employees.[332] Jenkins was fired on March 31, 2016. Jenkins was told he was being fired for smoking while on the clock, but this reason is not true. Jenkins took smoke breaks on the clock with Birchfield, on more than one occasion, and even smoked cigars with Birchfield while he was on the clock.[333] Shaw, Jenkins

---

[332] Doc.189-6 p., PX 156 Birchfield/Jenkins p. 67:1-5, Doc. 189-1 p. 4-5, PX 2, Birchfield Email
[333] Doc. 182-2 p. 79, DX 2 Jenkins p. 276:9-16, 279:14-16).

supervisor, was aware he was outside smoking with Birchfield while on the clock, and Birchfield was also aware Jenkins was on the clock.[334] McDickinson would also take smoke breaks with Jenkins while Jenkins was on the clock.[335] Birchfield also allowed Jenkins to leave work while on the clock with Randy Sharpley to go get miniatures of alcoholic beverages at a nearby store.[336]

Jenkins contends one of the reasons he was fired is because he refused to let Birchfield watch while McDickinson had sexual intercourse with him.[337] Birchfield discussed Jenkins' termination with Steve Jackson.[338]

### M.    KOCH IS NEGLIGENT AND WANTON IN HIRING, TRAINING, AND RETRAINING BIRCHFIELD AND MCDICKINSON

Around the time Jenkins filed his EEOC charge[339], McDickinson and Birchfield hired Brooke Smith as a HR Clerk after meeting her and dancing with her at a local bar. [340] McDickinson was her boss.[341] McDickinson and Birchfield hired Smith because they were both sexually attracted to her.[342] After Smith was hired she was invited to McDickinson's and Birchfield's home, where Jackson would also be present.[343] Smith and Jackson stayed overnight at the house with McDickinson and Birchfield while they were employed by Koch.[344] Birchfield and McDickinson continuously asked Smith to have sex with them and McDickinson kissed Smith and touched her breast while at McDickinson and Birchfield's home.[345] Birchfield, while on Koch premises, would walk outside to smoke with Smith and put his arm around her, touch her buttocks and make

---

[334] Doc. 182-2 p. 79, DX 2 Jenkins p. 276:17-277:2, 278:8-20).
[335] Doc. 182-2 p. 79, DX 2 Jenkins p. 279:2-8).
[336] Doc. 182-2 p. 79, DX 2 Jenkins p. 279:16-280:20).
[337] Doc. 182-2 p. 78, DX 2 Jenkins p. 273:2-16, Doc. 189-3 PX 95 Jenkins Declaration
[338] Doc.189-13 PX 172 Jackson p. 304:16-305:6, 400:7-15
[339] Doc. 189-2, p. 27-33 PX 44
[340] Doc. 189-3 p. 79, PX 94 Jackson Declaration p. 4, Doc.189-13 PX 172 Jackson/Jenkins p. 434:4-10
[341] Doc. 189-3 p. 79, PX 94 Jackson Declaration p. 4, Doc.189-13 PX 172 Jackson/Jenkins p. 434:4-10
[342] Doc. 189-3 p. 79, PX 94 Jackson Declaration p. 4, Doc. 189-16, PX 182 Smith/Gray p. 40:5-10
[343] Doc. 189-3 p. 79, PX 94 Jackson Declaration p. 4
[344] Doc. 189-16, PX 182 Smith/Gray p. 190:1-4
[345] Doc. 189-16, PX 182 Smith/Gray p. 33:13-15, 82:11-19, 86:15-17

comments to her like "you look so sexy today."[346] On other occasions he called her into a vacant office and told her he just needed a hug from her and would grope her buttocks.[347] McDickinson told Smith that Birchfield was making her have sex with people while he watched and Smith was sometimes present when this would happen.[348] McDickinson told Smith that Birchfield liked to watch her do things with other people because it turned him on. [349] He would videotape and take pictures.[350]

Smith and Jackson were with Birchfield and McDickinson one evening when they picked up two young boys at Wal-Mart and brought them to their house.[351] McDickinson and Birchfield took one boy in the bedroom to have sex with him. [352] Smith heard them engaging in sex with this boy and saw flashes of pictures being taken during the act.[353] Smith was terminated and contends she was fired because of her repeated refusal to have sex with Birchfield and McDickinson.[354] Birchfield told Smith "If you'd sleep with me, I'll get your job back."[355]

## III.    ARGUMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions

---

[346] Doc. 189-16, PX 182 Smith/Gray p. 87:20-88:4
[347] Doc. 189-16, PX 182 Smith/Gray, p. 88:10-25.
[348] Doc. 189-16, PX 182 Smith/Gray p. 47:21-25, 51:13-19, 200:23-201:5
[349] Doc. 189-16, PX 182 Smith/Gray p. 201:10-17
[350] Doc. 189-16, PX 182 Smith/Gray p. 201:10-17
[351] Doc. 189-16, PX 182 Smith/Gray p. 75:5-6, 76:7-11, 72:23-75:20, 76:7-11
[352] Doc. 189-16 , PX 182 Smith/Gray p. 75:5-6, 76:7-11, 72:23-75:20, 76:7-11
[353] Doc. 189-16, PX 182 Smith/Gray p. 75:5-6, 76:7-11, 72:23-75:20, 76:7-11
[354] Doc. 189-16, PX 182, Smith/Gray p. 17:18-20, 51:5-10, 93:17-20
[355] Doc. 189-16, PX 182 Smith/Gray p. 65:17-21

of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative

evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 135 L. Ed. 2d 606, 116 S. Ct. 2174 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)).

Judgment on the pleadings is only appropriate if "there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). In determining whether a party is entitled to judgment on the pleadings, courts must "accept as true all material facts alleged in the non-moving party's pleading, and [ ] view those facts in the light most favorable to the non-moving party. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014). Under that standard, Defendants Koch

Foods, Inc. and Koch Foods of Alabama, LLC (collectively "Defendants" or "Koch Foods") are

not entitled to judgment on the pleadings or summary judgment as to Plaintiff's Title VII sexual

harassment/hostile work environment claim.

### A.      DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE DENIED

Defendants do not dispute that David Birchfield ("Birchfield") and Melissa McDickinson

("McDickinson"), were high-ranking human resource employees of Defendants.  That means they

were the individuals Defendants hired to monitor compliance with the federal civil rights laws.

Yet Defendants are now arguing that they should be relieved of any liability for the conduct of

these two individuals if they used their knowledge of the laws (and the concept of "equal

treatment") to create a sexually hostile environment for all workers, men and women alike. After

all, claim Defendants, McDickinson and Birchfield were bi-sexual harassers who treated men and

women in the same manner.  Jenkins cannot demonstrate that he was subjected to discrimination

on the basis of his gender if McDickinson and Birchfield subject all employees to demands for

sexual favors.  But sophistry of this type has been recognized for what it is and rightly rejected.

Judge Richard Posner rejected this argument in *McDonnell v. Cisneros*, 84 F.3d 256, 260 (7th Cir.

1996): "It would be exceedingly perverse if a male worker could buy his supervisors and his

company immunity from Title VII liability by taking care to harass sexually an occasional male

worker, though his preferred targets were female."  Many other courts have agreed with Judge

Posner.  *See, e.g., E.E.O.C. v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 845 (9th Cir. 2005) ("[I]t

is error to conclude that harassing conduct is not because of sex merely because the abuser

"consistently abused men and women alike."); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1118

(9th Cir. 2004) ("Secondly, our case law is clear that the fact that an individual 'consistently abused

men and women alike' provides no defense to an accusation of sexual harassment."); *McDonnell v. Cisneros*, 84 F.3d 256, 260 (7th Cir. 1996) (finding the "bisexual harasser" theory "not compelling," "too literal" an interpretation, and stating "[w]e are rather surprised to find the Department of Justice urging" this, along with other, arguments); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994) (rejecting "equal opportunity harasser argument" and noting that "even if [the harasser] used sexual epithets equal in intensity and in an equally degrading manner against male employees, he cannot thereby 'cure' his conduct toward women."); *Sawa v. RDG-GCS Joint Ventures III*, No. CV 15-6585, 2017 WL 3033996, at *10 (E.D. Pa. July 14, 2017) (concluding "that a reasonable jury could find that [female plaintiffs] were subjected to sexually- harassing cyber-stalking because of their gender, notwithstanding the fact that [a male] may also have been subject to sexual harassment based on his gender"); *Cutrona v. Sun Health Corp.*, No. CV06218PHXMHM, 2008 WL 4446710, at *9 (D. Ariz. Sept. 30, 2008) ("It is well settled 'that the fact that an individual "consistently abused men and women alike" provides no defense to an accusation of sexual harassment.").

