**CASE NO. 22-10480**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### IRISH JENKINS, Appellant

v.

### KOCH FOODS, INC., et al., Appellees

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION
### Case No. 2:17-cv-364-RAH

---

## BRIEF OF APPELLEES DAVID BIRCHFIELD AND
## MELISSA MCDICKINSON

---

| | |
|---|---|
| Marion F. Walker<br>Of Counsel<br>(ASB L73M-0734)<br>FISHER PHILLIPS LLP<br>2100A South Bridge Parkway<br>Ste. 650<br>Birmingham, Alabama 35209<br>Telephone: (205) 327-8534<br>Facsimile: (205) 718-7607<br>Email:mfwalker@fisherphillips.com | Andrew J. Baer, *Pro Haec Vice*<br>Of Counsel<br>(LAB 35638)<br>FISHER PHILLIPS LLP<br>201 St. Charles Avenue<br>Suite 3710<br>New Orleans, LA 70170<br>Telephone (504) 522-3303<br>Facsimile (504) 529-3850<br>abaer@fisherphillips.com |

**COUNSEL FOR APPELLEES, DAVID BIRCHFIELD AND MELISSA MCDICKINSON**

**Date: August 15, 2022**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### No. 22-10480 Irish Jenkins v. Koch Foods Inc., et al.

Magistrate Judge Wallace Capel, Jr.

Magistrate Judge Stephen Michael Doyle

Barlotta, Rachel – Counsel for Defendants/Appellees Koch Foods, Inc. and Koch Foods of Alabama, LLC

Birchfield, David – Appellee

Carow, Michael - Vice-President for Human Resources Koch

Defendant/Appellee Koch Foods, Inc. and/or Koch Foods of Alabama, LLC

Edwards, Sonya – Counsel for Plaintiff

Elrod, Bobby – Former Vice-President for Human Resources Koch

Defendant/Appellee Koch Foods, Inc. and/or Koch Foods of Alabama, LLC

Fancher, Sharonda Childs – Counsel for Defendants/Appellees Koch Foods, Inc. and Koch Foods of Alabama, LLC

Fisher Phillips LLP – Counsel for Defendants/Appellees Melissa McDickinson and David Birchfield

Guerrier, Charles E. – Counsel for Plaintiff/Appellant

Haynes, Alicia K. – Counsel for Plaintiff/Appellant

Haynes & Haynes, PC - Counsel for Plaintiff/Appellant

Heather Leonard, PC – Counsel for Plaintiff/Appellant

District Court Judge R. Austin Huffaker, Jr.

i

Koch Foods of Alabama, LLC – Defendant/Appellee

Harmon, Bart Gregory – Counsel for Alabama Department of Corrections Legal Division, Movant in the District Court

Jackson, Steven – Witness

Karlson, Daisy Christina – Counsel for Defendants/Appellees Koch Foods Inc. and Koch Foods of Alabama, LLC

Koch Foods, Inc. – Defendant/Appellee

Leonard, Heather Newson – Counsel for Plaintiff/Appellant

McDickinson, Melissa – Appellee

District Court Judge Emily C. Marks

Reese, Annalese Herndon – Former Counsel for Defendants/Appellees Melissa McDickinson and David Birchfield

Smith Ashley Nicole of Miller Smith, LLC – Counsel for Steven Jackson

Pursuant to Fed. R. App. 26.1, counsel also makes the following disclosures:

David Birchfield and Melissa McDickinson are individuals and have no corporate

disclosure obligations.

## STATEMENT REGARDING ORAL ARGUMENT

Appellee, Melissa McDickinson, does not request oral argument and does

not think the case presents issues on this *de novo* summary judgment appeal which

bear the complexity of factual content or legal conflict to warrant an oral argument.


/s/*Marion F. Walker*
Marion F. Walker
Attorney for Appellee
Melissa McDickinson

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

CORPORATE DISCLOSURE STATEMENT ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

STATEMENT REGARDING ADOPTION OF BRIEF AND OTHER PARTIES..1

CITATIONS TO THE RECORD ...................................................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................3

STATEMENT OF THE CASE........................................................................................4

SUMMARY OF THE ARGUMENT ......................................................................32

ARGUMENT .................................................................................................................35

   I.   Standard for Entry of Judgment As A Matter of Law ....................................35

   II.   Jenkins Waived Argument on The Dismissal of the State Law Claims .......37

      A.   Dismissal Of State Law Claims Waived At District Court........................37

      B.   Dismissal Of State Law Claims Waived On Appeal ..................................41

   III.   Assuming Arguendo Jenkins Preserved An Argument On the State Law Claims, He Failed To Provide Substantial Evidence Any State Law Claim Should Be Submitted to a Jury ...................................................................................44

      A.   Jenkins Has Not Presented a Prima Facie Case of Invasion of Privacy .....44

      B.   Jenkins Has Not Presented A Prima Facie Case of Outrage......................48

      C.   Jenkins Has Not Presented A Prima Facie Case of Assault or battery .......50

   IV.   CONCLUSION .........................................................................................52

CERTIFICATE OF COMPLIANCE.......................................................................53

CERTIFICATE OF SERVICE .................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Standard Furniture*,
   197 F. App'x 830 (11th Cir. 2006) ...................................................47

*Atmore Cmty. Hsp.*,
   719 So. 2d 1190,1193 (Ala. 1998) ......................................45, 50, 51

*Booker v. Winn-Dixie Montgomery, LLC*,
   No. 11-00407 (S. D. Ala. Nov. 6, 2012) ...........................................45

*Brantley v. Int'l Paper Co.*,
   CV 2: 09-230-DCR, 2017 WL 3325085 (M.D. Ala. Aug. 3, 2017) .................37

*Busby v. Truswal Sys. Corp.*,
   551 So. 2d 322 (Ala. 1989) ..............................................................45

*Comer v. City of Palm Bay, Fla.*,
   265 F.3d 1186 (11th Cir. 2001) .......................................................35

*Cooke v. Stefani Mgmt. Servs., Inc.*,
   250 F. 3d 564 (7th Cir. 2001) ..........................................................50

*Dates v. Frank Norton, LLC d/b/a Milo's Hamburgers*,
   190 F. Supp. 3d 1037 (N.D. Ala. 2016) ...........................................36

*Davis v. Williams*,
   451 F. 3d 759 (11th Cir. 2006) .......................................................38

*Edwards v. Hyundai Motor Mfg., Ala., LLC*,
   603 F. Supp. 2d 1336 (M.D. Ala. 2009) ..........................................50

*Eldridge v. Gordon Brothers Group, L.L.C.*,
   863 F. 3d 66 (1st Cir. 2017) ............................................................40

*Ellis v. England*,
   432 F.3d 1321 (11th Cir.2005) .............................................35, 36, 37

*Fitzpatrick v. City of Atlanta*,
   2 F. 3d 1112 (11th Cir. 1993) .........................................................36

*Hamilton v. Southland Christian School, Inc.*,
    680 F. 3d 1316 (11th Cir. 2012) .............................................................36, 42, 43

*Harrelson v. R.J.*,
    882 So. 2d 317 (Ala.2003)....................................................................48

*Hosch v. Wachovia Bank, N.A.*,
    815 Fed. App'x (11th Cir. May 18, 2020).............................................42

*Johnson v. Corporate Special Services, Inc.*,
    602 So. 2d 385 (Ala. 1992)..................................................................45

*Jones v. UPS Ground Freight*,
    683 F.3d 1283 (11th Cir. 2012) ..........................................................36

*Jysk Bed 'N Linen d/b/a By Design Furniture v. Roy*,
    787 Fed. App'x 608 (11th Cir. Sept. 23, 2019)...................................43

*Kohser v. Protective Life Corp.*,
    649 Fed. Appx. 774 (11th Cir.2016)...................................................36

*Little v. Robinson*,
    72 So. 3d 1168 (Ala. 2011) .................................................................49

*Livingston v. Marion Bank & Trust*,
    30 F. Supp. 3d 1285 (N.D. Ala. 2014).................................................47

*Machen v. Childersburg Bank Corporation*,
    761 So. 2d 981 (Ala. 1999).................................................................44

*Marek v. Rhode Island*,
    702 F. 3d 650 (1st Cir. 2012)..............................................................41

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................36

*McCullum v. Orlando Reg'l Healthcare Sys., Inc.*,
    768 F.3d 1135 (11th Cir. 2014) ..........................................................37

*Meritor Savings Bank v. Vinson*,
    477 U.S. 47 (1986)..............................................................................45

*Miles v. City of Birmingham*,
  398 F. Supp. 3d 1163 (N.D. Ala. 2019)..............................................38

*Moorman v. UnumProvident Corp.*,
  464 F. 3d 1260 (11th Cir. 2006) ........................................................44

*Moton v. Cowart*,
  631 F. 3d 1337 (11th Cir. 2011) ........................................................37

*Nat'l Ass'n of Soc. Workers v. Harwood*,
  69 F. 3d 622 (1st Cir. 1995)..............................................................41

*Norelus v. Denny's, Inc.*,
  628 F. 3d 1270 (11th Cir. 2010) ........................................................42

*Phillips v. Smalley Maintenance Servs., Inc.*,
  435 So. 2d 705 (Ala. 1983)...........................................................44, 47

*Portera v. Winn-Dixie of Montgomery, Inc.*,
  996 F. Supp. 1418 (M. D. Ala. 1998)..................................................49

*Resolution Trust Corp. v. Dunmar Corp.*,
  43 F. 3d 587 (11th Cir. 1995) ............................................................40

*Road Sprinkler Fitters Local Union No. 699 v. Indep. Sprinkler Corp.*,
  10 F. 3d 1563 (11th Cir. 1994) ..........................................................40

*Saville v. Houston Cnty. Healthcare Auth.*,
  852 F. Supp. 1512 (M .D. Ala.1994) (Thompson, J.) ........................49

*Short v. Mando American Corp.*,
  805 F.Supp.2d 1246 (M. D. Ala. 2011)...............................................48

*Sindi v. El-Moslimany*,
  896 F. 3d 1 (1st Cir. 2018)............................................................41, 42

*Stevenson v. Precision Standard, Inc.*,
  762 So. 2d 820 (Ala. 1999)................................................................44

*Surrency v. Harbison*,
  489 So. 2d 1097 (Ala. 1986).........................................................49, 50

vii

*Thomas v. BSE Indus. Contractors, Inc.*,
    624 So. 2d 1041 (Ala.1993) ............................................................48, 49

*Tinker v. Beasley*,
    429 F. 3d 1324 (11th Cir. 2005) ...............................................................49

*Toevs v. Reid*,
    685 F. 3d 903 (10th Cir. 2012) ................................................................43

*U.S. v. Zannino*,
    895 F. 2d 17 (1st Cir. 1990) .....................................................................41

*Webb-Edwards v. Orange Cnty. Sheriff's Office*,
    525 F. 3d 1013 (11th Cir. 2008) ..............................................................40

*Wilson v. Health Services Fd., P.C.*,
    266 So. 3d 674 (Ala. 2017) ......................................................................49

*Wright v. Transportation Security*,
    265 Fed. App'x 894 (11th Cir. Feb. 21, 2008) ........................................43

**Other Authorities**

Fed. R. App. Proc. Rule 32(a)(5) ......................................................................53

Fed. R. App. Proc. Rule 32(a)(6) ......................................................................53

Fed. R. App. Proc. Rule 32(a)(7)(B)(1) ...........................................................53

Fed. R. App. Proc. Rule 32(f) ...........................................................................53

Fed. R. Civ. P. 56(c)..........................................................................4, 35, 36, 52

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

Appellee Melissa McDickinson adopts the Briefs and submissions of Koch

Foods of Ala., LLC and Koch Foods, Inc.