Defendants claim that the Eleventh Circuit's decision in *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982), established that "no cause of action exists under Title VII for bisexual harassing conduct because men and women are treated by the harasser in the same manner." (Doc. 180, p. 40.) But *Henson* held no such thing. *See McDonnell*, 84 F.3d at 260 (Judge Posner recognizing *Henson* as merely *dicta* "interpreting sex discrimination in too literal a fashion").

*Henson* did not involve a bi-sexual harasser or bi-sexual harassing conduct. The issue in *Henson* was whether a plaintiff must prove a tangible job detriment in order to establish a hostile work environment under Title VII. The Circuit held that "the creation of an offensive or hostile work environment due to sexual harassment can violate Title VII irrespective of whether the

complainant suffers tangible job detriment." *Henson*, 682 F.2d at 901. The hypothetical bi-sexual

harasser was not an issue in *Henson*, and this Court is not constrained by the Circuit's 37-year old

dicta on that issue. Rather, as is discussed more thoroughly below, this Court must be guided by

the recent language of the Supreme Court in *Bostock v. Clayton County GA*, __U.S.__, 140 S.Ct.

1731, 1741 (2020): "Nor is it a defense for an employer to say it discriminates against both men

and women because of sex. . . . Instead of avoiding Title VII exposure, this employer doubles it."

Contrary to Defendants' argument, it is likely that the Eleventh Circuit and the Supreme

Court would agree with Plaintiff on this issue, especially in light of the exceedingly "gender fluid"

climate of modern society. *See, generally, Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d

798, 810-811 (11th Cir. 2010) (employing a comparative evidence approach when the challenged

conduct was both gender-specific and non-gender specific and stating: "the real social impact of

workplace behavior often depends on a constellation of surrounding circumstances, expectations,

and relationships which are not fully captured by a simple recitation of the words used or the

physical acts performed . . .. Thus, we proceed with common sense, and an appropriate sensitivity

to social context . . ..") (internal quotation marks and citations omitted); *Grimm v. Gloucester

County School Board*, __ F.3d __, 2020 WL 5034430. at *1 (4th Cir. Aug. 26, 2020) (discussing

the baggage which needs to be unpacked when sex and gender are considered as binary options).

In determining whether a party is entitled to judgment on the pleadings, courts must "accept

as true all material facts alleged in the non-moving party's pleading and [ ] view those facts in the

light most favorable to the non-moving party." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335

(11th Cir. 2014). Defendants do not claim that Defendants' alleged conduct could not create a

hostile work environment in violation of Title VII. Rather, they argue that, because Jenkins claims

Birchfield and McDickinson sexually harassed men and women, they "treated men and women

the same" and were, therefore, incapable of being motivated by gender. This conclusion is not consistent with controlling case authority.

Jenkins alleges that Defendants, through Birchfield and McDickinson, subjected him to "quid pro quo" sexual harassment. (Doc. 1, ¶87.) He alleges that McDickinson: sought out Jenkins for the purpose of engaging in sexual activity with him (Doc. 1 ¶¶ 23-28); told him that she had a preference for African-American men (Doc. 1, ¶ 28); and approached him numerous times at work to engage in sexual conduct (Doc. 1, ¶¶ 37-45.) While Jenkins alleges that, on at least one occasion, Birchfield and McDickinson asked Jenkins to approach Ka'Toria Gray about engaging in "group sex" (Doc. 1, ¶¶ 47-50), this is not an allegation that McDickinson or Birchfield are bi-sexual. For all Jenkins knew, he was being asked to approach Gray about having sex with Birchfield at the same time as he was having sex with McDickinson. Indeed, Jenkins alleges that McDickinson told him Birchfield wanted to watch him have sex with her (Doc. 1, ¶¶ 52, 54, 65), not that Birchfield wanted to have sex with Jenkins. But Plaintiff made no allegations that Birchfield is bisexual. Nowhere does Plaintiff allege that there were any female employees with him when McDickinson and Birchfield propositioned him or when he engaged in  sexual conduct with McDickinson. Plaintiff never alleged that Birchfield is bi-sexual.  Plaintiff's Complaint simply does not support Koch Foods' argument that Birchfield and McDickinson were bi-sexual harassers who treated female and male employees in the same manner.  For this reason alone, Defendants' motion is due to be denied, and the Court need not consider the matter further.

*Holman v. Indiana*, 211 F3d 399, 401 (7th Cir. 2000), upon which Defendants rely, does not compel a different result.  This case is factually distinguishable[356] from *Holman*.  In *Holman*

---

[356] *Holman* does, however, speak in hypothetical terms to the situation actually presented here: the two highest human resource professionals employed by Defendants sexually harass the employees they are hired to protect:

the complaint "specifically and unequivocally claimed that the same supervisor had been sexually harassing the male and female plaintiffs by soliciting sex from each on separate occasions and then had retaliated against each," *Id.* at 401. Here, Jenkins alleges McDickinson propositioned him for sex in exchange for favorable working conditions, including his continued employment.  That is sufficient to allege a violation of Title VII.

The Supreme Court, in *Meritor Savings Bank, FSB v. Vinson*,  477 U.S. 57, 65 (1986), citing 29 CFR § 1604.11(a) (1985), recognized that "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" constitutes sexual harassment.  Identifying whether or not a violation of Title VII occurs turns, not on how the harasser acts at some other time and under some other circumstances.  Establishing a hostile environment is based upon the conduct directed at a single victim and whether the victim of that conduct subjectively perceived the environment to be sexually hostile at the time it occurred. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).  If the sexual conduct is sufficiently severe or pervasive to alter the terms and conditions of the victim's employment, that conduct violates Title VII.  *Vinson*, 477 U.S. at 67.  Further, "the fact that sex-related conduct was 'voluntary,' in the sense that the complainant was not forced to participate against [his] will, is not a defense to a sexual harassment suit brought under Title VII.  The gravamen of any sexual

---

Furthermore, the Holmans' theory that sexual harassers will attempt to insulate themselves and their employers from liability by purposely harassing members of both sexes in order to disguise their real intent seems unrealistic. It is hard to imagine that would-be harassers will know the intricacies of sexual harassment law and will manufacture additional harassments to attempt to avoid Title VII liability, particularly when doing so will increase their risk of being fired, sued under state law, and ostracized. Surely attorneys will not advise their employer-clients to instruct their employees to harass still more people—to commit, in most cases, state law torts—which could subject their clients to lawsuits and themselves to claims of malpractice and charges of professional misconduct. Moreover, if attorneys were actually to dispense such incredible advice, and their clients were to follow it, the clients would still be subject to Title VII liability. In such cases the harasser is not a bona-fide "equal opportunity" harasser; he is manufacturing another harassment to avoid Title VII liability.

*Holman*, 211 F.3d at 404.

harassment claim is that the alleged sexual advances were 'unwelcome.' 29 CFR § 1604.11(a) (1985)." *Vinson*, 477 U.S. at 69.