/s/*Marion F. Walker*
Marion F. Walker
Attorney for Appellee
Melissa McDickinson

## <u>CITATIONS TO THE RECORD</u>

All record citations are to the document ("Doc.") number, court's electronic exhibit number shown by hyphen from document number, court's electronic page number, followed by the page number in the document with line numbers, in the case of a deposition, otherwise to page and paragraph when and where appropriate.

/s/<u>*Marion F. Walker*</u>
Marion F. Walker
Attorney for Appellee
Melissa McDickinson

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

1.      Whether Jenkins waived state law claims at district court and appellate level for failure to present arguments and cite legal authority in opposition to dismissal.

2.      Whether Jenkins consented to sex with McDickinson and his conduct showed he welcomed the sexual activity.

3.      Whether Jenkins produced substantial evidence showing a genuine dispute of fact exists as to whether alleged sexual activity with Melissa McDickinson was assault and battery.

4.      Whether Jenkins produced substantial evidence showing a genuine dispute of fact exists as to whether alleged sexual activity with Melissa McDickinson was an invasion of privacy.

5.      Whether Jenkins produced substantial evidence showing a genuine dispute of fact exists as to whether alleged sexual activity with Melissa McDickinson was a tort of outrage.

6.      Whether Jenkins produced substantial evidence showing a genuine dispute of fact exists as to whether alleged sexual activity with Melissa McDickinson was assault and battery.

## STATEMENT OF THE CASE[1]

The factual background presented by Jenkins' Initial Brief, pp.16-41, did not include all facts he testified to both by way of declarations and depositions. An analysis of pertinent facts provided by Jenkins was undertaken by the district court. With Jenkins' abandonment of the claims against Birchfield, McDickinson will present a fair rendition of those facts.

David Birchfield "Birchfield") began his employment at Koch Foods in 2009 and he knew Irish Jenkins ("Jenkins") after he was hired. Doc. 176 - 28 - Birchfield Dec., p. 1, ¶ 2. Birchfield met Melissa McDickinson ("McDickinson") during their service in the National Guard and he hired her as an HR Supervisor at the DeBone Plant in August 2014. *Id, p.2, ¶ 4.* McDickinson applied for and became the HR Manager in December 2014. *Id. p. 2, ¶ 4.* She had her own office up the hall from the HR Office, and the capability to view and pull up footage from security cameras. *Id., p. 5 ¶ 11.* She would need to view them from time to time, when asked, or otherwise, in connection with alleged rules violations. *Id.* McDickinson came to know Jenkins over time because he was often around the plant performing his job, in the smoke area, and called to HR for various personnel issues. Doc. 176 - 27 -

---

[1] McDickinson denies the allegations that she had sex with Jenkins or took any action that could amount to an assault, battery, invasion of privacy or outrage toward him. However, consistent with the standards set forth in Fed. R. Civ. P. 56(c), all facts stated herein are taken in the light most favorable to Jenkins, the non-moving party and his facts are considered as prevailing, as the District Court did, in evaluating the Motion for Summary Judgment. McDickinson does not waive, and explicitly reserves the right, to dispute any fact stated herein if this case is returned for trial.

McDickinson Dec. p. 2, ¶ 5.  Jenkins shared an office as inventory clerk but worked in different departments to help out as needed around the plant. Doc. 176 -19, Jenkins Dep. 18:62:15 – 65:5.

Summer 2015

After fires in several places in the DeBone Plant were set early one morning, McDickinson pulled camera footage and facilitated the Fire Marshal's investigation at the DeBone Plant. Doc. 176 - 27 - McDickinson Dec., p. 2 ¶ 6.  They both suspected Jenkins. *Id.*, p. 2, ¶ 6*;* Doc. 176 - 20 - McDickinson Dep., 61:243:19-20. Randy Sharpley ("Sharpley") knew McDickinson was investigating the source of the fire and that she suspected Jenkins. Doc. 176 - 25 - Sharpley Dep., 57:225:7-227:2, 221:5-22.  McDickinson asked Jenkins questions about the fire. Doc. 176 - 19 – Jenkins Dep., 109:274:12-275:3.

There were telephone calls between Jenkins and McDickinson in July and August 2015. *See generally* Doc. 176 - 34 – Verizon records May 2015 – Aug. 2016, pp. 141-142, 178-185, 211-212.[2]  None have been found after August 2015.

August 2015

In early August 2015, McDickinson went on leave for National Guard duty for approximately three (3) weeks. Doc.176 - 2 - McDickinson LOA Military Aug.

---

[2] The McDickinson telephone records were produced as received per subpoena and contain two numbers – 256-391-5387 and 256-267-1469 – McDickinson's number was the former.  Doc. 176 – 33- McDickinson tel. records, p.1.

2015, pp. 1-8; Doc.176 - 20 - McDickinson Dep., 60:240:10-14. Almost simultaneously with her departure, Birchfield was told by maintenance worker, Sharpley, that he heard Jenkins and Jackson were seeing McDickinson on the side, and Jenkins' fiancé had caught them in a hotel. Doc.176 - 3 – Birchfield Investigation re McD-Jenkins-Jackson sex ("Rumors Investigation"), pp. 1-3.[3] Birchfield began an investigation. Jackson was on vacation. *Id.* at p.1. Within days, Jenkins was suspended on a separate charge of using a prohibited exit at the Plant to go smoke. Doc.176 - 4 – Birchfield Investigation re Jenkins wrong exit-USDA, pp. 1-5. This issue was added as a new issue to Birchfield's investigatory work. Doc. 176 - 3 – Rumor Investigation, p. 1 (10:00 entry). After he learned from Jenkins that the USDA employees also used that exit, Birchfield directed Jenkins be returned to work. Doc.176 - 21 - Birchfield Dep., 65:259:21-260:12, 269:22-272:15, Doc. 176 – 4 - Jenkins Wrong Exit Investigation, p. 6. Jenkins returned to work on August 12, 2015. *Id.* at p.7.

<u>Genesis of Davenport Letter</u>

In the summer of 2015, Kathy Denton, ("Denton"), Laura Cortes ("Cortes") and Rebecca Milam ("Milam") were HR employees who reported to McDickinson.

---

[3] Sharpley testified at deposition that Jenkins said he thought "old girl dig me," speaking of McDickinson. Doc. 176 - 25 - Sharpley Dep., p. 15:60:3-12. Jenkins never told him they had sex and when he observed the two in McDickinson's office, he observed nothing inappropriate. Doc. 176 – 25, p. 44:175:22-18. The negatives he heard about Birchfield and McDickinson were rumors. *Id.,* at 51:204:3-205:16.

6

During questioning about the rumor, Birchfield learned from Cortes that Jenkins and Jackson had eighteen or nineteen disciplinary points that had not been addressed and plant manager, Randy Davenport ("Davenport") wanted to fire them. Doc. 176 - 21 – Birchfield Dep. p. 58:231:10 – 232:7.  Birchfield also asked Denton about what she knew about the rumors and the points. Denton suspected that McDickinson was covering for Jenkins and Jackson and gave Birchfield background documents regarding the points. Doc. 176 - 28 - Birchfield Dec., p. 2, ¶ 5; Doc. 176 – 5 – Birchfield Points Investigation, pp.2-24. Birchfield worked with Milam, HR Clerk, in obtaining needed information and adjusting the points. Doc. 176-28- Birchfield Dec., p. 2, ¶ 6. A few days after questioning Denton, Birchfield learned from Elrod that Denton told Davenport about the rumors he had asked her about and Davenport had sent a letter to his boss, Wally Lewis, repeating the rumors and expressing his concern. Doc. 176 - 21 – Birchfield Dep., p. 62:247:21-249:2.

Points Investigation

The limit of points, before termination, at the time was seven.  Birchfield included an inquiry into the point issues with his investigation. Doc. 176 – 3, p.1; Doc. 176 - 5 – Birchfield Points Investigation Aug. 2015, pp. 1-30.  Birchfield obtained information from the payroll clerk and spoke with Jackson, who explained there was a problem clocking in on the week-ends, which was at the root of the undeserved points.  Doc. 176 - 21- Birchfield Dep., 27:307:22-310:1; Doc. 176 – 5

– Birchfield Points Investigation, pp. 25-27; Doc. 176 - 29 - C. Gray Dep., 4:34:23-36:12.  In short, the clock reflected week-end workers as tardy, inflating their point total.  Doc. 176 – 5 – Birchfield Points Investigation, pp.10-24. Birchfield confirmed this scenario with Mark Barrantine, one of the managers. Doc. 176-28-Birchfield Dec., p. 2, ¶ 5. After Birchfield resolved the points issue on August 11, 2015,[4] he met with Jenkins on August 12 and discussed with him both the points issue and the Jenkins-McDickinson rumor. Doc. 176 - 19 - Jenkins Dep., p. 24:89:3 - 91:13, 25:92:6-17; Doc. 176 - 21 – Birchfield Dep., 72:287:4-21, 73:289:17- 74:294:18; Doc. 176 – 3 – Rumors Investigation, p. 20.

Rumors Investigation

Birchfield began the investigation into rumors of Jenkins, Jackson and McDickinson having sex by interviewing, on August 7, 2015, Jenkins' fiancé, Johngernita Foxhall, ("Foxhall").  She denied that she had caught Jenkins and Jackson with McDickinson but had suspicions and had shared those with several people in the Plant. Doc. 176 - 3 – Rumors Investigation, pp. 5-6.; Doc. 176 - 22 - Foxhall Dep., 22:81:10-82:21.  Birchfield recorded that she said she would have killed them, but Foxhall later denied those words, instead saying she "would have beat her ass." Doc. 176 - 3 – Rumor Investigation, p. 1; Doc. 176 - 22 - Foxhall Dep.,

---

[4] Jenkins does not recall when he met with Birchfield but testified to the calendars Birchfield altered pursuant to the audit ("points audit") which is dated August 11, 2015. *See* Doc. 176 - 19 - Jenkins Dep., 26:95:7-20.

p., 19:68:9-13. Foxhall reported that she had heard McDickinson and Milam were at the bar and Jenkins showed up to shoot pool – they did not arrive or leave together. Doc. 176 – 3 – Rumor Investigation, p. 1, Doc. 176 - 21 - Birchfield Dep., p. 69:275:13 – 71:283:7. Foxhall said Jenkins came home about 7:30 p.m.. Doc. 176 – 3 – Rumor Investigation, p. 5.[5] When asked if there was anything else, Foxhall told Birchfield that McDickinson was always in the break room or smoking areas talking to employees. Doc. 176 - 3 at KF Bates 000545.