Not everyone reacts the same to offensive conduct. Numerous courts have recognized the importance of considering "differences in subjective effects" in "determining whether or not men and women were treated differently." *E.E.O.C. v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 845-46 (9th Cir. 2005); *see also Oncale*, 523 U.S. at 81 (noting that courts must consider how the "particular behavior . . . is experienced by its target."); *Harris*, 510 U.S. at 21 (explaining that the analysis can turn on the victim's subjective perception of the work environment). Men and women experience sexual conduct in the workplace differently, and what amounts to severe harassment for a single member of one group may not offend all members of that group or any other group.[357] *E.g., Nat'l Educ. Ass'n, Alaska*, 422 F.3d at 845-46 (noting that "objectively identical behavior" may amount to sexual harassment for a woman, but not a man, under a "reasonable woman" standard); *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1168 (9th Cir. 2017) ("We must view the evidence in light of 'the different perspectives of men and women.'"); *Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991) ("Men, who are rarely victims of sexual assault, may view sexual conduct in a vacuum without a full appreciation of the social setting or the underlying threat of violence that a woman may perceive.")

The importance of focusing on the individual, and not the group, has become abundantly clear after the Court's decision in *Bostock*. Pointing out that Title VII protects individuals and not

---

[357] Courts have variously analyzed the "equal opportunity harasser" issue using a binary system, *i.e.* examining how men were treated in comparison to women. But, as the Supreme Court in *Bostock v. Clayton County, GA* made clear, Title VII's protections extend to all sexual and gender groups or categories, actual or perceived. __U.S.__, 140 S.Ct. 1731, 1746-47 (2020).

groups, *Bostock*, 140 S.Ct. at 1740, the Court spoke directly to the "equal opportunity violator" theory.

> The consequences of the law's focus on individuals rather than groups are anything but academic.  Suppose an employer fires a woman for refusing his sexual advances.  It's no defense for the employer to note, while he treated that individual woman worse than he would have treated a man, he gives preferential treatment to female employees overall.  The employer is liable for treating *this* woman worse in part because of her sex.  Nor is it a defense for an employer to say it discriminates against both men and women because of sex.  This statute works to protect individuals of both sexes from discrimination and does so equally. So an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally.  But in *both* cases the employer fires an individual in part because of sex.  Instead of avoiding Title VII exposure, this employer doubles it.

*Bostock*, 140 S.Ct. at 1741.

> The Court explained further:

> An employer musters no better a defense by responding that it is equally happy to fire male *and* female employees who are homosexual or transgender.  Title VII liability is not limited to employers who, through the sum of all of their employment actions, treat the class of men differently than the class of women.  *Instead, the law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII.*  So just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.

*Bostock*, 140 S.Ct. at 1742-43 (emphasis added).

The message could not be more clear: the employer who sexually harasses a man and a woman does not eliminate liability under Title VII but doubles that liability.  To the extent *Henson* holds, suggests, or intimates some other result, that holding, suggestion, or intimation was rejected by the Supreme Court in *Bostock*.

When viewed through the lens of *Bostock*, Plaintiff's complaint alleges sufficient facts to state a claim.  He alleges that McDickinson, an agent of Defendants, approached him, made unwelcome sexual advances to him, and coerced him into engaging in sexual conduct at work. Certainly, at those times and places, Plaintiff's sex was a factor in McDickinson's decision.  And it makes no difference that some other factor may have played a part in their decision.  If Plaintiff's sex played a part in their decision, "that is all Title VII has ever demanded to establish liability." *Bostock*, 140 S.Ct. at 1744.

## B.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FARES NO BETTER

Defendants' bi-sexual harasser argument in support of summary judgment fares no better.

As the Supreme Court noted in *Oncale v. Sundowner Offshore Servs., Inc.*:

> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, *if there were credible evidence that the harasser was homosexual*.

*Id.* at 80 (emphasis added).   In other words, one way a plaintiff can satisfy the "because of sex" requirement is with evidence that the alleged harasser is sexually attracted to members of the plaintiff's protected class.  A bi-sexual harasser is, by definition, attracted to males and females and, therefore, more capable (as opposed to completely incapable) of acting "because of sex." Concluding otherwise would essentially neuter both *Oncael*[358] and *Bostock* and would sanction

---

[358] As Judge Evans of the Seventh Circuit wrote while contemplating the necessity of an exception to an equal opportunity harasser defense:

> I write separately only to note that the recognition of that possibility eliminates what otherwise seems to be a **troubling class with *Oncale v. Sundowner Offshore Services, Inc.*,** 523 U.S. 75, 118, S.Ct. 998, 140 L.Ed.2d 201 (1998).  The workplace in *Oncale* had eight employees, all male.  Nevertheless, the court concluded that it would be possible to find harassment – that it would be possible, therefore, to find discrimination.  If "discrimination" is possible in a single-sex workplace, it might also be possible in some circumstances in which we find an equal opportunity harasser.

widespread sexual harassment in the workplace so long as the harasser targeted all sexes and genders. This is contrary to the spirit of Title VII and commonsense.[359]  *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) (noting that the primary aim of Title VII is to "avoid harm.") But, as noted above, as far as Irish Jenkins is concerned, he was targeted by McDickinson for sex at least in part because he male. That is a violation of Title VII.

Despite Koch Foods' arguments otherwise, many courts agree and have addressed and patently rejected the "equal opportunity harasser" immunity argument. *See, e.g., E.E.O.C. v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 845 (9th Cir. 2005) ("[I]t is error to conclude that harassing conduct is not because of sex merely because the abuser 'consistently abused men and women alike.'); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1118 (9th Cir. 2004) ("Secondly, our case law is clear that the fact that an individual 'consistently abused men and women alike' provides no defense to an accusation of sexual harassment."); *McDonnell v. Cisneros*, 84 F.3d 256, 260 (7th Cir. 1996) (finding the "bisexual harasser" theory "not compelling," "too literal" an interpretation, and stating "[w]e are rather surprised to find the Department of Justice urging" this, along with other arguments); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994) (rejecting "equal opportunity harasser argument" and noting that "even if [the harasser] used sexual epithets equal in intensity and in an equally degrading manner against male employees, he cannot thereby

---

*Holman v. Indiana*, 211 F.3d 399, 407 (7th Cir. 2000) (Evans, J. concurring) (emphasis added).

[4]*See* THE "EQUAL OPPORTUNITY HARASSER": THE SLOW DEMISE OF A STRANGE CONCEPT?, Lab Law J. 11230491 ("Noting the absurdity of a rule that essentially holds that the more employees a supervisor or co-worker harasses, the less likely his employer will be held liable for that conduct, courts have examined plaintiffs' claims separately, espoused a broader meaning of the term 'sex,' bypassed discussion of the 'because of sex' requirement altogether, or permitted claims to proceed where both sexes were harassed but o a different extend and/or in different ways.")

[359] *See* THE "EQUAL OPPORTUNITY HARASSER": THE SLOW DEMISE OF A STRANGE CONCEPT?, Lab Law J. 11230491 ("Noting the absurdity of a rule that essentially holds that the more employees a supervisor or co-worker harasses, the less likely his employer will be held liable for that conduct, courts have examined plaintiffs' claims separately, espoused a broader meaning of the term 'sex,' bypassed discussion of the 'because of sex' requirement altogether, or permitted claims to proceed where both sexes were harassed but o a different extend and/or in different ways.")

'cure' his conduct toward women"); *Sawa v. RDG-GCS Joint Ventures III,* No. CV 15-6585, 2017 WL 3033996, at \*10 (E.D. Pa. July 14, 2017) (concluding "that a reasonable jury could find that [female plaintiffs] were subjected to sexual harassment by the cyber-stalking because of their gender, notwithstanding the fact that [a male] may also have been subject to sexual harassment based on his gender"); *Cutrona v. Sun Health Corp.*, No. CV062184PHXMHM, 2008 WL 4446710, at \*9 (D. Ariz. Sept. 30, 2008) ("It is well settled 'that the fact that an individual 'consistently abused men and women alike' provides no defense to an accusation of sexual harassment.").

The Supreme Court's decision in *Bostock* should now put this argument to rest.  When an employer, through its Human Resource professionals, makes sexual advances to an employee, male or female, cisgendered or transgendered, homosexual or straight, that employer necessarily and intentionally discriminates against that individual in part because of sex.  *Bostock*, 140 S.Ct. at 1744.  And the facts in this case are sufficient to establish that Defendants, through their agents Birchfield and McDickinson, created and sustained a sexually hostile work environment for Plaintiff.