On August 12th, Birchfield interviewed Jenkins. He heatedly and directly denied he had had any out of work contact with McDickinson, except seeing her at a bar when she was leaving. Doc. 176 – 3 – Rumor Investigation, p. 20; Doc. 176 - 28 - Birchfield Dec. p. 3, ¶ 8. He agreed they talked at work, but strictly denied ever having sex with her and said it was "Bull Shit" and "all lies" and accused his "old lady" of starting talk like that around the Plant. Doc. 176 – 3 – Rumor Investigation, p. 20. He also accused Sharpley of starting something, *i.e.* the rumors, because he had lost authority in the Union to Jackson. *Id.* Jenkins believed that at the time of the interview, he had been suspended, not because of the points, but because McDickinson was letting them get away with the points violations. Doc. 176 - 19 - Jenkins Dep., p. 128:349:13-21; 129:352:4-17. In his interview on August 13th

---

[5] From information readily available, the sun set at 7:56 p.m. on July 18, 2015. *See* https://www.google.com/search?client=firefox-b-1-d&q=time+sunset+on+July+18%2C+2015.

Jackson also denied having sex with McDickinson. Doc. 176 – 3 – Rumor Investigation. pp.1, 21; Doc. 176 - 21 – Birchfield Dep., 62:246:9-63:247:2. Jenkins claims after Birchfield interviewed Jackson, he suspended him. Jenkins' Initial Brief, p. 30. This is incorrect and the citation provided does not support the claim.[6]

On August 26, 2015, after she returned from military duty, Birchfield talked with McDickinson, who denied ever having sex with Jackson or Jenkins.  He required her to write out a statement and sign it before she went back to her office. Doc. 176 – 3 – Rumor Investigation, p. 19: Doc. 176 - 21 – Birchfield Dep., 76:301:21 – 77:302:6.  Having spoken with and obtained denials from all the alleged participants, Birchfield considered the matter settled.

December 2015

On December 7, 2015, Plant Manager, Bobby Cotton ("Cotton"), reported Jenkins smoking in an unauthorized place near propane tanks and noted Jenkins alleged Cotton was "targeting him" when Cotton upbraided him. Doc. 176 - 6 Emails & Reprimand re Cotton report, pp. 1-9; Doc. 176 - 26 - Shaw Dep.,11: 44:20-47:9. Jenkins was given a verbal reprimand. Doc. 176 - 26 – Shaw Dep., 11:44:20-47:9; Doc. 176 - 18 – Jenkins Personnel file, p. 23.  On December 11th, Jenkins was required to go to HR and sign for disciplinary points he was assigned because of

---

[6] The citation " Doc. 189-12:109:18 – 110:7" cannot be located. If referring to page 109 of Jackson's deposition in this case, the testimony is a recording. If referring to page 109 of the court's electronic numbers, the testimony covers four pages, none of which refer to what Jenkins tells the court.

previous violations of the tardy/absence Rule. Doc. 176 - 7 – Jenkins 2015 Employee Attendance Report. This brought his total points to 6 and he was given a Final Warning by HR Clerk, Young Kim. *Id.*

Soon after December 11th, McDickinson called Birchfield to report that Jackson had told her Jenkins told a co-worker, Armando, that he had sex with McDickinson. Doc. 176 - 20 - McDickinson Dep.,101:404:8-405:7. Birchfield noted in the Rumor Investigation that he had heard an allegation about Jenkins' boast on December 16, 2015. Doc. 176 – 3- Rumor Investigation, p. 2.

Jenkins' Initial Brief claims he was called to Birchfield's office for a December 12, 2015 meeting with Birchfield and suggests there are purported texts with Jackson on December 14th followed that meeting. No texts between Jackson and Birchfield have been authenticated so any alleged document purporting to be texts among them is not admissible.[7] Any meeting on December 12th, was not about the claims by Jenkins of having sex with McDickinson. Jenkins' deposition citation to Birchfield's deposition only refers to questions about "December." *See* Jenkins; Initial Brief, p. 32.[8] Birchfield's testimony squares with Jenkins' when he says he signed the statement the same day he made the recording of the conversation with Birchfield. (Doc. Doc. 176-10 – Jenkins' June 2016 Dec., p. 3, ¶ 11; Doc. 176-19 –

---

[7] Defendants filed Joint Objections and Motion to Exclude Jenkins' Evidence, Doc 198, pp. 5-6 which objected to these purported texts as not authenticated.

[8] Jenkins' Initial Brief, p. 32. The citation for this claim is "(Doc. 189-6:328:10-329:5)." The reference is to Birchfield's deposition which can be found at Doc. 189-6, 179:327:16 – 180:330:4.

Jenkins Dep., p. 36:134:6 – 37:137:13; 182-26). The statement is dated December 17, 2015. Doc. 189 - 4 – Jenkins' Statement, p. 121.[9]

Jenkins' Initial Brief, at p. 32, implies the text exchange between Birchfield and Jackson on December 2015 occurred because of or following the confrontation with Jenkins. December 14th texts to Jackson, asking for Jenkins' number, followed Jenkins' write-up for being tardy and receiving a final warning; the texts preceded the meeting Birchfield had with Jenkins on December 17, 2015, at the DeBone Plant. Doc. 176 - 28 - Birchfield Dec., p. 4, ¶ 9; Doc. 176 – 3 – Rumor Investigation, p. 2. A heated exchange took place in the meeting in which Jenkins flatly denied he had, or, said that he had, had sex with McDickinson. *Id.* Birchfield agrees he raised his voice because Jenkins raised his. Doc. 176 - 21 – Birchfield Dep., 94:373:5-10. Many employees at the DeBone Plant were afraid of Jenkins. *Id.,* p. 108:431:4-432:11.

Jenkins now claims the statement was forced and he was not under oath. *Id.,* 124:332:9 -14;   Doc. 176 - 9 – Jenkins Declaration signed 5-20-2016,  ¶ 10, Bates 00446-447; Doc. 176 - 10 – Jenkins Declaration signed 6-17-2016, ¶ 11, Bates 206-209; Doc. 176 - 19 - Jenkins Dep., 124:333:6-7. Nothing on his recording suggests he was "forced." (Doc. 182-39)

---

[9] The district court was confused as well and recited the December date for the meeting and the 17th for the written statement. Appx. Vol. II, Doc 222, p. 116.

January – March 2016

On January 6, 2016, Milam told Birchfield Jenkins had been in to sign for a half point for being tardy but became "argumentative," insisting he had not been tardy. Doc. 176 - 11 – Email Milam to Birchfield re Jenkins signing for points & attitude 1-6-2016, pp. 1-2.  On January 26, 2016, Milam wrote to Birchfield to advise Jenkins had come by and left word that he wanted to speak with him. Doc. 176 - 12 – Email Milam to Birchfield, pp. 1-2.  On February 2, 2016, Cortes wrote Birchfield, copied McDickinson, saying: "Irish is trying to contact you regarding excusing a future absence due to a court summons." Doc. 176 - 13 – Email Cortes to Birchfield, pp. 1-3.  On February 22, 2016, Young Kim, an HR Clerk, and Birchfield exchanged emails regarding the number of points Jenkins had because Jenkins had sent Birchfield a message asking to be off for court. Doc. 176 - 14 – Email re Jenkins' points – Birchfield – Kim 2-22-2016, pp. 1-2.

On March 21, 2016, Jeff Shaw ("Shaw"), Jenkins' supervisor,[10] found Jenkins was smoking while on the clock and took him to the HR Office. Doc. 176, - 26 - Shaw Dep., 29:114:10-14, 126:12-15.   In the interaction, Jenkins admitted to smoking on the clock and repeatedly not clocking out for smoke breaks, a direct violation of company policy.  Doc. 176 - 16 – Docs re Jenkins' Suspension, p. 9;

---

[10] Shaw is not sure of the date he became Jenkins' supervisor but it was at least by August 7, 2015. Doc. 176-26, p.15, 60:6-19.

Doc. 176 - 26 – Shaw Dep., 29:115:16 – 30:116:13; Doc. 176 - 19 – Jenkins Dep. 104:255:11-14.   Before confronting Jenkins, Shaw saw footage of the security camera in McDickinson's office showing Jenkins had been smoking on the clock on a Saturday as well.   Doc. 176 - 26- Shaw Dep., 25:98:2 – 26:99:6, 41:163:17-21. The footage McDickinson pulled was dated March 21, 2016 at 9 a.m. with a notation that said 10 a.m. because that is when he was caught by Shaw. Doc. 176 - 15 – Photographs of I. Jenkins & clock, pp. 1-3; Doc. 176 - 27 - McDickinson Dec., p. 5, 17; Doc. 176 - 20 – McDickinson Dep., 115:458-462.

Cortes took a statement from Shaw and suspended Jenkins pending investigation.  Doc. 176 - 16 – Documents re Jenkins March 21, 206 suspension, 9 - 10;  Doc. 176 - 20 - McDickinson Dep., 488:5-13.   McDickinson did not have anything to do with Jenkins' personnel decisions that month, except for pulling the camera footage. Doc. 176 - 20 - McDickinson Dep., 122:486:20 – 123:22, 487:6-14. Jenkins received a call from the HR Office and was told on March 25, 2016 that he had been terminated. Doc. 176 - 19 - Jenkins Dep., 100:239:14-23; Doc. 176 - 16 – Docs re Suspension, p. 10; Doc. 176 - 17 – PAF for Jenkins' termination.  Jenkins acknowledged but did not know why the plant managers wanted to get rid of him. Doc. 176 – 19 -Jenkins Dep., pp. 55:213:11 – 56:215:7, 57:218:3-16.

Jenkins Called Elrod

After being fired, Jenkins told Elrod he had been sleeping with McDickinson, (Doc. 176 – 9 – Jenkins Dec., p. 2, ¶ 12), but at deposition insisted he was only suspended when he talked with Elrod. (Doc. Doc. 176 – 29 - Jenkins Dep., pp. 52:198:23 – 53:199:9.)[11]   Jenkins had not complained to any person during his employment about having sex with McDickinson, or being assaulted, battered, or having his privacy invaded.  He told Elrod "about his dealings with Melissa . . . . About me and her's (sic) sexual encounters and David questioning me about it." Doc. 176 - 19 – Jenkins Dep., 101:241:18 – 102:242:6.  Elrod testified Jenkins called him to file a complaint against Birchfield who had said Jenkins was having sex with McDickinson but that was not true – she was Birchfield's girl or woman. Doc. 176 - 30 – Elrod Dep., p. 5:20:12-20.  Regardless of when Jenkins called or what he said, he did not complain that McDickinson acted in such a way that made him a victim of the state torts he alleges.