## C.    DEFENDANTS' MISTAKE THE CAUSATION STANDARD

### 1.    "But For" Causation Is Not The Same As Sole Causation

Many of the arguments put forth by Defendants to support summary judgment are based upon an erroneous statement of the law, particularly as it relates to the causation standard applicable to claims brought pursuant to 42 U.S.C. § 1981 and Title VII.

a.   **"But For" Causation Is Not Sole Cause**

In Section III.A.1 of their brief, Defendants argue that Plaintiff cannot assert a "race plus" theory of discrimination under § 1981 because that section protects only against race discrimination.  To support their argument, Defendants cite Justice Gorsuch's majority opinion *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, __U.S.__, 140 S.Ct. 1009 (2020), for the proposition that claims brought under § 1981 require "but for" causation.  And Defendants are correct that *Comcast* holds that a plaintiff pursuing a claim under § 1981 "bears the burden of showing that race was a but-for cause of its injury."  *Comcast*, 140 S.Ct. at 1014.  This "ancient and simple" causation test supplies the default or background rule against which Congress is normally presumed to have legislated when creating causes of action, including federal antidiscrimination laws.  *Id.*

Defendants argue that, in order to prevail on his § 1981 claim, he must prove that his race, and only his race, caused him to suffer an injury.  Defendants cite two cases to bolster this conclusion: *Jones v. Horizon Shipbuilding, Inc.*, 2012 WL 5187800 (S.D. Ala. 2012) and *Craig v. Yale Univ. School of Med.*, 2013 WL 789718 (D. Conn. 2013).  But Defendants' argument is wrong because it ignores the Justice Gorsuch's majority opinion in *Bostock v. Clayton County, GA*, __U.S.__, 140 S.Ct. 1731 (2020), in which the Court speaks directly to the nature of "but for" causation.

> Often, events have multiple but-for causes.  So, for example, if a car accident occurred *both* because the defendant ran a red light *and* because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision.  Cf. *Burrage v. United States*, 571 U.S. 204, 211-212 (2014).  When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision.  So long as the plaintiff's [protected trait] was one but-for cause of that decision, that is enough to trigger the law.

*Bostock*, 140 S.Ct. at 1739.

By misreading the Court's holding in *Comcast* and *Bostock*, and substituting the definite article 'the' for the indefinite article 'a',[360] Defendant concludes that "but-for" causation requires proof that race was the sole factor which cause Plaintiff's injury.  Indeed, the two cases cited by Defendants to support this argument say as much.

In *Jones*, the district court noted, unsurprisingly, that § 1981 only prohibits discrimination on the basis of race, not sex.  What is surprising is the district court's statement that an intersectional race-plus-sex claim would not be allowed under Title VII.  *Jones*, 2012 WL 5187800, at *11 n. 31.  Intersectional race-plus-sex claims have long been recognized under Title VII, beginning with the former Fifth Circuit.  *See Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025,  1032-1033 (5th Cir. 1980) (rejecting the "sole" causation argument and embracing the existence of  Title VII violations based upon a confluence of prohibited traits); *Kimble v. Wisconsin Dept. of Workforce Development*, 690 F.Supp.2d 765, 770 (E.D. Wis. 2010) (noting that scholars have long recognized that black males are subject to distinct stereotypes and recognizing the existence of an intersectional race-plus-sex claim brought by an African-American male); *see also* Pamela J. Smith, *Part II – Romantic Paternalism The Ties That Bind: Hierarchies of Economic Oppression That Reveal Judicial Disaffinity for Black Women & Men*, 3 J Gender, Race & Justice 181, 254 (1999-2000); Floyd D. Weatherspoon, *Remedying Employment*

---

[360] Interestingly, the Supreme Court, itself, has been prone to making this same mistake.  In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the Court ruled that "but-for" causation applied to the Age Discrimination in Employment Act: "We hold that a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged employment action."  557 U.S. at 180.  The Court made a similar statement in *Univ. of Tex. SW Med. Cntr v. Nassar*, 570 U.S. 338 (2013) concerning the anti-retaliation provision of Title VII: "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  570 U.S. at 352. But five years later, in *Burrage v. United States*, 571 U.S. 204 (2014), the Court recast the holdings of both *Gross* and *Nassar* by substituting the indefinite article 'a' for the definite article 'the'.  *Burrage*, 571 U.S. at 212-213.

*Discrimination Against African-American Males: Stereotypical Bases Engender a Case of Race Plus Sex Discrimination*, 26 Washburn L.J. 23, 41 (1996).

The Court in *Craig* reaches a similar result under § 1981, but for a different reason. According to the *Craig* court, § 1981 only applies to "discriminatory acts based solely on race." *Craig*, 2013 WL 789718, at *13 (citing *Patterson v. Cnty. of Oneida*, N.Y., 375 F.3d 206, 226 (2nd Cir. 2004).

Both of these cases interpret "but for" causation as requiring proof that race was the sole factor. But that is not correct. As the Court said in *Bostock* when describing the "but for" causation standard applicable to most civil rights statutes:

> No doubt, Congress could have taken a more parsimonious approach. As is has in other statutes, it could have added "solely" to indicate that actions taken "because of" the confluence of multiple factors do not violate the law. Cf. 11 U.S.C. § 525; 16 U.S.C. § 511. Or it could have written "primarily because of " to indicate that the prohibited factor had to be the main cause of the defendant's challenged employment decision. Cf. 22 U.S.C. § 2688. But none of this is the law we have.

*Bostock*, 140 S.Ct. at 1739.

Consequently, "but-for" causation does not mean "solely," "primarily because of," or the "main cause." *Id.* "An employer violates [the statutes] when it intentionally fires an individual employee based in part on [a protected trait]. It doesn't matter if other factors besides the plaintiff's [trait] contributed to the decision." *Id.* at 1741, 1742. The protected trait "need not be the sole or primary cause of the employer's adverse action. ... So, too, it has no significance here if another factor ... might also be at work, or even play a more important role in the employer's decision." *Id.* at 1744. And the employee need not disprove any alternative cause identified by the employer. *Id.* at 1736 (defendant cannot avoid liability by citing to some other factor that contributed to the decision).

Consequently, while Defendants are correct that Plaintiff may not recover for sex discrimination under § 1981, that does not mean he cannot recover under § 1981 if Defendants acted as it did in part because of his race.  If Defendants' treatment of Plaintiff was based in any part on his race, Defendants violated both § 1981 and Title VII.[361]

### 2.      Plaintiff Need Not Produce "Substantial" Evidence To Defeat Summary Judgment

Defendants argue that Plaintiff must prove his case through "substantial evidence."  (Doc. 180, pp. 28, 29.)  Regardless of whether that standard is correct at trial[362], in order to defeat summary judgment Plaintiff need not prove anything.  To defeat a motion for summary judgment, the nonmoving party must only show sufficient evidence supporting the claimed factual dispute to require a jury to resolve the differing versions of the truth at trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)(internal cites omitted).  The Supreme Court has never held that the burden on the nonmoving party is to come forward with "substantial" evidence to support her claim.   As the Eleventh Circuit noted in *United States ex rel. Saldivar v. Fresenius Medical Care Holdings, Inc.*, 841 F.3d 927, 932 (11th Cir. 2016), "to survive summary judgment, the nonmoving party . . .  must make a showing sufficient to permit the jury to reasonably find on its behalf."  By focusing on whether Plaintiffs' evidence was "substantial," Defendants are urging this Court to adopt an incorrect legal standard.

### 3.      Favorable Treatment of Other Minorities Does Not Defeat Plaintiff's Claims

---

[361] Of course, as the Court noted in *Bostock*, Title VII also contains the "more forgiving" motivating factor standard which allows liability to be established even if a protected trait was not a but-for cause of the employer's challenged action.  *Bostock*, 140 S.Ct. at 1740; 42 U.S.C. § 2000e-2(a)(1).

[362] Plaintiff must prove a standard "but for" claim by a preponderance of the evidence.  *Desert Palace, Inc.*, 539 U.S. 90, 100 (2003).