Jenkins Claims Sexual Encounters With McDickinson

It was not until his deposition in January 2020 that Jenkins claimed there were nine to ten times McDickinson performed oral sex upon him and at least one time they had sexual intercourse:  in the "cage;" in the warehouse where he worked; in

---

[11] The district court refused to credit Jenkins' deposition testimony about his employment status when he spoke to Bobby Elrod, HR Director, finding it was a sham. Appx., Vol. II, p. 137, n. 11.

her office; in her car and behind the Dèjá Vu Bar; in her car and in a random parking lot; on co-worker Herman Boleware's couch; and, in his office area in the Receiving Department at the Koch Foods DeBone Plant. Jenkins claims he and McDickinson began a "consensual sexual affair" in October 2015. Doc. 176 -10, Jenkins' Declaration June 2016, p. 2 ¶ 4. He claims there were nine to ten times he and McDickinson had sex from August until the time he was fired. Doc. 176 – 19, Jenkins Dep., 45:172:3 – 14, 50:190:10 – 191:5.

Initial Contact

Jenkins says McDickinson called him to her office and gave him her cell number, or gave it to him through Jackson, and he called her and then he stopped. Doc. 176 - 19 - Jenkins Dep., 27:100:18-101:15.  He said the following about how sex with McDickinson began: (1) "Mr. Birchfield, the Complex Human Resources Manager, wanted to watch me have sex with his subordinate, Human Resources Manager Melissa McDickinson. I was not comfortable with that and refused. After that, Ms. McDickinson and I began a sexual relationship.  Steve Jackson with the union asked me to go drinking with him and Ms. McDickinson at a bar. Mr. Jackson said Ms. McDickinson wanted to see or hang out with me. When we were at the bar, she showed an interest in me, and we began a sexual relationship." Doc. 176 – 9 – Jenkins Dec. May 2016, p. 1, ¶¶ 3-5.

(2) "In October 2015, Ms. McDickinson approached me to engage in a consensual sexual affair.  Soon after, we began a sexual relationship that was indeed consensual. I learned Ms. McDickinson was attracted to me and wanted to 'hang out' when she sent a message through a Union Representative at the DeBone plant, an African-American male name Steve Jackson.  Mr. Jackson invited me to go drinking with him, Ms. McDickinson and McDickinson's sister-in-law, Rebecca Milam at a local bar. Ms. Milam is employed by Koch Foods and works at the DeBone plant in the Human Resources Department. When we were at the bar, Ms. McDickinson flirted with me and told me she was attracted to me sexually and was interested in pursuing a sexual relationship. Ms. McDickinson is a white female. She told me she preferred African American men." Doc. 176 – 10 – Jenkins' Dec. June 2016, p. 1, ¶ 4.

(3) "But she was for real because she came to me, she approached me, and asked me would I like to go to Déjá Vu, the bar, with her and Steve and Rebecca." Doc. 176 - 19 - Jenkins Dep., 27:101:16-19. Jenkins thought it was on a week-end because there was a plan to go and his wife even noticed and asked why he was dressing up, as though she knew he was "messing up" but he said he was going to Cheers with Steve. *Id.* at 27:101:23 – 28:102:6.[12]   He drove his truck to the

---

[12] Later in his deposition, Jenkins would admit he had planned to go to the bar with Herman, and McDickinson and Milam showed up. *See* Doc. 176 - 19 -Jenkins Dep., pp. 184:11-186:12.

supermarket parking lot and McDickinson and Rebecca picked him up in a black Hyundai Sonata, "or something." *Id.* at 27:102:6-10. After being at the bar, McDickinson was drunk and when he got in her car, she began performing oral sex on him, and Milam and Jackson saw them with Milam commenting, that they were "nasty." *Id.* at 131:360:9-361:10. Then McDickinson stopped by the side of the road and pulled into "a random parking lot," up the street from the bar, and started to perform oral sex on him until she got out of the car and came around the car and opened the passenger door and pulled him to standing position and squatted down and performed oral sex on him some more and then pulled off her pants – she does not wear panties – and turned around and reaching behind her, took his penis and put it in her. *Id.,* at 44:167:8 - 169:21, 147:424:9 - 426:2. He does not remember if he told her he just wanted to get back in his vehicle because of the location. *Id.,* 147:426:1-12. Jenkins testified to this event occurring behind the Déjá Vu when they met there. Doc. 176 - 19 - Jenkins Dep., 144:401:1-18, 146:423:21 – 147:424:1-22. He cannot recall if that type of event happened more than once. Doc. 176 - 19 - Jenkins Dep., 148:429:4-10. *But see* Doc. 182-26, pp. 21-2 where Jenkins' answer to Interrogatories No. 17 stated McDickinson and he were dancing at the Déjá Vu club and began making out and she allegedly said she wanted to have sex with him. He said they went out to his car and she performed oral sex on him and they went around to the back of the building and they had sex.

Oral Sex in the Cage

Actually, Jenkins recalled, before going to the Déjá Vu, the first time McDickinson performed oral sex on him was when she came to his work area in the warehouse and asked him to go into the "cage"[13] and back to the filing cabinets. Doc. 176 – 19 – Jenkins Dep., p. 30:113:8-18; 31:116:10-15; 136:382:12-15. He could not recall any non-platonic touch or comment McDickinson had made to him before she allegedly performed oral sex on in the cage. Doc. 176 -19, Jenkins Dep., 31:114:8 – 117:5. *But see* Jenkins claims at brief McDickinson pursued and seduced him. Jenkins' Initial Brief, p. 20-21.

In August McDickinson called the Receiving office and Willingham answered and she told him she was in the cage and wanted Jenkins there. *Id.* 39:146:19 - 147:7; 134:372:2 - 373:16, 134:374:17 - 375:7. At the filing cabinets she was squatting and began to fondle his penis outside of his clothes, then unzipped his pants, she sucked his penis, as he braced himself on the cabinets; he pushed away, concerned about his colleague working there; when he turned around, she began again until he had an orgasm and expelled in her mouth. *Id.,* at 31:117:22-12; 380:4-7. Jenkins did not

---

[13] The cage was a fenced area for records but also had "lugs," portions of a line that had broken down about seven feet high and filing cabinets in the back with an entrance about a "body wide to go back there" so it blocked a view to the back. Doc. 176 - 19 - Jenkins Dep., 113:15-6; 366:4-5, 19-20; 367:20-368:19. *But see* co-worker Derrick Willingham says the cage contained HR files and boxes, no machinery, and he saw more of other HR workers than McDickinson there. Doc. 176 - 24 - Willingham Dep., 15:53:4-56:7. *And see* "It was part of the warehouse that had chain-link fencing to secure paperwork." Doc. 176 - 26 - Shaw Dep., 8:32:15-6.

19

remember if he asked her to stop, agrees he was capable of walking, and surmises he may have been able to use force to stop her. *Id.,* at 32:119:18 - 22:121:3-9, 8:22-122:4.   He said he went through with it to keep his job even as he denies McDickinson ever threatened his job if he did not allow her to give him oral sex. *Id.,* at 32:120:9-16; 33:122:15-20.

Oral Sex in McDickinson HR Office

Jenkins does not remember any date or day of the week McDickinson performed oral sex on him in her HR office. *Id.,* at 138:391:20-23.  It started with small talk that he cannot remember. *Id.,* at 40:150:13-19; 45, 417:2-6. This happened more than two or three times, *Id.,* at 138:390:17-19, or "[p]robably five or more that [he] was called there and it occurred." *Id.,* at 41:156:1-2.  He locked the door several times, including the first time, so they would not get caught. *Id.,* at 40:152:12 - 153:1-5, 20-23.  After locking the door, he returned to behind the desk and she began "jacking [him] off" and when he got an erection, performed oral sex on him. *Id.,* at 41:154:7-14.  Once he "got into it," he enjoyed himself. *Id.,* at 41:154:15-23.  He had an orgasm every time except when they were almost caught. *Id.,* at 41:155:9-11. Sharpley  came in the door on one occasion and, according to Jenkins, after that is when Sharpley ran to Birchfield "on us." *Id.,* at 41:156:20-156:1.  Jenkins was not physically afraid but only afraid of "having  no occupation." *Id.* However, the fear of losing his job did not come from a threat by McDickinson about her causing him

to lose his job, despite claims in Jenkins' Initial Brief, pp. 23, 25. *See* Doc. 176 – 19, Jenkins Dep., 33:122:15 – 20.

Sex at Herman Boleware's Apartment on the Couch

Jenkins testified that Herman Boleware ("Boleware")[14] called him and told him to meet him and when he got there, McDickinson and Milam were there. *Id.,* at 47:181:7 – 48:184:3. But Jenkins also said McDickinson called him to meet her and Milam and they went to Boleware's apartment. Doc. 176 - 19 - Jenkins Dep., 47:181:7 – 48:184:10. Regardless of how he got there, Jenkins testified when Boleware and Milam went to the back, McDickinson began performing oral sex on him and they were discovered when the other two returned to the living room; Jenkins asked them to go into the bathroom. *Id.* at 45:170:5 - 171:19.

Receiving Office

This is the area in which Jenkins worked, where he used the desk and computer. Willingham, generally, was with him in the area most of the workdays. Doc. 176 - 24 - Willingham Dep., 11:39:11 - 23. One morning there was an early meeting to pass out clear bags and when Jenkins arrived at 4:30 a.m., McDickinson was already there to pass out the bags and asked Jenkins to help. Jenkins testified "[a]nd she –we had sex that morning." Doc. 176 - 19 - Jenkins Dep., 45:173:6-

---

[14] Boleware was a former co-worker of Jenkins' in 2015. *See* Doc. 176 - 23 - Boleware Dep.,4: 9:12-14, 11:34:3-5.

174:12. Jenkins' testimony defies the assertion in Jenkins' Initial Brief, p. 23 that McDickinson was waiting on him in order to have sex. She had gotten to work early to pass out some clear bags due to recent thefts of chicken. Doc. 176 – 19, Jenkins Dep., 45:173:6 – 174: 12.

Jenkins' testimony is that McDickinson was in this department and told him she was going to start coming down there to smoke. Doc. 176 – 19, Jenkins Dep., 31:114: 19 – 115:18. In his brief, Jenkins claims McDickinson directed him to take his smoke breaks "in the back smoking area." Jenkins' Initial Brief, p. 19.

Meetings at the Store Down the Street

Prior to when McDickinson picked up Jenkins in the parking lot to go to the bar, she met Jackson and Jenkins at the store or the gas station down the street from the plant. *See* Doc. 176 - 19 - Jenkins Dep., 28:105:7-8, 19-22. McDickinson would give Jackson money and while he went in the store to buy, maybe Corona beer, Jenkins would get in McDickinson's car: "I would go sit in the car. It's what she did to me, touch me, whatever, fondle me or whatever. You can't do much at the service station." *Id.,* at 29:108:6-21, 30:110:7 - 14. He got in the car three different times and each time, he knew she would be touching him again; he never touched her or kissed her and does not remember if he told her to stop or not to touch him. *Id.,* 30:111:8 - 21. The length of time this lasted was only so long as Jackson was in the store, but he received an erection each time. *Id.,* 30:111:13 -15, 30:112:17 - 113:1.