Defendants argue that he cannot establish either his Title VII or § 1981 claims because the individuals who Plaintiff claims were more favorably treated share his racial characteristics.  (Doc. 180, pp. 28-29.)  This interpretation of Title VII law is not consistent with the Supreme Court's opinion in *Bostock*.

Title VII protects individuals, not groups.  *Bostock*, 140 U.S. at 1740. Consequently, it is no defense for an employer to note that, while it treated an individual poorly because of his race, that same employer gives overall preferential treatment to employees of the same race.  *Id.* at 1741.  "And it doesn't matter if the employer treated women as a group the same when compared to men as a group.  If the employer intentionally relies in part on an individual's [protected trait] when deciding [to take an action] – put differently, if changing the employee's [trait] would have yielded a different choice for the employer – a statutory violation has occurred.  Title VII's message is 'simple but momentous': An individual employee's [trait] is 'not relevant to the selection, evaluation, or compensation of employees.'  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion)."  *Bostock*, 140 U.S. at 1741.

Consequently, it makes no difference that the individuals identified by Jenkins as receiving more favorable treatment than he are also African-American.  If his race was a factor in the employer's employment decisions, the Defendants have violated Title VII and § 1981.

### 4.     The Existence Of Other Factors Does Not Defeat Plaintiff's Claims.

Defendants argue that Plaintiff's termination claim must fail because he identified reasons other than his protected conduct as factors in his termination.  (Doc. 180, pp. 34-35.)  Again, this argument is not consistent with "but-for" causation and the Court's decision in *Bostock*.

As the Court noted in *Bostock*, "[i]t doesn't matter if other factors besides the plaintiff's [protected trait] contributed to the decision." *Bostock*, 140 S.Ct. at 1741. "[T]he plaintiff's [protected trait] need not be the sole or primary cause of the employer's adverse action. ... So, too, it has no significance here if another factor ... might also be at work, or even play a more important role in the employer's decision." *Bostock*, 140 S.Ct. at 1744. "At bottom, the employers' argument unavoidably comes down to a suggestion that [the protected trait] must be the sole or primary cause of an adverse employment action for Title VII liability to follow. And, as we've seen, that suggestion is at odds with everything we know about the statute." *Bostock*, 140 S.Ct. at 1748.

Further, it makes no difference that Plaintiff may have identified other factors which may have been at play in his termination. "In conversation, a speaker is likely to focus on what seems most relevant or informative to the listener. So, an employee who has just been fired is likely to identify the primary or most direct cause rather than list literally every but-for cause. To do otherwise would be tiring at best. But these conversational conventions do not control Title VII's legal analysis, which asks simply whether sex was a but-for cause." *Bostock*, 140 S.Ct. at 1745.

Consequently, Plaintiff's retaliation claim does not fail because he alleges he was terminated because of his race, his gender, and in retaliation for refusing to engage in sex acts with his supervisors. All could be "but-for" causes and, if so, all would be unlawful.

### D.   KOCH SUBJECTED JENKINS TO TANGIBLE JOB ACTION SEXUAL HARASSMENT

In *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004), the Eleventh Circuit made clear sexual harassment in the workplace can alter the terms and conditions of employment in either of two ways. One way is if the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against him. *Hulsey*, 367 F.3d at

1245. That conclusion logically has to follow, because tangible employment action is defined in a way that includes a change in the terms and conditions of employment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753-54, 118 S. Ct. 2257, 2265, 141 L. Ed. 2d 633 (1998). As defined by the Supreme Court, a tangible employment action is "a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 761, 118 S. Ct. at 2268. An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because she refused to give in to his sexual overtures. That liability exists regardless of whether the employee took advantage of any employer- provided system for reporting harassment. *See id.* at 765, 118 S. Ct. at 2270.

The second way for sexual harassment to violate Title VII is if it is sufficiently severe or pervasive to effectively result in a change (including constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned. This is hostile work environment harassment. *Hulsey*, 367 F.3d at 1245.

Jenkins' sexual harassment claim is based on the first theory of sexual harassment; a claim for tangible job action sexual harassment. Jenkins testified in his deposition he believed Birchfield, McDickinson and Elrod played a direct role in his termination stating he felt his refusal to let Birchfield watch while McDickinson had sex with him and his refusal to continue to have sexual relations with McDickinson were a motivating factor in his termination.

Plaintiff has presented evidence of tangible job action harassment. To succeed in proving discrimination based on sexual harassment resulting in a tangible employment action, Jenkins must present evidence that McDickinson and Birchfield made unwelcome sexual advances toward him; that McDickinson took an adverse tangible employment action against him or caused Koch to do

so; that Jenkins' rejection of the unwelcome sexual advances was a motivating factor that prompted McDickinson and Birchfield to take the adverse tangible employment action or to cause Koch to do so; and that Jenkins suffered damages because of the adverse tangible employment action. *See* Pattern Civ. Jury Instr. 11th Cir. 4.8 (2013); 42 U.S.C. § 2000e-2(a); *see also Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004).

Jenkins presented evidence that McDickinson on numerous occasions touched Jenkins genitals, performed fellatio on Jenkins, and had sexual intercourse with Jenkins, and that Birchfield asked to watch Jenkins and McDickinson have sexual intercourse.

### 1.       Voluntary Participation Does Not Negate A Sexual Harassment Claim

In 1986, in *Meritor Savings Bank v. Vinson*, 477 U.S. 47 (1986), the Supreme Court held that "hostile environment" sexual harassment was sex discrimination, actionable under Title VII, even if it does not cause a direct financial injury.  In *Meritor*, Michelle Vinson alleged that she had been pressured into having sexual relations on numerous occasions with her supervisor, Taylor. *Id.* at 60.  She said she agreed to do so out of fear of losing her job.  Vinson never reported Taylor to his supervisors, allegedly because she feared him.  Taylor denied Vinson's accusations, The bank, citing the absence of any complaint by Vinson, claimed ignorance of any improper conduct by Taylor.

The Supreme Court stated that "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminate[s] on the basis of sex. *Id.* at 64 (internal quotation marks omitted).  Further, The Court rejected the defense's argument that liability was incompatible with the trial court's finding that Vinson's submission to Taylor's advances had been "voluntary."  The Supreme Court held that whether it was *voluntary* was not determinative; the correct question was whether Vinson, by her conduct, had indicated that the

sexual advances were *unwelcome*. *Id.* at 68 (fact that sex-related conduct was "voluntary," "in the sense that the complainant was not forced to participate against her will, is not a defense to a sexually harassment suit" under Title VII). The Court acknowledged that the distinction between voluntary submission and unwelcome conduct required fact finders to make fine distinctions, often based on the credibility of the witnesses.  While these distinctions and credibility assessments can be made, it is the fact finder, after considering all of the circumstances, who is to make these distinctions, not the district court on summary judgment. *Id.* at 68-69.

The evidence in the record creates a genuine issue of material fact as to whether Jenkins welcomed McDickinson's unrelenting sexually harassment. When asked why he did not turn around and walk away from McDickinson, Jenkins responded, "I didn't have anything. I needed my job, so I went through with it, man, to keep my job."[363] McDickinson seduced Jenkins at work on another occasion, waiting for him in his office in the receiving department when he reported to work at 4:30 am, and had sexual intercourse with Jenkins in the receiving department.[364]

Jenkins felt he was blessed to have a job and when it was suggested he could have put his hands on McDickinson and push her away from assaulting him, Jenkins responded, "Put my hand on her? No. Push her and go back to prison? No. I just -- I don't know, man. I just had got a blessing to get a job and I wanted to keep it. God blessed me with that job. So I just -- I went along what she asked me, what she did. She said she had me, man. She got me."[365]

## E.   KOCH IS LIABLE FOR THE TORTIOUS CONDUCT JENKINS SUFFERED

---

[363] (Doc. 182-2, p. 33, DX 2, Jenkins p. 119:13-17, 120:10-16).
[364] (Doc. 182-2, p. 46-47, DX 2, Jenkins p. 173:20-174:21).
[365] (Doc. 182-2, p. 33, DX 2, Jenkins p. 120:17-121:2).