Jenkins got in the car with McDickinson "[b]ecause we're messing around now, you know." Doc. 176 - 19 - Jenkins Dep., 29:108:6-8.  At brief, Jenkins claims he was surprised when McDickinson was at the store when he rode there with Jackson. Jenkins' Initial Brief, p. 24. ("Unbeknownst to Jenkins, McDickinson had arranged to arrive at the store at the same time.") Jenkins testified: "Steve asked me to ride with him or whatever after, you know, she done presented herself to me. He would ask me to ride down there to meet her. . ." Doc. 176 – 19, Jenkins Dep., 29:108:12-15.

<u>Jenkins Welcomed Alleged Sex</u>

Jenkins claims McDickinson forced herself upon him and he was not attracted to her and "didn't know her." *Id.,* 49:187:5-16.  On maybe two occasions, he asked her not to fondle or touch him and she would assure him that he was "protected." *Id.,* at 47:179:2 - 180:16. The first oral sex in her office, Jenkins allegedly told McDickinson "no, man, we're going to get caught." Doc. 176-19 – Jenkins Dep., 40:150:18-19). On several occasions, when she called him to meet, he did not go, *Id.,* at 146:421:16-18, 146:422:14-18, and on at least five occasions he used a condom. *Id.,* at 44:169:13 - 21.  Even though Jenkins said she initiated any sex, he allowed it. *Id.,* at 141:402:22 - 403:5.  Jenkins claims so long as he allowed McDickinson to perform oral sex on him, she said he was bullet proof. *Id.,* at

141:403:14 – 142:403:20.  He could not explain how she could make that boast when she had to report to Birchfield. *Id.,* at 141:403:21 – 142:404:11.

When asked if McDickinson's alleged approaches caused him fear of physical harm, Jenkins only mentioned that she was a white woman and he was an ex-felon. Doc 176 – 19, Jenkins Dep.,147-48:427:20 – 428:14. As to what he felt at the time he was touched by McDickinson, Jenkins testified: "I felt that, hell, if I didn't do what she wanted me to do, hell, what if she said I raped her or some shit like that. I just wanted to get everything over with at the time of every encounter." Doc 176 – 19, Jenkins Dep., 148:428:15-21.

Jenkins was asked the question: "All right. So, you are allowing her to do oral sex because you're getting a benefit from it; is that why you're saying that because it makes you bullet proof?" He said: "I can't – I don't really know how to say whether that's the reason why I was continuing."  *Id.,* at 146:423:14 - 21.  Jenkins claims he told McDickinson about "twice" that he did not "want to deal with her." *See, e.g.,* Doc. 176 - 19 – Jenkins Dep., pp. 46:176:3 - 18, 177:12- 47:178:2, 47:178:3 - 18, 47:179:2 - 21. He never "unbuckled" himself when she was performing oral sex and never pushed her away physically but did say "no," after he got mad at Jackson for not telling him the truth[15] and when things were blown out of proportion

---

[15] The "truth" he referred to was about the rumor that Birchfield and McDickinson were seeing each other.  Doc. 176 - 19 – Jenkins Dep., p. 28:105:13-22.

by his fiancé and got around the plant. *Id.,* 146:420:17 - 421:10. When he believed he almost lost his job, he testified: "I'm like hell no leave me alone, and I'm about to lose my fiancé." *Id.,* 46:175:3-7. Yet he does not know when sexual contact with McDickinson stopped but surmised it was after he had been fired. Doc. 176-19 – Jenkins Dep., p. 49:188:6 - 50:191:17-21. But when he found out Birchfield and McDickinson had a relationship, he did not want anything more to do with her and he backed away. *Id.,* at 143:410:3 - 19.

Despite his signed Declarations Under Penalty of Perjury, Doc. 176-4- Jenkins May 2016 Dec., p. 1, ¶ 5, and Doc. 176 – 10- Jenkins June 2016 Dec., p. 1, ¶ 4, at deposition, Jenkins said he could not recall if he ever had said sex with McDickinson was "consensual." In fact, he claimed not to know what "consensual" means. Doc. 176 - 19 - Jenkins Dep., 124:334:19 - 335:8. Yet, Jenkins admitted McDickinson never threatened he would lose his job if he did not have sex with her. *Id.,* at 33:122:15 – 20.

Jenkins knew Kathy Denton worked in HR. Doc. 176 - 19 - Jenkins Dep. 119:314:23 - 315:2. She told him about the rumors going around the Plant about him and McDickinson being involved. *Id.,* at 119:315:5 - 316:2. He did not make a complaint to her, i*d.,* at 120:317:19 - 318:5, or to the Plant Manager, Randy Davenport (*Id.,* at 142:405:1-5), Plant Manager Bobby Cotton (*Id.,* 51:185:1 – 20) his supervisor, nor HR clerks. *Id.,* at 196:12 – 197:13. When asked about points

McDickinson excused for him, Jenkins referred to the occasion when he needed to be off to attend his step-son's funeral. Doc. 176 - 19 - Jenkins Dep., 27:98:2 - 99:12.

<u>Meetings With Birchfield</u>

Jenkins does not recall telling Birchfield that the allegation about McDickinson and him was "bull shit" or that he had nothing to hide. *Id.,* at 127:346:18 - 347:8. He does recall a meeting with Birchfield where he was told he had nineteen points and Birchfield was angry that McDickinson had excused them. *Id.,* at 128:349:13 – 129:354:6. Jenkins agrees that by the time he had the discussion about the nineteen points with Birchfield, he had already had oral sex by McDickinson and had been to the bar. *Id.,* at 129:354:7 - 355:17. In fact, Jenkins says he had sex with McDickinson in the cage, and at Déjá Vu before the meeting about the nineteen points. *Id.,* at 138:389:10 - 390:6.

Jenkins did recall the December 17, 2015 meeting that he recorded. *Id.* at 21:322:9 - 14. He recorded the conversation because Birchfield had asked him before if he had had sex with McDickinson and Jenkins had told him "no." *Id.*, at 121:322:15 - 19. He agrees in the meeting he told Birchfield he was not having sex with McDickinson. *Id.,* at 121:323:14 - 23. Jenkins claims he knew before the meeting that McDickinson and Birchfield were romantically involved because she had told him. *Id.,* at 122:324:9 - 13. Despite the meeting being heated, Jenkins does not accuse Birchfield of touching him.

Jenkins claims on a date he cannot remember, he was sexually harassed by Birchfield and McDickinson. A time when he was suspended, McDickinson called him to her office. *Id.*, 114:293:17 - 294:5.  When he got there, Birchfield came into McDickinson's office and she asked him about having sex with her and letting Birchfield watch. *Id.* at 116:302:12 - 306:1; Doc. 176 – 10 – Jenkins' Dec. June 2016, ¶¶ 9, 12.  Jenkins refused. *Id.*  Jenkins said this meeting occurred before the one in December 2015 he had with Birchfield where he signed the statement about not having sex with McDickinson (December 17, 2015) because he had already refused to have sex with her and let Birchfield watch, so wanted to save his job. Doc. 176 - 19 – Jenkins Dep., 58:224:7-226:2.  In his second Declaration, Jenkins claims he had a subsequent meeting in January 2016 in which McDickinson called him to her office and Birchfield came in and she asked if he had reconsidered having sex and letting Birchfield watch and he refused. Doc. 176 - 10 – Jenkins Declaration June 17, 2016, ¶ 12.

Foxhall Had Unconfirmed Suspicions

Foxhall said she had her own suspicions because Jenkins came home with McDickinson's cell number, cigarettes, and with glasses only a woman would drink out of. Doc. 176 - 22 - Foxhall Dep., 17:60:5 – 18, 17:61:5 - 62:5.  She testified that Jenkins was a friendly person and dressed nicely and is "real sweet." *Id.,* at 15:53:9 - 17, 54:19-21. McDickinson was also friendly and it got to be that every time

Jenkins was on a break, she was there. *Id.* at 16:55:1-3, 56:10-19. She said McDickinson came out of the bathroom one time with her hair all twisted up and said she wanted her hair like Jenkins'. *Id.,* at 16:55:5 - 56:4.

Sometime after the interview, Foxhall saw McDickinson who told her that she would not have done that to her. *Id.,* at 17:57:7 – 18:58:1. Foxhall did not believe it because she knows Jenkins well and "if he likes something --…yeah. Yeah, I know." *Id.,* at 17:58:5 - 20. Foxhall did not suspect any kind of harassment or discrimination, and Jenkins never complained that he was being harassed or assaulted. *Id.* at 19:66:7-20. What is more, Jenkins never complained about being mistreated at work and he did not exhibit any evidence of depression or distress until after he was fired. *Id.,* at 24:87:5 - 18.

Jenkins says his fiancé already knew about McDickinson and him because Birchfield had already called her into the office. *Id.,* at 122:325:13 - 9. This meeting occurred in August. Doc. 176 – 3 – Rumor Investigation, pp. 4-5. According to Jenkins, Foxhall did not tell him, at first, what she talked about with Birchfield. *Id.,* at 122:326:6 - 9. Foxhall claims she never told him what was said in her meeting with Birchfield. Doc. 176 - 22 - Foxhall Dep., 12:40:1 - 7. She testified Jenkins denied to her having any sexual contact with McDickinson. Doc. Doc. 176-22, Foxhall Dep., p. 19:66:7-20.

Jenkins could not answer as to how McDickinson caused him emotional distress. Doc 176 – 19- Jenkins Dep., 151:442:15-20.  Jenkins could not recall what McDickinson did to invade his privacy.  *Id.,* at 150:439:10 - 440:3.[16]  When asked when McDickinson assaulted him, Jenkins pointed to the time at the Déjá Vu  club when he sat in her car saying: "The time when I didn't want her touching me like that, like when Rebecca looked around and looked into the car. I was like no, man, no, but she continued and I'm in her car." *Id.,* at 147:426:22 – 427:3 – 7. The context of the testimony relates to his fear of the sex act occurring in front of others not a fear of bodily harm. He did not try to get out of the car.

Jenkins' Factual Record Incomplete

Jenkins chose to cherry pick "facts" in a narrative designed to tell a story of McDickinson inviting sexual activity, as opposed to directing his argument at the undisputed facts the district court relied upon in dismissing all claims. For instance, telling the Court McDickinson "would describe her sexual preferences to Jenkins, including telling him that black guys were different, better, and bigger; . . ." , Jenkins' Initial Brief, p. 7, when this testimony by Jenkins was given in response to the question of whether she ever mentioned Jenkins' race.   Doc 812-2, Jenkins'

---

[16] With those questions and answers, Jenkins' attorneys called the deposition. Doc. 176 - 19 - Jenkins Dep., 151:442:21 – 157:445:21.

Dep., 78:275:4-17. The use of "would" implicitly suggests McDickinson did this more than once but that is not Jenkins' testimony.

Jenkins made reference in his argument to a text between McDickinson and Jackson purportedly relating to Jenkins, without a citation to the Record which is hearsay and not competent evidence as no such text has been authenticated by McDickinson, Jackson or Jenkins' withdrawn expert.[17] Jenkins Initial Brief, p. 59. Jenkins attached, without authentication, some purported text messages between Jackson and McDickinson.