1.    McDickinson Intruded Upon Jenkins' Privacy And The
       Intrusion Was  Offensive

Under Alabama law, there are four wrongs that can constitute invasion of privacy: "(1) the intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false but not necessarily defamatory position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for a commercial use." *Phillips v. Smalley Maintenance Servs., Inc.,* 435 So.2d 705, 708 (Ala.1983). "Each of these categories of invasion of privacy has distinct elements, and each category establishes a separate privacy interest that may be invaded." *S.B. v. Saint James School,* 959 So.2d 72, 90 (Ala.2006) (citing *Regions Bank v. Plott,* 897 So.2d 239 (Ala.2004)). Jenkins asserts McDickinson and Koch are liable for the first of the four possible types of invasion of privacy; McDickinson's conduct invaded Jenkins' personal and emotional sanctum by physically touching him, subjecting him to sexual touching and sex acts.

In *Phillips v Smalley Maintenance Servies, Inc.*, 435 So.2d 705 (Ala. 1983), the Alabama Supreme Court adopted the *Restatement (second) of Torts* definition of the wrongful-intrusion branch of the invasion-of -privacy tort:

> One who intentionally intrudes physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." (internal cites omitted).

The commentary to the *Restatement* definition of this tort adds:

> The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of

documents that the plaintiff is required to keep and make available for public inspection. Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters.

*Restatement (Second) of Torts* § 652B (1977) cmt. c.

To support an intrusion claim, a plaintiff must show that the defendant "intruded" or "pried" into a private matter in a way that would be objectionable to a reasonable person. *Hogin v. Cottingham*, 533 So.2d 525, 531 (Ala. 1988). "Two primary factors are to considered in determining whether or not an intrusion which effects access to private information is actionable. The first is the means used. The second is the defendant's purpose for obtaining the information." *Id.* (internal citations omitted). "[E]xtensive egregious inquiries into one's sex life, coupled with intrusive and coercive sexual demands," is an example of intrusion that is sufficient "'to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Stevenson v. Precision Standard, Inc*., 762 So.2d 820, 826 (Ala.1999) (quoting *Phillips v. Smalley Maint. Servs., Inc.,* 435 So.2d 705, 711 (Ala. 1983)); see also *Baldwin v. Blue Cross/Blue Shield of Ala*., 480 F.3d 1287, 1300 (11th Cir. 2007).[366]

McDickinson, the HR Manager for the Debone Plant, subjected a subordinate, Jenkins to the following conduct: oral sex, sexual touching of his genitals, sexual intercourse, and talked about black men being "bigger," and her preference for sexual misconduct. Jenkins did not like McDickinson and did not want to have sex with her. Birchfield, with knowledge that McDickinson

---

[366] It is not necessary that information about the victim's private concerns be communicated to a third party. *Phillips*, 435 So.2d at 709. Further, it is not necessary that the wrongdoer invade the victim's physical privacy. *Id*. at 711.

was assaulting Jenkins, failed to protect him and instead targeted Jenkins for disciplinary action unless Jenkins agreed that Birchfield could watch.

A jury could certainly see McDickinson's actions, sexual demands, and comments as an intrusion into Jenkins' private matters in a way that could induce humiliation or shame in a person of ordinary sensibilities, and McDickinson had no legitimate purpose for her conduct. Summary judgment is due to be denied on the invasion of privacy claim.

### 2.   McDickinson Birchfield and Koch Foods Subjected Jenkins to an Assault and Battery

"To succeed on a claim alleging battery, a plaintiff must establish: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex Parte Atmore Community Hosp.*, 719 So.2d 1190 (Ala. 1998); *see also Harper v. Winston County*, 892 So.2d 346, 354 (Ala. 2004); *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala. 1986). *In Ex Parte Atmore*, the plaintiff survived a motion for summary judgment by presenting evidence that the defendant "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg ... [and] that each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." 719 So.2d at 1193.

The circumstances are similar here. McDickinson touched Jenkins' genitals, rubbed his penis, had sexual intercourse with him and performed fellatio on him despite his objections. As indicated above, Jenkins did not welcome McDickinson's sexual assault. McDickinson was the aggressor and Jenkins did not engage in her sexual misconduct.[367]  He did not touch her, fondle her, remove her clothing, or touch her sexually.[368] He did not care for her and was not attracted

---

[367] Doc. 182-2 Jenkins p. 186:13-189:18
[368] *Id*

to her. He had never been with a white female and was uncomfortable with the interaction and her forcing herself on him sexually all the while afraid to push her away.[369]

In *Livingston v. Marion Bank and Trust Co.*, 2:11 CV1369 LSC, 2014 WL 3347910, at *28 (N.D. Ala. July 8, 2014) the Magistrate Judge discussed the facts necessary to support a claim of assault and battery. The facts supporting Livingston's assault and battery claim are similar to Jenkins facts and further directly dispute Defendants' argument. Under Alabama law, an assault consists of 'an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.' *Allen v. Walker*, 569 So.2d 350, 351 (Ala.1990) (citations omitted). A battery has been defined by the Alabama Supreme Court as follows: 'A successful assault becomes a battery. A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner ... to lay hands on another in a hostile manner is a battery, although no damage follows.' *Surrency v. Harbison*, 489 So.2d 1097, 1104 (1986). *Peterson v. BMI Refractories,* 132 F.3d 1405, 1412–13 (11th Cir.1998) (emphasis omitted); see also *O'Rear v. B.H.*, 69 So.3d 106, 117 (Ala.2011); *Walker v. City of Huntsville*, 62 So.3d 474, 494 (Ala.2010). Battery also encompasses the rude or offensive touching of another person's clothing. *Hyde v. Cain*, 159 Ala. 364, 47 So. 1014, 1014 (1908); *Mills v. Wex–Tex Industries, Inc.,* 991 F.Supp. 1370, 1382 (M.D.Ala.1997). "The wrong [in committing a battery] consists, not in the touching so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting damages." *Harper v. Winston County*, 892 So.2d 346, 353 (Ala.2004) (quoting *Surrency*

---

[369] *Id*

61

*v. Harbison*, 489 So.2d 1097, 1104 (Ala.1986), quoting *Singer Sewing Machine Co. v. Methvin*, 184 Ala. 554, 63 So. 997, 1000 (1913)).

Defendants do not dispute that McDickinson engaged in touching of Jenkins but argue the actions are neither an assault or battery because McDickinson did not touch Jenkins in any angry or hostile manner. Doc. 180, p. 63. In *Livingston*, the Court denied summary judgment and summarized Plaintiff's allegations of the defendant touching Plaintiff's face, playing with her hair, frequently placed his hand on the small of her back to "guide" her closer to him, ostensibly to view documents she was holding and at times tugged on her skirt and blouse, including one time where he untied the strings securing the latter, put his arm on her to stop her from walking away from him, and instructed her to allow him to retie them while suggesting that it might appear to other employees that they were having a sexual affair. The Court concluded that "while these actions are not blatantly offensive physical contacts, there is sufficient evidence from which to infer that such touching was intentional, gratuitous, conducted with sexual overtones, and was unwelcome. As such, there is sufficient evidence from which a jury could find that defendant committed a battery, the apprehension of which by plaintiff would give rise to an assault." *Livingston*, 2014 WL 3347910, at *28. (Citing *Atmore Community Hosp.*, 719 So.2d at 1194; *Bryars v. Kirby's Spectrum Collision, Inc.*, 2009 WL 1286006, at *16 (S.D.Ala. May 7, 2009); *Edwards v. Hyundai Motor Mfg. Ala., LLC*, 603 F.Supp.2d 1336, 1356 (M.D.Ala.2009).