Fuller Another Employee Who Never Stated A Complaint Until Fired

Jenkins' Initial Brief did not provide a factual basis for including any reference to Harvey Fuller's claims, nor address them in an argument. Before filing an EEOC Charge, Fuller denied to Birchfield that McDickinson had acted inappropriately at all. The district court's Memorandum and Opinion made no reference to Fuller. Appx Vol. II, Doc 222. There was no argument regarding Fuller so his unproven allegations were included by Jenkins to poison the well.

District Court Granted Summary Judgment on all Claims Against McDickinson

The district court granted summary judgment for McDickinson on January 14, 2022, holding the state law claims failed because ". . . there is no genuine issue of

---

[17] Defendants filed Joint Objections and Motion to Exclude Jenkins' Evidence, Doc 198, pp. 5-6 which objected to these purported texts as not authenticated.

fact as to whether the relationship was consensual and welcome. Indeed, Jenkins fails to grapple with his own testimony that he enjoyed receiving oral sex; that he achieved orgasm during almost every sexual encounter; that he reciprocated McDickinson's advances and would make the conscious decision to put on a condom; that he would meet her all over town, at all times, and with co-workers, friends, and family present; that he never felt threatened by McDickinson; that he felt comfortable refusing McDickinson's requests if he wanted to - like refusing to break up with his girlfriend and refusing to allow Birchfield to watch; that he never complained or reported McDickinson once during their prolific, months-long affair, and that he himself described the relationship as consensual on multiple occasions, even after being fired. Because the relationship was consensual and welcome, Jenkins's assault and battery, invasion of privacy, and outrage claims all collaterally fail." Appx Vol. 2, Doc 222, p.139. The district court then analyzed the requirements needed to satisfy each tort and the analysis leading to dismissal. *Id.,* pp. 139-40.

## SUMMARY OF THE ARGUMENT

The entry of summary judgment on the state law claims against McDickinson should be affirmed. Jenkins has not identified, at any stage of the litigation, evidence that any alleged sexual activity between he and McDickinson was unwelcomed or otherwise without his consent. Indeed, at the district court and in his Initial Brief, Jenkins has not made any attempt to explain, dispute or otherwise address his testimony describing his conduct responsive to the alleged sexual touchings by McDickinson. This evidence was the basis for defendants' Motions for Summary Judgment  and upon which the district court relied in granting summary judgment on the state law claims. Accordingly, Jenkins waived these arguments.

Classifying Jenkins's argument that the sexual activity was unwelcome is generous, as only two paragraphs of fifty-six pages of his Initial Brief address the state law claims against McDickinson. Jenkins' refusal to identify the specific facts he claims are genuine, material and in conflict, leaves vague allegations for McDickinson to guess at and address in a void. Accordingly, he waived an appeal from the dismissal of the state law claims.

Jenkins presupposes a finding of sexual harassment implies *a fiori* state law violations without reliance on any legal authority or argument. He failed to demonstrate a prima facie case of invasion of privacy, tort of outrage or assault and battery. Jenkins thereby implicitly presupposes if he secures a reversal of the

dismissal of the sexual harassment claim, the state law claims will be reversed. This is a legally incorrect and unsupported supposition.

Only months after he was fired from Koch Foods, Jenkins signed two Declarations Under Penalty of Perjury stating he had a consensual sexual relationship with McDickinson. A year later he filed a Complaint in federal court alleging they had a consensual sexual relationship. Three years later in deposition he attempted to disavow consensual sex with her stating he did not know what "consensual" means. Such an effort violates the Sham Affidavit Rule and should not be allowed. The district court credited those initial Declarations ruling Jenkins admitted to a consensual sexual affair and his conduct confirmed McDickinson's actions were welcome. Jenkins has not disputed any fact from the Record upon which the district court's ruling relied.

The only reasonable interpretation of Jenkins' conduct in reaction to McDickinson's alleged approaches for sex was unambiguous: Jenkins did not walk away from any proposed sex act; he locked the door, returning to behind the desk to accept oral sex; he agreed to meet McDickinson during his personal time and ride in her car; he got in her car at the gas station several times knowing she would put her hand down his pants and fondle his genitalia because they were "messing around" then; he used condoms and experienced orgasms with each encounter, except when they were almost caught; he was with her around friends and family and he never

complained to the Plant Manager, HR clerks, his supervisor or his friends Jackson, Sharpley or Boleware. Even though there were sexual experiences at the plant, no one ever observed them. When asked by Birchfield about sexual activity with McDickinson, Jenkins denied it twice.

Jenkins fails to demonstrate any genuine disputes related to a prima facie case of each of the state law claims, warranting an affirmance of the ruling below. A finding of invasion of privacy is antithetical to the consensual and welcoming nature of the conduct Jenkins exhibited at the time he claims he and McDickinson engaged in sexual activity.  Even absent consensual sex, Jenkins has not pointed to any evidence where McDickinson intruded into private matters; and he does not claim and cannot show the required level of extreme injury to meet a prima facie case.

Outrage requires a similar finding to invasion of privacy in that the intentional conduct must be extreme in degree and outrageous and of such a nature as to be totally intolerable in a civil society. In both invasion of privacy and outrage, the offending actions must cause severe emotional distress to such an extent a reasonable person could not be expected to bear it. These are not requirements to find actionable sexual harassment. Jenkins never experienced any actions, injury or damage of this magnitude. Moreover, his sworn testimony is not consistent with  the narrow types of cases the Alabama law condones as actionable outrage.

A prima facie case of assault and battery requires Jenkins to show McDickinson intentionally touched him in a harmful or offensive manner, the touching had sexual overtones and was unwelcome. Jenkins has described intentional touchings with sexual overtones. However, he failed to carry his burden to show evidence that McDickinson touched him in a harmful or offensive manner or that it was unwelcome. There was no anger expressed by either party to the nine or ten times there were encounters between August or October and March 2016. Moreover, Jenkins did not refuse, except on a few occasions, and denied McDickinson threatened his job if he failed to engage, warranting the finding he welcomed the attention and the sex. In light of the copious and undisputed evidence of Jenkins' consent and the welcoming nature of his conduct toward McDickinson's actions, no reasonable jury could find he was assaulted and battered in the course of alleged sex with McDickinson.

## **ARGUMENT**

## I.    **STANDARD FOR ENTRY OF JUDGMENT AS A MATTER OF LAW**

"Summary judgment is appropriate where the evidence shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Comer v. City of Palm Bay, Fla.*, 265 F.3d 1186, 1192 (11th Cir. 2001), quoting Fed. R. Civ. Proc. 56(c). Genuine disputes are those in which a reasonable jury could return a verdict for the non-movant. *Ellis v. England*,

432 F.3d 1321, 1325 (11th Cir.2005). (citations omitted). Factual issues are only genuine if supported by the Record. Mere conclusions or unsupported factual assertions cannot defeat a motion for summary judgment. *Id.* (citations omitted). "Evidence that is merely colorable, or not significantly probative of a disputed fact, is insufficient to create a genuine issue of material fact." *Kohser v. Protective Life Corp.*, 649 Fed. Appx. 774, 777 (11th Cir.2016), citing *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

The entire exercise provided by Fed. R. Civ. P. 56(c) is to tease out the viable issues that should go to a jury. Judgment as a matter of law is warranted in the absence of any disputed fact which is material to the claims. *See Dates v. Frank Norton, LLC d/b/a Milo's Hamburgers,* 190 F. Supp. 3d 1037, 1042 (N.D. Ala. 2016)(Once the movant meets the burden of showing the absence of a genuine issue of material fact, the non-movant must produce "significant, probative evidence demonstrating the existence of a triable issue of fact.") quoting *Fitzpatrick v. City of Atlanta,* 2 F. 3d 1112, 1115 (11th Cir. 1993).

In its *de* novo review, the court will draw "all inferences and review all evidence in the light most favorable to the non-moving party." *Hamilton v.*

*Southland Christian School, Inc.*, 680 F. 3d 1316, 1318 (11th Cir. 2012) quoting *Moton v. Cowart,* 631 F. 3d 1337, 1341 (11th Cir. 2011); *Ellis,* 432 F. 3d at 1325. Despite the deference provided, the non-moving party is only entitled to reasonable inferences and is not entitled to unreasonable assumptions. *Brantley v. Int'l Paper Co.*, CV 2: 09-230-DCR, 2017 WL 3325085, at *5 (M.D. Ala. Aug. 3, 2017), citing *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1141 (11th Cir. 2014). Jenkins has not met his burden so dismissal should be affirmed.

## II.    JENKINS WAIVED ARGUMENT ON THE DISMISSAL OF THE STATE LAW CLAIMS

### A.    Dismissal Of State Law Claims Waived At District Court

Jenkins failed to raise an argument before the district court that a genuine dispute as to his conduct in response to alleged sexual activity by McDickinson showed anything but that the sex was welcome. Beyond merely making an unsupported claim that a material fact existed as to "whether Jenkins welcomed McDickinson's unrelenting sexually (sic) harassment," there was no argument. The most Jenkins could offer was a reference to the two having "sexual intercourse" in the receiving department; and his fear, expressed for the first time four years later, that putting his hand on her would cause him to go back to prison. *See* Doc 194, p. 57, citing Doc 182-2:33, Jenkins Dep., 120:17-121:2. ("Put my hand on her? No. Push her and go back to prison? No. I just – I don't know, man. I just had got a blessing to get a job and I wanted to keep it. God blessed me with a job. So I just –

I went along what (sic) she asked me, what she did. She said she had me, man. She got me.") He did not attempt to explain or provide a reasonably different meaning to his own sworn descriptions about how he acted in response to the alleged sexual activity of McDickinson. Jenkins' unresponsive argument on the issue is antithetical to his responsibility to allow the district court to meet its obligation to consider the "totality of the circumstances" in ruling on judgment as a matter of law. *See Davis v. Williams,* 451 F. 3d 759, 763 (11th Cir. 2006)("At summary judgment stage, courts view the totality of the circumstances in the light most favorable to the nonmoving party.")

When addressing the state law claims before the district court, Jenkins pointed only to his being a "subordinate" to McDickinson, as opposed to his being a former prisoner, as the inferential basis for his "inability" to resist the alleged sexual activity. Doc. 194, Jenkins' Opposition to Summary Judgment, p. 59. By simply detailing cherry-picked actions that McDickinson took regarding sex, and noting he felt "blessed to have a job," Jenkins does not satisfy his burden to show his conduct reflected the sex was unwelcomed. *See, e.g., Miles v. City of Birmingham,* 398 F. Supp. 3d 1163, 1180 (N.D. Ala. 2019) cited by the district court in this case, saying the "crux of the welcomeness inquiry" is whether the "employee's conduct indicated that the sexual advances were unwelcome" not whether the relationship is characterized as unwelcome after-the-fact." Appx. Vol. 2, Doc 222, p. 133.