Similarly, Jenkins experienced McDickinson pulling his pants down, exposing his genitals, performing sexual acts with his body and using his body for her own personal gratification of which he had no choice but to stand or sit and allow her to have her way with him. See also *Ex Parte Atmore Community Hospital,* 719 So.2d 1190, 1194 (Ala. 1998) (finding sufficient evidence of a battery where plaintiff's supervisor "touched her waist, rubbed against her when passing her

in the hall, poked her in the armpits near the breast area, and touched her leg," where there was evidence that the touching was intentional, conducted with sexual overtones, and unwelcome).  Jenkins testified he could not push her away and risk going back to prison.  He needed his job and that McDickinson let him know she and Birchfield were in charge and so he had no choice but to go along with McDickinson's pursuit of using him sexually.  McDickinson's text messages clearly show her pursuit of Jenkins and having Jackson find him and bring Jenkins to her.

Clearly, McDickinson's and Birchfield's continued vulgar comments and invitations for sexual contact is indicative of rudeness and lack of respect that they had for Jenkins in Defendants' workplace.  As the Alabama Supreme Court explained, "[t]he wrong here consists, not in the touching, so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting damages."  *Surrency* at 1104.  McDickinson's and Birchfield's manner or spirit directed to Jenkins was to use him physically without any care the emotional and physical damage that Jenkins was suffering.  Indeed Jenkins described that he was scared and felt he had no recourse other than go along and visibly had emotional difficulty during his deposition discussing the assault of McDickinson and Birchfield, indicating he needed a break and was about to cry.  Doc. 182-2, 224:11-228:23; 119:13-122:14.

A fact question certainly exist and a reasonable fact finder could find all of McDickinson's and Birchfield's perverted sexual conduct, questions, comments and actions were hostile, rude and unwelcomed by Jenkins and created an apprehension so great he was caused to suffer great duress.

If there is a genuine dispute whether the defendant's conduct was intended to "create a reasonable or well-founded apprehension of imminent harm" so as to constitute assault, summary

judgment is inappropriate.  *Saville v. Houston County Healthcare Authority*, 852 F. Supp. 1512, (M.D.Ala.1994) (quoting *Allen v. Walker*, 569 So.2d 350, 352 (Ala.1990)).  Summary judgment is due to denied on Defendants' motion on assault and battery.  A reasonable juror could conclude that such touching was harmful and offensive. Summary judgment is due to be denied on this claim.

### 3.      JENKINS WAS CAUSED TO SUFFER THE TORT OF OUTRAGE

In order to prevail on tort-of-outrage or intentional infliction of emotional distress claim, Jenkins is required to present substantial evidence indicating that Birchfield's, McDickinson's and Koch Food's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. *Thomas v. BSE Indus. Contractors, Inc*. 624 So. 2d 1041, 1043 (Ala. 1993); see also *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).

Courts have recognized the tort of outrage in three areas: (1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) egregious sexual harassment. *Stabler v. City of Mobile*, 844 So.2d 555, 560 (Ala. 2002). Jenkins' claim falls into the last category. McDickinson knew she had power over Jenkins' professional and financial future and made overt references to that power in propositioning him for sex. Recognizing her power over him and his inability to refuse her, McDickinson touched Jenkins inappropriately, performed fellatio on Jenkins and had sexual intercourse with Jenkins. This evidence establishes the elements of an outrage claim warranting the denial of summary judgment. *See Edwards v. Hyundai Motor Mfg. Ala., LLC*, 603 F. Supp. 2d 1336, 1356 (M.D. Ala. 2009) (denying summary judgment on an outrage claim where there was evidence the harasser touched the plaintiff's leg, blocked her path, shook his genitals at her, intentionally bumped up

against her, pulled her pony tail, asked her very explicit and vulgar questions about her sex life, and propositioned her sexually). Summary judgment is due to be denied on this claim.

### 4.    KOCH IS LIABLE FOR MCDICKINSON'S TORTIOUS ACTS

For Koch to be deemed liable for the intentional torts of its HR Manager, McDickinson, Jenkins must demonstrate that (1) the tortious acts were committed "in the line and scope of the employment," (2) they were committed "in furtherance of the business of the employer," or (3) the employer "participated in, authorized, or ratified the wrongful acts." *Potts v. BE & K Const. Co*., 604 So. 2d 398, 400 (Ala. 1992); *see also Joyner v. AAA Cooper Transp*., 477 So.2d 364, 365 (Ala. 1985). Here, McDickinson used her position at Koch Foods to touch, call, have sexual intercourse and perform sex acts on Jenkins. Her conduct was couched as being in the line and scope of her job. McDickinson committed these acts in the course of performing work for Koch and at times on Koch premises, so these facts satisfy the first way of showing liability.

To show ratification, in addition to proving that the offending employee committed a tort, "a complaining employee must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee ...; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation." *Potts*, 604 So. 2d at 400. "If the steps taken to remedy the situation are not reasonably calculated to halt the harassment, the steps taken by the employer are not 'adequate.'" *Id* From these facts, a jury could find Koch liable for the tortious acts of McDickinson.

### F.    KOCH IS LIABLE FOR NEGLIGENT/WANTON SUPERVISION, RETENTION AND TRAINING

In *Lane v. Central Bank of Alabama, N.A.* 425 So.2d 1098, 1100 (Ala.1983), (quoting *Thompson v. Havard*, 285 Ala. 718, 723, 235 So.2d 853 (1970)), the Alabama Supreme Court first set out the standard for the negligent and wanton hiring training supervision and retention claim embodied in plaintiff's allegations. The *Lane* case codifies the employer's duty to investigate the backgrounds of potential employees before hiring and, also the employer's duty to train and supervise employees.

In *Big B, Inc. v. Cottingham*, 634 So.2d 999 (Ala. 1993), the defendant was held liable for negligently supervising its store manager where there was sufficient evidence from which the jury could find that had the employer sufficiently investigated the complaints, the manager's attitude towards women and his fitness for employment would have been more seriously re-evaluated and he would not have been allowed to remain where he could mistreat female customers or employees. Once the company has reason to suspect an employee's unfitness, it is under a duty to thoroughly investigate and take such precautions so that the conduct will not occur again. *Id.*

Koch contends it did not behavie negligently or wantonly because it lacked any knowledge of tortious conduct by McDickinson. The nature of McDickinson's position, Human Resources manager, imputes the knowledge directly to Koch. She holds the position responsible for ensuring this type of conduct does not occur. Because of the nature of her conduct and her position as well as the knowledge of her conduct by other HR employees, Koch's failure to act in a way to deter or stop her behavior warrants denial of summary judgment on this claim.

Koch's training on how to treat complaints is not to document them objectively or in the voice of a complaining employee; Koch's training directs supervisors to "document to defend." (Doc. 189-9 PX 165, Elrod Depo, pp. 253:20-254:21). Further, the evidence shows that Koch did not want to supervise or delve into McDickinson's conduct. Elrod testified he did not observe her

and relied on Birchfield to report how she was doing her job. (Doc. 189-9 PX 165, Elrod Depo, pp. 151:15-152:16). This type of institutional ignorance coupled with Koch's overt decision that any complaints should be treated as something to defend further warrants denial of summary judgment on this claim because it shows Koch affirmatively decided it did not try to stop or deter any type of tortious conduct, but rather, pit referred to deny knowledge of its occurrence or defend against it.

Finally, though, Birchfield's termination from Koch evidences why summary judgment cannot be granted on this claim. Koch terminated Birchfield following repeated concerns of McDickinson having sex with hourly employees and the conclusion that Birchfield did not get to the bottom of what was going on. (Doc. 189-9 PX 165, Elrod Depo, pp. 241:13-248:5). Koch concluded Birchfield lost the ability to effectively manage (Id). Koch's termination of Birchfield for essentially being negligent and/or wanton in his handling of McDickinson provides the evidence requiring summary judgment being denied on this claim.