Jenkins did not articulate any genuine dispute of fact to advocate before the district court that the state law claims of assault and battery, invasion of privacy or tort of outrage should be sent to a jury. This failure resulted in a waiver of those claims. Specifically, on the claim for invasion of privacy, Jenkins referred to "McDickinson's action, sexual demands, and comments as an intrusion into Jenkins' private matter . . . ." without pointing to what this conduct was and why the evidence could be interpreted to show Jenkins did not welcome her actions. Doc. 194, Jenkins; Opposition to Summary Judgment, p. 60.

The assault and battery "argument," included the description of some of the actions McDickinson allegedly took toward Jenkins but did not mention one discrete act of consent the defendants argued.[18] Doc. 194, Jenkins' Opposition to Summary Judgment, pp. 60, 62. Jenkins attributed three sentences of justification for the tort of outrage, none of which addressed any of his conduct at the time indicating he found McDickinson's actions unwelcome. Likewise, without citation to any law or fact about the exercise of  McDickinson's "power" over Jenkins, nothing was mentioned about the nature of his responses and reactions to her at the time they occurred, regardless of their relative job positions. *Id.*, p. 64.

There were no citations to the record to support Jenkins' claims about an abuse of power. There is no record support for the notion that McDickinson threatened

---

[18] *See, e.g.,*  Doc. 177-1, McDickinson's Brief in Support of Summary Judgment, pp.14-22, 34-5.

Jenkins's job if he did not agree to have sex with her. Jenkins had the legal obligation to make arguments responsive to the issues in the Motion for Summary Judgment and failed. In a summary judgment context, "the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F. 3d 587, 599 (11th Cir. 1995) quoting *Road Sprinkler Fitters Local Union No. 699 v. Indep. Sprinkler Corp.,* 10 F. 3d 1563, 1568 (11th Cir. 1994).

By not fully addressing what defendants claimed was his consensual and welcome conduct toward McDickinson's alleged sexual activity, which was the basis for the Motion for Summary Judgment, Jenkins waived the right to appeal the district court's ruling. *See Webb-Edwards v. Orange Cnty. Sheriff's Office,* 525 F. 3d 1013, 1030 (11th Cir. 2008)(explaining the "raise or waive" rule in the context of an objection at trial); *Eldridge v. Gordon Brothers Group, L.L.C.,* 863 F. 3d 66, 83 (1st Cir. 2017)(claim based on implied-covenant was waived when plaintiff failed to submit an argument in district court to defendant's partial summary judgment to reject implied covenant in its entirety).

The district court highlighted this omission noting Jenkins failed to "grapple with" the evidence that belied his claim of unwelcome sex. Appx. Vol. 2, Doc 222, pp. 133-34, 139. Jenkins did not file a Motion to Reconsider the dismissal to take a last chance to dispute the evidence or district court's ruling reflecting he welcomed

the sex at the time it was offered. Accordingly, Jenkins waived the issue of whether he consented to or found unwelcome the sexual activity of McDickinson toward him.

### B.    Dismissal Of State Law Claims Waived On Appeal

Even if Jenkins raised sufficient argument about the conduct he described and the district court found to be consensual and welcome, which McDickinson denies, he failed to make the argument on appeal with respect to the state law claims, causing waiver. Pointing to his federal claims arguments with "[a]s discussed above," Jenkins offered a "passing reference" and not an "argument" concerning the district court's ruling on the state law claims. *See* Jenkins' Initial Brief, p. 67. With the implicit mandate to address on appeal the actions showing consent and the welcomed conduct of the alleged sexual activity, Jenkins does not mention, try to explain, distinguish or show a dispute surrounding any of those discrete actions identified at Appx. Vol. 2, Doc 222, pp. 133-34, 138-39. *See Sindi v. El-Moslimany,* 896 F. 3d 1, 27 (1st Cir. 2018) holding "[w]hen a party's contentions 'lack both coherence and development,' we ordinarily deem them procedurally defaulted. *Marek v. Rhode Island,* 702 F. 3d 650, 655 (1st Cir. 2012)(citing [*U.S. v.*] *Zannino,*895 F. 2d [1], 17 [(1st Cir. 1990)]. This principle, sometimes inexactly called the 'raise-or-waive-rule,' is 'founded upon important considerations of fairness, judicial economy and practical wisdom.' *Nat'l Ass'n of Soc. Workers v. Harwood,* 69 F. 3d 622, 627 (1st

41

Cir. 1995);"[19] *Norelus v. Denny's, Inc.,* 628 F. 3d 1270, 1296-97 (11th Cir. 2010)(stating it is "by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.")

Jenkins did not posit, much less cite to legal authority, challenges to the district court's ruling that the consensual and welcome nature of Jenkins' conduct was a defense to the intentional torts. Appx. Vol. 2, Doc 222, pp. 139-140. For instance, the  most Jenkins could write about the district court's reliance on his sworn, written testimony in 2016 Declarations that the relationship was "consensual," was, without explanation, his implicit disavowal by saying in his deposition he did not know what "consensual" means. Jenkins' Initial Brief, p. 67. He did not point to any evidentiary dispute nor use one drop of ink to challenge the analysis of the state law claims as error.

Accordingly, Jenkins' appeal as to the state law claims and any issue arising from them are waived. *See Hosch v. Wachovia Bank, N.A.,* 815 Fed. App'x, 352, 354 (11th Cir. May 18, 2020)(Several arguments waived for failure to adequately raise and brief issues) citing *Hamilton v. Southland Christian Sch., Inc.,* 680 F. 3d 1316, 1318 (11th Cir. 2012)("passing reference to an issue in a brief is insufficient to

---

[19] Despite its citation of the rule, the majority on the panel found good cause to nevertheless allow the challenged injunction involving "purely legal questions" and "critical issues  . . . virtually certain to arise in future defamation cases," to be heard on appeal. *Sindi,* 896 F. 3d at 28.

raise that issue, "and the failure to make arguments and cite authorities in support of an issue waives it."); *Jysk Bed 'N Linen d/b/a By Design Furniture v. Roy,* 787 Fed. App'x 608, 611-12 (11th Cir. Sept. 23, 2019)(failure to argue district court's grant of summary judgment on a claim supported by cited legal authority, "is insufficient to preserve the issue on appeal" and amounts to abandonment of the claim); *Wright v. Transportation Security,* 265 Fed. App'x 894, 895 (11th Cir. Feb. 21, 2008)(party must "clearly identify the issues presented for review with citations to the authorities and portions of the record on which the appellant relies."); *Toevs v. Reid,* 685 F. 3d 903, 911 (10th Cir. 2012)("Arguments not clearly made in a party's opening brief are deemed waived.")   The court in *Hamilton* explained the reasoning of what is essentially the "raise-or-waive rule," saying:

> The requirement that issues be raised in a party's brief on appeal promotes careful and correct decision making. It ensures that the opposing party has an opportunity to reflect upon and respond in writing to the arguments that his adversary is raising. And it gives the appellate court the benefit of written arguments and provides the court and the parties with an opportunity to prepare for oral argument with the opposing positions and arguments in mind. It is not too much to ask of an appellant or appellee.

680 F. 3d at 1319.

Jenkins' accusation the district court weighed the evidence or employed credibility assessments has no legal traction in the absence of his identification of and argument about even one such dispute as it relates to the state law claims. In any case, a claim the district court committed reversible error by weighing the evidence

and employing credibility assessments in ruling on summary judgment is subsumed

in a *de novo* review of the decision. *Moorman v. UnumProvident Corp.,* 464 F. 3d

1260, 1266 n1 (11th Cir. 2006).

    For his failure to properly address the state law claims in his Initial Brief with

argument and citations, the dismissal as to those claims is due to be affirmed.

## III.    ASSUMING ARGUENDO JENKINS PRESERVED AN ARGUMENT ON THE STATE LAW CLAIMS, HE FAILED TO PROVIDE SUBSTANTIAL EVIDENCE ANY STATE LAW CLAIM SHOULD BE SUBMITTED TO A JURY

### A.    Jenkins Has Not Presented a Prima Facie Case of Invasion of Privacy

    Jenkins apparently relies upon the same factual allegations to support a state

law claim of invasion of privacy as for his claim of sexual harassment.  Alabama

does not recognize sexual harassment as an actionable claim. *Machen v.*

*Childersburg Bank Corporation,* 761 So. 2d 981, 983 n.1 (Ala. 1999), but in *Phillips*

*v. Smalley Maintenance Servs., Inc.,* 435 So. 2d 705, 708 (Ala. 1983)*,* recognized "a

cause of action for invasion of privacy stemming from sexual harassment."

*Stevenson v. Precision Standard, Inc.,* 762 So. 2d 820, 826 (Ala. 1999).  The *Phillips*

court held: "extensive egregious inquiries into one's sex life, coupled with intrusive

and coercive sexual demands, constituted a wrongful intrusion into one's private

activities sufficient to impose liability for invasion of privacy. *Stevenson*, 762 So. 2d

at 826. The tort imposes liability for the "intentional wrongful intrusion into one's

private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *See Johnson v. Corporate Special Services, Inc.,* 602 So. 2d 385 (Ala. 1992). To prove this tort, a plaintiff must show: "(1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Booker v. Winn-Dixie Montgomery, LLC,* No. 11-00407 * 40 (S. D. Ala. Nov. 6, 2012) quoting Ex parte *Atmore Cmty. Hosp.,* 719 So. 2d 1190, 1194 (Ala. 1998)(citing *Busby v. Truswal Sys. Corp.,* 551 So. 2d 322, 323 (Ala. 1989).

This court should affirm the district court's finding that a consensual sexual affair is antithetical to invasion of privacy. Appx. Vol. II, Doc 222, p.140. Jenkins would have the court impose the *Meritor*[20] requirement that there must also be a finding the sex was unwelcome but does not cite authority for this claim. Even so, the district court made such a finding and the undisputed facts support it. The tort simply <u>may</u> arise from claims of sexual harassment, a finding of which does not infer invasion of privacy. For all of the sex acts Jenkins describes, there is very little conversation and no acts of McDickinson prying into his personal life with Ms. Foxhall, or otherwise. McDickinson smoked outside with both of them – she knew they were a couple and they knew she was married and had children. Beyond those

---

[20] *Meritor Savings Bank v. Vinson, 477 U.S. 47 (1986);* Jenkins' Initial Brief pp. I, 40, 49, 50,53.

45

benign exchanges, there was no effort by McDickinson to intrude upon Jenkins' solitude and into his personal life.  Of course, the sex acts described, primarily of McDickinson providing gratification for Jenkins, involve her touching his genitalia when his only objections had to do with his concern of being caught.