### G.    NO SUMMARY JUDGMENT ON PUNITIVE DAMAGE CLAIMS

In *Kolstad v. ADA*, 527 U.S. 526, 114 L. Ed. 2d 494, 119 S. Ct. 2118 (1999), the United States Supreme Court considered punitive damages under a Title VII. There, the Court determined that "where an employer has undertaken such good faith efforts at Title VII compliance, it demonstrat[es] that it never acted in reckless disregard of … protected rights." *Kolstad,* 527 U.S. at 544, 119 S. Ct. at 2129(quotation omitted) (alterations in original). Certainly, "a written non-discrimination policy is one indication of an employer's efforts to comply with Title VII." *Romano v. U-Haul Int'l,* 233 F.3d 655, 670 (1st Cir. 2000), *petition for cert. filed,* 534 U.S. 815, 151 L. Ed. 2d 14, 122 S. Ct. 41 (2001). However, "a written statement, without more, is insufficient to insulate an employer from punitive damages liability." *Romano,* 233 F.3d at 670; *see Ogden v. Wax Works,*

*Inc.,* 214 F.3d 999, 1010 (8th Cir. 2000) (written policy alone "does not suffice, as a matter of law

… to establish good faith efforts"); *EEOC v. Wal-Mart Stores, Inc.,* 187 F.3d 1241, 1248 (10th

Cir. 1999) (written policy "alone is not enough"to avoid punitive damages). Rather, a defendant

"must also show that efforts have been made to implement its anti-discrimination policy, through

education of its employees and active enforcement of its mandate." *Romano,* 233 F.3d at 670.

Without requiring a showing of active enforcement of the sexual harassment policy, a company

could insulate itself from liability by adopting a policy that it has no intention to enforce, thwarting

the preventative purpose of the statute. *See Kolstad,* 527 U.S. at 545, 119 S. Ct. at 2129; *Romano,*

233 F.3d at 671.

Koch argues that there is no evidence of malice or reckless indifference because it had

policies prohibiting the harassing, discriminatory, and retaliatory conduct alleged by Jenkins. Yet,

the evidence demonstrates that Koch did very little, if anything, to insure its employees, including

its HR managers who were the gatekeepers responsible for enforcing those policies, were educated

and complied with the policies. Koch's cursory annual training on its harassment policies took 45

minutes to an hour and consisted solely of reading the policy out loud and Birchfield asking if

there were any questions. (Doc.192-3, PX 191 Birchfield/Fuller pp. 19:18-21:16, 94:20-96:23).

There were no other materials. (Id.). If no questions were asked, then there was no discussion.

(Id.).

While Koch asserts it has a "zero tolerance" policy on harassment, testimony from

Birchfield, the Complex HR Manager, evidences that there was not only tolerance but also

approval by equivocating between the zero-tolerance language and the actual discipline for

harassment. The company "would address the particular issue with the individuals involved in that

particular case." (Doc. 192-3, PX 191, Birchfield/Fuller, pp. 31:3-16).

Birchfield's testimony evidences how Koch easily dismissed knowledge of harassing and discriminatory conduct. Rather than expressing a commitment to investigate all allegations of harassment and discrimination brought to Human Resources attention, Birchfield testified "there's a fine line between knowing and hearing a rumor and actually receiving a valid complaint." (Doc. 192-3, PX 191, Birchfield/Fuller p. 34:10-18). HR ignored complaints brought to their attention of conduct which could be discriminatory, harassing or retaliatory.

Even more important to the punitive damage claim brought by Jenkins are the actors in his claim: HR Manager McDickinson, HR Complex Manager Birchfield, and HR Director Elrod. HR managers are held to a higher standard because they are the gatekeepers of the policies. (192-3, PX 191, Birchfield Depo, p. 18:6-13). One of the gatekeepers, McDickinson, used her position to pressure Jenkins into a sexual relationship and then she and Birchfield fired him after Birchfield found out and Jenkins refused to let Birchfield watch McDickinson have sex with him, Davenport complained about the sexual relationship and Human Resources also complained.

Two of the gatekeepers employed by Koch to protect employees from sexual harassment and retaliation are the very employees who abused their power and violated Koch's policies, rendering Title VII's protections meaningless pieces of paper. Koch ignored the law and left the fox in charge of the hen house. The very people responsible for ensuring Koch followed federal anti- discrimination laws are the ones who engaged in the very conduct prohibited by the law. This is the very situation anticipated for punitive damages. The gatekeepers of the policies adopted a practice of tolerance toward allegations of unlawful conduct, acted in reckless disregard of the Title VII rights of the Koch employees, choosing to label concerns and reports of sexual harassment as "rumors" and taking a defensive posture rather than investigating to see whether unlawful conduct actually occurred. The issue of punitive damages must be submitted to the jury.

## IV.      CONCLUSION

In light of the aforesaid, the summary judgment motions filed by Koch-Inc., Koch-AL, Birchfield and McDickinson should be denied because Plaintiff, Irish Jenkins, has presented questions of fact to be determined by the jury.

Respectfully submitted this the 8th day of September 2018,

/s/Cynthia Forman Wilkinson
CYNTHIA FORMAN WILKINSON
Attorney for Plaintiff

**OF COUNSEL:**
WILKINSON LAW FIRM, PC
1717 3rd Avenue North
Suite A
Tel.:    (205) 250-7866
Fax:    (205) 250-7869
E-mail: wilkinsonefile@wilkinsonfirm.net

/s/ Heather Newsom Leonard
HEATHER NEWSOM LEONARD
Attorney for Plaintiff

**OF COUNSEL:**
HEATHER LEONARD, P.C.
2105 Devereux Circle, Suite 111
Birmingham, Alabama 35243
Tel.:    (205) 977-5421
Fax:    (205) 278-1400
Email: Heather@HeatherLeonardPC.com

/s/ Alicia K. Haynes
ALICIA K. HAYNES
Attorneys for Plaintiff

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, AL 35226
Tel.:    (205) 879-0377
Email: akhaynes@haynes-haynes.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 8th day of September 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Rachel V. Barlotta, Esq.
Sharonda C. Fancher, Esq.
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
Wells Fargo Tower
420 North 20th Street, Suite 1400
Birmingham, AL 35203

Marion F. Walker, Esq.
FISHER PHILLIPS
2323 2nd Avenue North
Birmingham, AL 35203

*/s/ Heather Newsom Leonard*
OF COUNSEL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **IRISH JENKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:17-cv-00364-RAH-JTA** |
| | ) | |
| **KOCH FOODS, INC.** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## PLAINTIFF'S NOTICE OF APPEAL

COMES NOW Plaintiff Irish Jenkins, by and through his attorneys of record, and hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the Memorandum Opinion and Order entered on January 14, 2022 (Docs. 222 & 224) granting Final Judgment as to all of Plaintiff's claims and dismissing this case with prejudice, and from all other interlocutory orders or rulings affecting his rights, whether entered before or after the entry of Final Judgment, including any subsequent award of attorneys' fees or costs.

This Notice is being filed within thirty (30) days of the entry of the Final Judgment dismissing this case. Rule 4(a)(1)(A) and 4(a)(4)(A)(v), Fed. R. App. Proc.

EXHIBIT C

*/s/ Charles E. Guerrier*
Alicia K. Haynes
Charles E. Guerrier

**OF COUNSEL:**
**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, AL 35226
Phone: (205) 879-0377
Fax: (205) 879-3572
E-mail: akhaynes@haynes-haynes.com

Heather Newsome Leonard
**HEATHER LEONARD, P.C.**
2105 Devereux Circle, Suite 111
Birmingham, Alabama 35243
Phone: (205) 977-5421
Fax: (205) 278-1400
Email: heather@heatherleonardpc.com

Cynthia Forman Wilkinson
**WILKINSON LAW FIRM PC**
215 Richard Arrington, Jr. Blvd., Suite 301
Birmingham, AL 35203
Phone: (205) 250-7866
Fax: (205) 250-7869
Email: cwilkinson@wilkinsonfirm.net

2

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of February, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Rachel V. Barlotta
Sharonda C. Fancher
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
420 North 20th Street, Suite 1400
Birmingham, AL 35203
Email: rbarlotta@bakerdonelson.com
Email. sfancher@bakerdonelson.com

Marion Francis Walker
FISHER & PHILLIPS, LLP
2323 2nd Ave N
Birmingham, AL 35203
Email: mfwalker@fisherphillips.com

/s/ Charles E. Guerrier
OF COUNSEL