Jenkins has given plenty of examples that he considered he and McDickinson to be having a personal and consensual relationship, beyond the sworn Declarations where he wrote it plainly. Any sex she performed on him was welcomed and enjoyed by him.  A prominent example is his testimony about being discovered by his friend, Boleware, with Milam while McDickinson is allegedly performing oral sex on him on the couch – he did not jump up in embarrassment or try to shame her because he was humiliated.  Instead, he asked them to at least go in the bathroom so they would not be watching – not asking McDickinson to stop. An essential element of the tort is comprised of the prying into a person's personal life, or their intimate experiences. This is not shown by their voluntarily creating more intimate moments.  Jenkins took the most umbrage at McDickinson mentioning his prison past and touching his dreads when his fiancé was present than with any sex act or mention of one. *See, e. g.,* Doc. 176 - 19 - Jenkins Dep., 69:274:12 - 275:13.   Asked about any statement McDickinson made while they were being intimate, Jenkins told of smoking at work with her on the clock. (She did not work on a clock.) Yet when they met at the gas station after work, Jenkins on about three occasions went and sat in her car, expecting

46

her intimate touch "[b]ecause we're messing around now, you know." Doc. 176 – 19, Jenkins Dep., 29:107:14 – 108:8. He received an erection each of these times as she allegedly put her hand down his pants and rubbed his penis. Doc. 176 – 19, Jenkins Dep., 30:111:14 – 112:13. He not only did not object but willingly went and got in her car several times.

This welcoming conduct is not consistent with acts contemplated for an actionable invasion of privacy claim. *See, e.g., Armstrong v. Standard Furniture,* 197 F. App'x 830, 834 (11th Cir. 2006) citing *Phillips v. Smalley Maintenance Servs., Inc.,* 435 So. 2d 705, 708 (Ala. 1983); *Livingston v. Marion Bank & Trust*, 30 F. Supp. 3d 1285, 1322-23 (N.D. Ala. 2014)(Bank president groping his secretary, regularly asking for sex, asking about plaintiff's personal sexual life). One plaintiff in *Armstrong* testified the defendant regularly made sexual comments in the workplace, daily asked to have sex with her, groped her while she was working, and asked if she was menstruating because he wanted some "cat." *Armstrong,* 197 F. App'x at 834. The Eleventh Circuit held a jury could find these facts met the threshold requirement of the wrongful intrusion tort. *Id.* These facts differ in tone and substance from what Jenkins referred to as a "sexual relationship," (Doc. 176 – 10, p. 1 ¶4) which he kept quiet and purportedly experienced for at least five or more months. Moreover, there is no evidence McDickinson regularly approached Jenkins for sex. He testified to some nine to ten times over five or as many as eight months.

47

McDickinson's alleged invitation to allow Birchfield to watch Jenkins have sex with her likewise does not meet the threshold for a prima facie case of invasion of privacy. Jenkins rejected the invitation. Additionally, the invitations did not ask about his sex life and intimate moments with his fiancé, nor were they designed to humiliate him or cause him mental suffering. And, according to Jenkins[21] and his fiancé, he did not suffer mentally or emotionally in refusing the offer. Only when he lost his job for violating the rules did he suffer at all. *See* Appx. Vol. II, Doc. 222, p. 138, n.12 explaining these invitations did not provide a prima facie case. The dismissal of the claim for invasion of privacy is due to be affirmed.

### B.    Jenkins Has Not Presented A Prima Facie Case of Outrage

The tort of outrage is also known as "intentional infliction of emotional distress" under Alabama law and requires the underlying facts establish: "that [the defendant's] conduct was '(1) intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'" *Harrelson v. R.J.*, 882 So. 2d 317, 322 (Ala.2003) (quoting *Thomas v. BSE Indus. Contractors, Inc*., 624 So. 2d 1041, 1043 (Ala.1993)). *See Short v. Mando American Corp*., 805 F.Supp.2d 1246 (M. D. Ala. 2011) stating: " Indeed, both the conduct complained of and the emotional distress caused by it must be extreme, a standard which has been 'strictly' applied by the Supreme Court of

---

[21] *See* Doc. 176 - 19 – Jenkins Dep., 120:318:18-319:18.

Alabama." *Saville v. Houston Cnty. Healthcare Auth.*, 852 F. Supp. 1512, 1541 (M

.D. Ala.1994) (Thompson, J.) (citations omitted);    *Portera v. Winn-Dixie of

Montgomery, Inc.,* 996 F. Supp. 1418, 1435 (M. D. Ala. 1998).   The claim is

actionable only in limited circumstances. *Thomas,* 624 So. 2d at 1044 (recognizing

"egregious sexual harassment" qualifies). The test of a claim's legal viability is

whether the facts are "so extreme in degree as to go beyond all possible bounds of

decency and be regarded as atrocious and utterly intolerable in a civilized society."

*Wilson v. Health Services Fd., P.C.,*  266 So. 3d 674, 677 (Ala. 2017) quoting *Little*

*v. Robinson*, 72 So. 3d 1168, 1172–73 (Ala. 2011)(citations omitted), *accord Tinker*

*v. Beasley,* 429 F. 3d 1324, 1330 (11th Cir. 2005); *Surrency v. Harbison,* 489 So. 2d

1097, 1105-06 (Ala. 1986).

Jenkins' testimony is vague, untethered by timing of any event and, where it

may mention a known fact, fails to provide any appreciable context.  What is plain is

that to the extent the sex acts he described occurred as he said, he was a willing

participate.  Jenkins' facts do not fit within the narrow factual application the tort of

outrage is allowed in Alabama.   The district court correctly held "a consensual

relationship is not a form of 'egregious sexual harassment' as required by an outrage

claim." Appx. Vol. II, Doc. 222, p. 140. Moreover, Jenkins has not shown an

intention by McDickinson to inflict emotional distress, or that the conduct he

described was outrageous, extreme or utterly intolerable in a civil society. *Edwards v. Hyundai Motor Mfg., Ala., LLC,* 603 F. Supp. 2d 1336, 1354 (M.D. Ala. 2009).

Notably, the fact McDickinson was the HR Manager for the Debone Plant did not convert the consensual sexual relationship into a claim for outrage. She was not a working supervisor to him who could control his work throughout the day as was the case in *Cooke v. Stefani Mgmt. Servs., Inc*., 250 F. 3d 564 (7th Cir. 2001).  He was then free to claim a need to be somewhere else in the plant for work; he had friends in Jackson, Sharpley and Boleware to whom he never complained; he willingly met McDickinson to ride or sit in her car in Montgomery; he expected to be touched by her when in private; and he admitted he continued in the relationship, even if he does not know if it was because he received benefits. There is no Record evidence McDickinson knew about Jenkins' prison past or that such a fact would make him vulnerable to having sex with her. No reasonable jury could  find outrageous conduct on these facts so the dismissal should be affirmed.

### C.    Jenkins Has Not Presented A Prima Facie Case of Assault or Battery

The prima facie case of assault and battery requires an intentional touching done in a harmful or offensive manner. Ex parte *Atmore Cmty. Hsp.,* 719 So. 2d 1190,1193 (Ala. 1998); *Surrency v. Harbison,* 489 So. 2d 1097 (Ala. 1986).  Where the touching carries sexual overtones, the question of liability turns on whether it

was welcome or not. *Atmore Cmty. Hsp.,* 719 So. 2d at 1193. The analysis must address the actions of the alleged victim at the time of the alleged sexual assault.

There is no evidence, even a denial by Jenkins, that he recoiled from McDickinson's touch, or ran from the car at the gas station where he got into her car expecting her to touch and fondle his genitalia, because as he said, "We're messing around now." Jenkins told his co-worker Sharpley in speaking about McDickinson, "The old girl dig me." Doc. 189-2, Sharpley Dep., Doc. 176 - 25 - Sharpley Dep., p. 15:60:3-12. Jenkins acknowledged he continued with the relationship but not because McDickinson exercised any threat of power over him by virtue of being the HR Manager, directing his work, or his personal life. By way of example, Jenkins refused to meet McDickinson on several occasions, refused to leave his fiancé when she suggested he do so, refused to let Birchfield watch them have sex, and backed away when he found out she was in a relationship with Birchfield. After what he claims was at least a five months affair, he swore it was consensual, claimed the same in his lawsuit but four years later attempted to withdraw that consent on the premise he does not know the meaning and convert his experiences into repeated assaults and batteries. These claims are simply untenable on the Record.

Jenkins' suggestion, with respect to the state law claims, that this exercise was "weighing the evidence" or utilizing "credibility determinations" is not supported

51

by any reference to a disputed material fact that was resolved by the district court. Only Jenkins' contradictory testimony could be suggestive of a disputed fact.

## IV.    CONCLUSION

In light of the foregoing, Melissa McDickinson urges the court to affirm the dismissal of all state law claims pursuant to 56(c), Fed. R. Civ. P.

Submitted: August 15, 2022

/s/ *Marion F. Walker*
Marion F. Walker

Of Counsel
(ASB L73M-0734)
**FISHER PHILLIPS LLP**
2100A South Bridge Parkway
Ste. 650
Birmingham, Alabama 35209
Telephone:  (205) 327-8534
Facsimile:  (205) 718-7607
Email:mfwalker@fisherphillips.com

Andrew J. Baer, *Pro Haec Vice*

Of Counsel
(LAB 35632)
**FISHER PHILLIPS LLP**
201 St. Charles Avenue
Suite 3710
New Orleans, LA 70170
Telephone (504) 522-3303
 Facsimile (504) 529-3850
abaer@fisherphillips.com

## **CERTIFICATE OF COMPLIANCE**

I certify this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B)(1), Fed. R. App. Proc., in that, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. Proc., this brief contains 12,600 words.

I further certify this brief complies with the typeface requirements of Rule 32(a)(5), Fed. R. App. Proc., and the type-style requirements of Rule 32(a)(6), Fed. R. App. Proc., in that this document has been prepared using Word 14-point font in Time New Roman.


/s/*Marion F. Walker*
Marion F. Walker (ASB L73M-0734)
Attorney for Appellee
Melissa McDickinson

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Charles E. Guerrier<br>ceguerrier@haynes-haynes.com<br>Haynes & Haynes, PC<br>1600 Woodmere Drive<br>Birmingham, AL 35226<br><br>Heather Newsom Leonard<br>Heather@HeatherLeonardPC.com<br>Heather Leonard, P.C.<br>2105 Devereux Circle, Suite 111<br>Birmingham, AL  35243<br><br>Cynthia Forman Wilkinson<br>cwilkinson@wilkinsonfirm.net<br>Wilkinson Law Firm P.C.<br>1317 Third Avenue North, Suite A<br>Birmingham, AL 35203<br><br>Alicia Kay Haynes<br>akhaynes@haynes-haynes.com<br>Haynes & Haynes, PC<br>1600 Woodmere Drive<br>Birmingham, AL  35226<br><br><br>*Attorneys for Plaintiff* | Rachel V. Barlotta<br>rbarlotta@bakerdonelson.com<br>Sharonda C. Fancher<br>sfancher@bakerdonelson.com<br>Baker, Donelson, Bearman,<br>Caldwell & Berkowitz, P.C.<br>Wells Fargo Tower<br>420 North 20th Street, Suite 1400<br>Birmingham, AL  35203<br><br>*Attorneys for Defendants Koch Foods, Inc.*<br>*And Koch Foods of Alabama, LLC* |

/s/ Marion F. Walker
Marion F. Walker